Exhibit A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| KRISJENN RANCH, LLC, Debtor. | CASE NO: 20-50805-rbk<br>San Antonio, Texas<br>Thursday, June 4, 2026<br>1:18 p.m. to 3:12 p.m. |

HEARING

BEFORE THE HONORABLE RONALD B. KING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Debtor: | RONALD J. SMEBERG<br>Smeberg Law Firm, PLLC<br>4 Imperial Oaks<br>San Antonio, TX 78248 |
| | CHARLES JOHN MULLER, IV<br>Chamberlain Hrdlicka White Williams & Au<br>111 W. Sunset Road<br>San Antonio, TX 78209 |
| For Express H2O Pipeline & Row, LLC: | HERBERT C. SHELTON, II<br>Hayward PLLC<br>7600 Burnet Road<br>Austin, TX 78757 |
| | HOLLI PRYOR-BAZE<br>Skelton Slusher Barnhill Watkins Wells<br>1616 S. Chestnut Street<br>Lufkin, TX 75901 |
| For U.S. Trustee: | JIM ROSE<br>US Trustee's Office<br>615 E. Houston<br>San Antonio, TX 78295 |

For DMA Properties, Inc. and Longbranch Energy LP:
LOURDES LULU ORTIZ
Cleveland Krist PLLC
303 Camp Craft Road
West Lake Hills, TX 78746

CHRIS JOHNS
Johns & Counsel PLLC
13341 W. U.S. Highway 290
Austin, TX 78737

ALSO APPEARING: MR. SACHITANO

Court Reporter: UNKNOWN

Courtroom Deputy: UNKNOWN

Transcribed by:
Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

SAN ANTONIO, TEXAS; THURSDAY, JUNE 4, 2026; 1:18 PM

(Call to Order)

CLERK: This is the United States Bankruptcy Court of the Western District of Texas. Today is the 4th of June 2026 where the Honorable Ronald B. King will be presiding in San Antonio, Texas to hear a San Antonio matter, 20-50805.

THE COURT: (Indiscernible) San Antonio, our 2 o'clock case is KrisJenn Ranch LLC, No. 20-50805. Just going to get announcements from those of you that intend to speak.

MR. SMEBERG: Good afternoon, Your Honor. Ron Smeberg. I am the withdrawing counsel for KrisJenn Ranch and the other debtors.

THE COURT: All right.

MR. MULLER: Your Honor -- good morning, Your Honor. Apologies. John Muller on behalf of the same parties.

THE COURT: All right.

MR. SHELTON: Your Honor, this is Charlie Shelton with Hayward PLLC, appearing on behalf of Express H2O and Larry Wright.

THE COURT: All right. Ms. Pryor-Baze, I think you're muted or not working sound. Yeah, we still can't hear you. You might want to check on that. Ms. Ortiz, are you representing DMA and --

MS. ORTIZ: Yes, Your Honor. Lulu Ortiz on behalf of DMA, Mr. Moore and Longbranch, and I'm here with my colleague, Chris Johns.

THE COURT: Okay, and Mr. Sachitano, you're with H2O?

MR. SACHITANO: Yes, Your Honor. I don't intend to speak today, but I'm the manager of Express H2O.

THE COURT: All right, and Mr. Rose with the U.S. Trustee?

MR. ROSE: Yes, Your Honor. Jim Rose here for the U.S. Trustee.

THE COURT: Okay. Ms. Pryor-Baze, were you able to get your sound working?

MS. PRYOR-BAZE: I hope so, Your Honor. Can you hear me?

THE COURT: There you go.

MS. PRYOR-BAZE: Okay.

THE COURT: We can hear you.

MS. PRYOR-BAZE: Thank you very much. I'm appearing for the same parties Mr. Shelton (indiscernible).

THE COURT: Let me say first, that we have limited things that we're hearing today. We're not hearing the merits, as you all are aware. We have two motions for continuance and two motions to withdraw. So, we'll just do them all at the same time, if that's okay. I don't want to

have inconsistencies for any reason. But Mr. Smeberg and Mr. Muller have both filed motions to withdraw. I think Mr. Muller actually withdrew from the adversary a couple of years ago. Is anyone objecting to the two motions to withdraw by Mr. Smeberg and Mr. Muller?

MS. ORTIZ: Your Honor, we didn't object originally. Our only concern at this point, on behalf of GMA and Longbranch is that, to the extent a continuance is being sought precisely because of the withdrawal of counsel from representing KrisJenn. We just want to make sure that that is not going to cause an excessive delay.

THE COURT: Okay. So, who would be speaking on behalf of the Debtor here, KrisJenn? I mean, would that be -- obviously, Mr. Smeberg and Mr. Muller are trying to withdraw. Mr. Shelton, are you representing KrisJenn?

MR. SHELTON: No, I'm not, Your Honor. So, that's precisely -- well, that's the issue. When I was engaged, and I can share the engagement agreement, it's not a secret, it's very clear that I only represented Express H2O and Larry Wright. I think there was one hearing in the adversary proceeding. It may have been related to a motion for protective order in which I announced for KrisJenn, and that was in the adversary proceeding. Shortly after that, we had a hearing in which, I forget who it was, maybe Austin Krist, indicated that I represented KrisJenn and I tried to

clarify the record, this was almost a year ago, that no, I actually don't. I represented them for that one discreet issue, but that was the end of it. And so, if the -- and to be clear, I'm not opposed to the withdrawals. But if they're allowed today, then KrisJenn will just be a classically unrepresented entity. I have started the conversation with Mr. Wright to ask the question, do you want me to represent KrisJenn in this order to show cause, and if so, how are you going to pay it, how much is it (indiscernible)?

THE COURT: Well, that's next week as I was alluding to a minute ago. That's not today.

MR. SHELTON: I understand. Yeah, and I'm not getting today, but my point is, the actual -- my engagement was pretty clearly constrained to just express -- sorry, yeah, to express -- one too many entities for me, to just Express H2O and Larry Wright. And so, I've started that conversation with Mr. Wright. As of today, I haven't been engaged, I haven't been paid a retainer, I haven't even been asked to do it. So, I don't --

THE COURT: And nobody else is representing, other than the two that are withdrawing, anyone else on this call today is representing to the Debtor, KrisJenn, right?

MR. SHELTON: I believe that's correct, Your Honor.

THE COURT: Okay. And so, Ms. Ortiz, you don't object to withdrawal unless it ends up delaying things?

MS. ORTIZ: Yes, Your Honor. I think we just don't want to end up in a situation where this is delayed indefinitely when KrisJenn should be able to relatively, easily found counsel given that Mr. Wright or the principal has all of these very esteemed colleagues in the field with us.

THE COURT: Okay. Mr. Smeberg, you have been involved since 2022, right, and pretty much the same for you, Mr. Muller, maybe 2024 for you, Mr. Muller?

MR. MULLER: Yes, Your Honor.

THE COURT: Okay. All right. Well, my inclination is to let them out, let them withdraw. They don't know what's happened in the case in the last two years. We'd have to catch them up and we're not even sure that Mr. Wright or any others involved in KrisJenn would want to hire them at this point or retain them in the case. Mr. Rose, you didn't have any objection to the two motions to withdraw?

MR. ROSE: Your Honor, Jim Rose for the U.S. Trustee. Your Honor, my only concern is the local rule about a corporate debtor not being able to be pro se. KrisJenn would need to find another attorney, I would think. That's the only concern I have.

THE COURT: Right. Okay.

MR. JOHNS: Your Honor, this is Chris Johns, and I apologize I'm not showing my face. I'm on the way to a funeral right now.

THE COURT: Okay.

MR. JOHNS: But I do have a question that's a little perplexing. You'll remember that counsel who was on this phone, represented to the Court that KrisJenn was -- you know, didn't even exist anymore. And so, I'm curious whether that's -- you know, what's true and what isn't. And I'm a little concerned about having a hangup over finding counsel for an entity that, unless I've misunderstood things, doesn't even exist. So, that's kind of confusing to me and it doesn't seem like a good basis for continuing the hearing that we have scheduled for next week. But if -- you know, obviously, if KrisJenn doesn't exist, as has been represented by at least a couple of the counsel for the other side, then I don't see how I can object to the withdrawal of counsel for an entity that doesn't even exist.

THE COURT: Okay. Well, I don't independently know what has happened to KrisJenn, LLC and it would not be appropriate for me to go do any outside-the-record research to find out. But my speculation, from the hearings that we've had, is that they quit paying the franchise taxes, and so it got forfeited or terminated by the Secretary of State.

But I don't know that to be the case, that's just my belief based on what I've heard from hearings over the past two or three years. So, Mr. Shelton, do you know?

MR. SHELTON: I don't, Your Honor.

THE COURT: Okay.

MR. SHELTON: I'm not entirely sure that an entity that once existed that has forfeited its charter by some sort of -- other than, maybe, a direct termination, but even in that case, I'm not entirely sure that that entity can't still hire counsel. That's kind of what's being implied by Mr. Johns' statement. I don't know that to be true, but I do understand the point that --

THE COURT: Yeah, well --

MR. SHELTON: -- if somebody's going to stand up in Court and make a representation on behalf of KrisJenn, that they should be able to at least articulate the legal basis by which KrisJenn -- sorry, yeah, by which KrisJenn could make those statements.

THE COURT: Yeah. This question would make a good question for a moot court competition on what happens when the Chapter 11 reorganized debtor loses its charter and the case converts to 7. So, it might make an interesting legal issue. My understanding is it doesn't have to have a charter for there to be a Chapter 7 estate, so, I'll just tell you that. Otherwise, I wouldn't have done the show

cause order. But I'll listen and look at any authority that anybody has on this. But after some preliminary review, I don't think you get out of the plan by letting your charter get forfeited. If it converts to 7, I think there still can be a Chapter 7 estate. That's all I'm saying. But if somebody's got authority to the contrary, I'll certainly be glad to look at it and change my mind if it's persuasive.

Okay. Well, Mr. Smeberg and Mr. Muller, there's no reason to delay you any further. Your motions can be granted today, and I can sign your orders. So, you can be on your merry way if you want to drop off now.

MR. SMEBERG: Thanks, Your Honor.

MR. MULLER: Thank you, Your Honor.

THE COURT: Okay. But we did have a memorable trial. Everybody got Covid and even though it was on Zoom or Webex or whatever, everybody got sick. But it wasn't my fault because I didn't make you come to Court.

MR. MULLER: Correct.

MR. SMEBERG: Yeah, it was interesting.

THE COURT: All right.

MR. SMEBERG: Thank you, Your Honor.

THE COURT: Good luck. Feel free to drop off. All right, let's talk about the motion for continuance. So, I think the first one was filed by you, Mr. Shelton, or -- oh, the other one was filed by Mr. Smeberg, so --

MR. SMEBERG: Yeah.

THE COURT: -- we can just moot his motion. He represented the Debtor but no longer represents the Debtor. So, go ahead, Mr. Shelton.

MR. SHELTON: Yeah, Your Honor. There's -- sort of, it comes in two parts and the first is the one that we just talked about which is that KrisJenn apparently, as of today, has no counsel for the main bankruptcy case.

THE COURT: Let's go back one step before we get to your arguments, and I'll listen to everything you have to say. But is Express H2O a party in interest in this case? It's not a creditor.

MR. SHELTON: Is Express a party in interest?

THE COURT: Does it have standing to come in and object to anything in the case? I mean, you all have been arguing legal points for what, a couple of years now, but do you have standing? Are you a party in interest?

MR. SHELTON: In the main bankruptcy case?

THE COURT: Yes.

MR. SHELTON: I would need to think about that a little bit more. Certainly, Larry Wright does as of --

THE COURT: Okay. You represent Mr. Wright?

MR. SHELTON: I do, Your Honor, yes.

THE COURT: Individually?

MR. SHELTON: Correct.

THE COURT: Okay. All right.

MR. SHELTON: I can -- I need to think longer. I had thought through this exact question about four or five days ago and I forgot where I came down on. I came down on yes, but I'm having a hard time pulling the top of my mind why.

THE COURT: Okay.

MR. SHELTON: But nonetheless --

THE COURT: That's always an important thing because you hate to try a case and it go to the Fifth Circuit and them say, "You idiot. There's no standing here. It's all dismissed." So, we don't want that to happen on appeal.

MR. SHELTON: Understood. Well, to be clear, the motion could stand on just Larry Wright's property --

THE COURT: Okay.

MR. SHELTON: -- I think on its own. I believe --

THE COURT: All right. Well, go ahead.

MR. SHELTON: My apologies. Go ahead, Your Honor.

THE COURT: That's -- yes, go ahead.

MR. SHELTON: The -- so, nonetheless, the thrust of the motion comes in two components. The first one is, sort of, I think, fairly basic and Mr. Rose talked about the Local Rules saying that a corporate entity can't appear without counsel (indiscernible).

THE COURT: Right. If it's converted to 7, it's got to get counsel, at least to update the schedules and do some minimal representation of the Debtor.

MR. SHELTON: I think that, but I also think that, in order just to present a case at the order to show cause hearing, I think that whoever is standing up and doing that is going to be doing it on behalf of KrisJenn, the Debtor. And right now, there is no counsel for KrisJenn, the Debtor. Ergo I think, sort of, as a matter of opinion, there's a very strong basis, a very strong basis under cause to continue the hearing for that reason alone. The second --

THE COURT: Well, if the Debtor doesn't have counsel, I'm powerless to go forward?

MR. SHELTON: No, Your Honor. No, I wouldn't say that at all. But typically, the way I've seen it done is that there's some sort of reasonable deadline put for the Debtor to get counsel or else we're going to go forward regardless. I do agree with Ms. Ortiz, there should not be some indefinite suspension. You know, if I just keep coming back in July and say, "Still no counsel", and then, August, "Still no counsel", that doesn't work.

THE COURT: Well, haven't we been doing that for two years?

MR. SHELTON: Well, no, not -- no, there's been a couple of different set of issues for two years.

THE COURT: Every time we have a hearing, it's like, "Well, we need more time."

MR. SHELTON: I understand, but for entirely different reasons. So, when -- I think what Your Honor is referring to is the progress that's been made in the Westlake case over time.

THE COURT: Right.

MR. SHELTON: And yes, and I would actually say that that progress that the Court has allowed us to make, the time that the Court has allowed, has paid really good dividends as I attached to the motion to continue, Your Honor, several different summary judgment orders that are getting very close to a dispositive resolution on this case, completely. I also --

THE COURT: Are we going to have an appeal to the Court of Appeals, the State Court of Appeals?

MR. SHELTON: Yes, but the equivalent, and Ms. Pryor-Baze can correct me. I'm probably butchering the exact procedural setup, but the equivalent of a direct certification, in order to get that question answered once, right. So, it's not going to be answered by the State Court and then go up on appeal and then come back down. The main -- the primary dispositive issue is yesterday, the Angelina Court entered an order allowing the direct appeal or at least asked for the direct appeal up to the Appellate Court.

And so, presuming that that is granted and that the Appellate Court hears it, it's only going to be heard one time. We're going to shorten this time frame. But if Your Honor recalls --

THE COURT: Well, what do you need to appeal it? I thought everything was getting granted by the State Court trial judge?

MR. SHELTON: I might pass it over to Ms. Pryor-Baze, so I don't misspeak too much here. But go ahead. If Your Honor doesn't mind my passing the podium.

THE COURT: Okay. Go ahead.

MS. PRYOR-BAZE: Yes, Your Honor. The State Court judge did grant the parties consent to appeal --

MR. SHELTON: I'm having a hard time hearing you, Ms. Pryor-Baze.

THE COURT: Yeah, your sound is really, very high pitched --

MS. PRYOR-BAZE: Is that any better?

THE COURT: -- for some reason. Are you on your computer sound or telephone or what?

MS. PRYOR-BAZE: Yes, I'm on my computer. Is that any better?

THE COURT: No, it's not good. Maybe you need to log off and try to log back on.

MS. PRYOR-BAZE: I apologize. Is that any better,

Your Honor?

THE COURT: That is. What'd you do?

MS. PRYOR-BAZE: Okay.

THE COURT: Tell us the secret so that we'll know.

MS. PRYOR-BAZE: Now, I can't hear you all. I really apologize. This is not -- this does not happen to me.

THE COURT: We can hear you.

MS. PRYOR-BAZE: Can you hear me now?

THE COURT: Yes.

MR. SHELTON: Yes.

THE COURT: Can you hear us?

MS. PRYOR-BAZE: Charlie, you might have to talk about this. You were right -- I can't -- because I can't hear you all, and I'm sorry. This really has never happened. But there is a permissive appeal. It's on an accelerated basis and it will appeal the title issues. That is -- we're very pleased with this development. It will speed up the appellate process and it's heard on an accelerated basis. And so, typically, the Tyler Court of Appeals gets those done really quickly. It doesn't take a year like the normal process in Tyler, it takes closer to three to six months. And so, we're real pleased with that.

This will appeal the title issues for once and for good. There'll be a final -- there'll be a finality to it,

Case 5:21-cv-00253-JKP Document 48-1 Filed 10/03/26 Page 17 of 60


and we look forward to that resolution by the Appellate Court to confirm Judge Kassaw's title opinions, title summary judgment. As you know, Your Honor, and we've presented those orders to the Court a couple of times. He's confirmed superior and valid title to Express H2O. He's quieted title against Westlake and so we are -- the Appellate Court has heard, on a mandamus once before, some of the issues and rejected that mandamus and said, "Instead, comes here -- come to a full appeal." And so, that's what we're doing now with permission.

THE COURT: Okay, and she may not be able to hear me, but don't you have to be not a prevailing party in order to appeal. I mean, you can't be a prevailing party and say, "We won but we're still appealing." So, what did Express H2O lose with the trial judge that needs to be appealed?

MS. PRYOR-BAZE: Your Honor, we didn't lose anything. We asked the Court to let us appeal that summary judgment title action and the Court said yes and identified the controlling issues of law. And so, we can appeal that grant of summary judgment now and the parties can hash it out. It is a --

THE COURT: I've never heard of appealing an order that you prevailed on.

MS. PRYOR-BAZE: We'd like finality now instead of having to fight about it after a final judgment, and so, the

Court agreed. The Tyler Court does have to accept the appeal, but that's also on an accelerated process. We file a petition within 15 days of the order. Westlake has a very short period to respond and the Court has to decide that within 30 days, whether or not they'll accept the permissive appeal.

THE COURT: So, it's an interrogatory appeal and they call it "permissive appeal"?

MS. PRYOR-BAZE: Yes, Your Honor. Mm-hmm. It's by permission of the State Court judge and then by permission of the Appellate Court. The Texas --

THE COURT: Is there a rule in the Texas Rules of Civil Procedure that allows this?

MS. PRYOR-BAZE: Yes, Your Honor, there is. I believe it's 168, but I might need to check if that's correct.

THE COURT: Okay. Okay.

MS. PRYOR-BAZE: Yes. The Texas Supreme Court actually encourages these types of permissive appeals, so you don't go through a whole trial and wait to the end and then appeal, if there are only controlling issues of law, not any fact dispute, which this is. The superiority and validity of the express title over the Westlake challenges is truly an issue of law with no fact questions.

THE COURT: Okay, and suppose you appeal it and

you win, then Westlake can seek review by the Texas Supreme Court?

MS. PRYOR-BAZE: Yes, Your Honor. And that also would be on an accelerated basis.

THE COURT: By virtue of what the Rule says or what other reason?

MS. PRYOR-BAZE: Yes. It goes under the accelerated appeal rules throughout the appeal. As far as I understand it, that's correct.

THE COURT: So, Westlake isn't agreeing that you've won, they're just still fighting it, basically. Right?

MS. PRYOR-BAZE: That's correct. Yes, Your Honor.

THE COURT: Okay. So, we're really talking about another one to two years for the Texas Supreme Court, assuming they seek review of the Texas Supreme Court, either denies review or grants it and affirms. And then the question is, what if they reverse or what if the Tyler Court reverses? Then you're back in the Trial Court. What do you do then if the Tyler Court reverses? You get the trial judge to go ahead and do a final judgment, disposing of all issues?

MS. PRYOR-BAZE: I --

THE COURT: Why doesn't he just do a final judgment disposing of all issues and all parties? Maybe

that's the question.

MS. PRYOR-BAZE: We still have the injunction phase and we had intervenors, Your Honor.

THE COURT: Okay.

MS. PRYOR-BAZE: And so, we -- the intervenors were the landowners. They intervened at the last minute, and the Trial Court allowed them to intervene. And so, finality in Angelina County, without severing, might take longer than the time period to appeal. And so, we were looking at, we really want that judgment affirmed by the Appellate Court. You asked what happens if the Appellate Court reverses, if they send it down for fact-finding. The trial judge could do that if they reversed and rendered, which I cannot imagine that would be a complete upset in all title law, especially property law in Texas. Then, we would likely appeal to the Supreme Court because that would be completely wrong. But if they found a fact issue, I guess it would go back to the trial court to determine the fact issue. So far, all the parties agree --

THE COURT: So, would there be a jury -- would there be a possibility of a jury trial on those fact issues?

MS. PRYOR-BAZE: If the Appellate Court identified one. So far, all the -- both Westlake and Express have agreed that there are no fact issues. We didn't have a trial, if the Court were to recall, in December when we were

set for a jury trial because the parties all agreed there were no fact issues.

THE COURT: Is there some sort of stipulation of facts that the parties have signed or that they could sign?

MS. PRYOR-BAZE: I think they are undisputed facts, and that includes all of the title work. If the Court recalls, 1907-1925 are the original gulf easements that were conveyed from the landowners to Gulf Oil. And those titles then changed hand again around 1959 or so, and then a few more times in the 1990s and 2000s. The current landowners received their rights in the 1990s. And so, the first recorded, plus -- the first recorded titles, the superior titles are those that created the gulf easements from 1907 to 1925. And all hostile users to those superior easements must be excluded and so, we are -- we believe that the Appellate Court will affirm that because that's based on pretty clear Texas law.

THE COURT: What's clear about it?

MS. PRYOR-BAZE: That the first given and the first recorded titles are superior to titles later on, on the exact same property and rights.

THE COURT: In other words, first in time?

MS. PRYOR-BAZE: Yes, Your Honor. There were no more rights for those landowners to give, and all of those landowners took the property subject to the easements. And

all of the easements conveyed to Westlake's predecessor, were subject to all first in time recorded easements. And so, we have a number of arguments there that the gulf easements are valid and superior to any after-acquired easements.

THE COURT: Is it different in each county or are they all the same?

MS. PRYOR-BAZE: The Angelina County lawsuit is three grants and Angelina and Nacogdoches County for three landowners.

THE COURT: Mm-hmm, and what about the other two counties?

MS. PRYOR-BAZE: The other two counties, our title is clear as far as I understand. I work on the litigation in Angelina County. We haven't worked on Shelby or Rusk County, so I can't speak about that, the title there. But we have not filed a lawsuit trying to clear the title there.

THE COURT: And so, you've got all these intervenors that are property owners that own the fee, presumably maybe subject to the easements, right?

MS. PRYOR-BAZE: Yes, Your Honor. There are three landowners that now own the property. Their predecessors were granted the property in the 1990s subject to our easements. And the Court considered all of those grants and invalidated those grants back in July of '25 in the Court's

summary judgment order on title and then quieted the title. The intervenors claim that those orders do not apply to them and they've challenged that summary judgment order from before they were in the case.

THE COURT: Do you have a certified copy of the judgments finding that they are subject to the easements?

MS. PRYOR-BAZE: We have -- Your Honor, we do have evidence that those landowners took the property subject to the gulf easements, yes. We submitted that evidence to the trial court.

THE COURT: Was it expressly in their deeds, like, disclosed in their deed or was it just that maybe they didn't even know about it and it was subject to it because it was in the chain of title?

MS. PRYOR-BAZE: I'd have to go back and look at each of the three, Your Honor, in order to make sure I'm testifying -- I'm telling the Court correctly. I believe, at least, and Mr. Sachitano might recall better than I can right now, but at least two of them had the gulf easements listed precisely and specifically in their deed. But I'm not sure about the third. The easement conveyance also to Mustang, Westlake's predecessor, included a provision that accepted all previously given easements and told Mustang, "You better check out the property records to make sure there are no additional easements", which ours were properly

recorded.

THE COURT: And so, you've got certified copies of those documents from the 1920s?

MS. PRYOR-BAZE: We have the certified property records, yes, Your Honor, that were publicly recorded. And we have -- we also have certified land records, property records from all of those other transactions. Yes, Your Honor. That was submitted all to the Court in our motion for summary judgment that led to the title summary judgment order.

THE COURT: So, it sounds like we're still years away from getting some final resolution, right?

MS. PRYOR-BAZE: I don't believe we're years away, Your Honor. I think Tyler will come up with a decision in about three months, and the Texas Supreme Court is trying to reach these very quickly. I think that that process shouldn't take -- it's not a two-year process any longer like it used to be, and this is on an accelerated appeal. So, I believe we'll have some additional -- we'll have more, definitely more resolution in three months. And then, I think that it'll move quickly if anyone appeals to the Supreme Court.

THE COURT: It sounds like, to me, that Westlake is going to appeal if they don't win in the Court of Appeals. And if they don't win in the Texas Supreme Court,

they'll probably try to take it to the U.S. Supreme Court. I mean, they're not giving up.

MS. PRYOR-BAZE: They aren't giving up, Your Honor. But I don't see -- they did not -- we -- they've already mandamused this judge once and their mandamus was denied, and the Court said, "Come back on appeal."

THE COURT: They're not the only ones.

MS. PRYOR-BAZE: Well taken, Your Honor. And they did not go to the Texas Supreme Court on that mandamus, on the Tyler Court decision. So, I can't really project what they do. I cannot see the United States Supreme Court wanting this at all. It's not really --

THE COURT: No, of course not.

MS. PRYOR-BAZE: -- their kind of issue.

THE COURT: It's a delay while they consider the application for (indiscernible).

MS. PRYOR-BAZE: And I don't see, Your Honor, the Texas Supreme Court taking it either. The legal principles that are title, that that order was granted on, are very old Texas principles of property law. So, unless the Tyler Court throws out something brand new, then I don't see the Texas Supreme Court having any interest in this because it's not -- it wouldn't be for the purpose of reversal, except if the Tyler Court got it wrong, then the Texas Supreme Court might want to take it for purposes of reversal.

THE COURT: Okay. Mr. Shelton, what else?

MR. SHELTON: Your Honor, so the -- ultimately, the motion for continuance, as I was saying, comes in those two discreet rationales and probably two different time frames. One would be, even without the Westlake issue would we give KrisJenn time to get counsel and then get counsel up to speed in order to properly present an argument at the order to show cause hearing. If the Local Rules are followed, I think, as written, we would have a witness and exhibit list due tomorrow, and we don't even have counsel yet. So, that would be one request, would be to --

THE COURT: Well, you represent Mr. Wright.

MR. SHELTON: Correct, Your Honor.

THE COURT: You signed the petition in this case.

MR. SHELTON: That is true, Your Honor, but the -- I have not analyzed the monthly operating reports. I have analyzed the plan, to some extent. But I have not analyzed the creditor matrix. I'm not -- I don't know what the claims register was. I haven't looked at the disclosure statement. I truly don't have the ability to answer the question whether or not the Debtor performed under all of its terms under the plan. I just don't -- I'm currently not up to that speed. So, that would be one and that would probably suggest a shorter, although still reasonable, extension.

The second one or the second reason would be the Westlake issue, which we've identified in our motion. The Westlake issue, as Ms. Pryor-Baze indicated and as our motion indicated, the concern -- so, we also filed -- let me go back one step. I mean, I know Your Honor set it for June 11th. I'm not trying to argue this, but we also filed a motion for clarification. I assume, just sitting here right now, unless I'm told otherwise, that what the performance that the Court is concerned with is the transfer of the right of way to Express H2O. If that's the only narrow issue, then if a Chapter 7 trustee is appointed, if we go forward on June 11th, which again, I'm asking for a continuance, that the Court goes forward on June 11th, converts the case and then on June 12th, we have Chapter 7 trustee, I think, my experience has been that when a court does that, the Chapter 7 trustee feels nearly compelled, not legally compelled, but nearly compelled to bring a fraudulent transfer action, or at least to start digging pretty extensively on that issue.

THE COURT: Or he might file an abandonment, or he might file a motion to dismiss the case.

MR. SHELTON: He might. Yeah, and I'm certainly --

THE COURT: Certainly, fraudulent transfers is one possibility, of course.

MR. SHELTON: Understood, and I'm not trying to imply, at all, that our Chapter 7 Trustees don't have the ability to do their own diligence. I mean, they certainly can. Nonetheless, if a Chapter 7 trustee shows up in the Westlake case or somehow makes a demand on Express H2O and says, "I should be either the party in interest or your fraudulent transferee and I demand a return of the asset or the value of the asset." The moment that demand happens, if it happens, it may not. But if it happens in a public forum, it's going to completely undermine Express H2O's -- well, not completely undermine, it's going to undermine their ability to -- if they enter into settlement negotiations with Westlake, it's going to undermine, potentially, their credibility in front of the State Court judge. And even if it doesn't do those two things, it's going to make everybody in that Express H2O, Westlake lawsuit, want to say, "Oh, wait a minute. Are we dealing with the right party or should we be dealing with the Chapter 7 Trustee?" That's the second basis for cause, and they are slightly different.

And I think, just to be -- if you just ask me to be judge for a half second, they probably split into two different timeframes. I think the one where KrisJenn doesn't have counsel is probably a slightly shorter timeframe, probably a few weeks. Give them a deadline and

say, "If you're going to have counsel, we're going to reset the hearing for this date. If you're going to have counsel, get them and make sure that you have them in time for that hearing." And if, for some reason, they can't, they could file a second motion, but I don't expect that to happen. But that would be, probably, a shorter timeframe, which, as Your Honor will recall in our original motions, we were talking about probably about a month.

The second one that Your Honor is talking about, I think there is a desire to avoid, to the extent humanly possible, having this hearing occur while the Westlake case is still active. Because, as we've discussed, the benefits of that Westlake case inure to the benefit of DMA and Longbranch, as well. And if that case is undermined, then the creditors of this very estate that we're trying to protect, are going to be undermined immediately. Not just the creditors, but also the equity interest. And that's the reason for the -- so, like I said, Your Honor, it's two separate causes, two separate timeframes. I do understand what the Court is saying that, "Hey, the Westlake case could go on for years." That's, I think, irrebuttably true, that it could go on that long. But I think it's also irrebuttably true that the work that Mr. Sachitano, Mr. Bailey, and Ms. Pryor-Baze have put in have gotten that case right up on the precipice of a resolution, at least an

initial resolution.

THE COURT: Did you say Mr. Bailey?

MR. SHELTON: Sorry, Mr. Wingate. Sorry, his name is Bailey Wingate. He's counsel for --

THE COURT: Oh, okay.

MR. SHELTON: He's counsel for Express H2O.

THE COURT: I didn't know who that was.

MR. SHELTON: Yeah, I'm sorry. That was a misspeak on my part.

THE COURT: Okay.

MR. SHELTON: I don't know. Maybe his kids call him Mr. Bailey, I don't know. But nonetheless, they've done a great amount of work to get that case a long way. And I would really like to avoid anything that would undermine that effort, especially because DMA and Longbranch's interest is already protected as a matter of law by this Court and by --

THE COURT: They don't feel very protected.

MR. SHELTON: I do understand that, Your Honor. Which is -- I understand that concern, and we've offered to -- we've offered reporting, we've offered all kinds of things to try to -- to assuage their concerns. They don't seem particularly assuageable with anything short of a complete decimation of Express' efforts to monetize this (indiscernible) through the Westlake lawsuit, and I --

THE COURT: Well, I mean, they think you're trying to take it away from them.

MR. SHELTON: I understand that, Your Honor, and they've presented absolutely -- they've never presented any evidence other than just they're concerned that we're trying to take it away.

THE COURT: What about the evidence that it was transferred from the reorganized debtor to Express H2O? That doesn't count?

MR. SHELTON: No, Your Honor. For two reasons, one, the plan indicated that they would -- I think at the time of the judgment, that transfer was already known, for one thing. And the judgment itself put a constructive trust on the right of way in the hands of Express H2O.

THE COURT: Right.

MR. SHELTON: So, their rights have4 always been protected from that point. Second, Express H2O has come before this Court on several occasions, and I think Mr. Sachitano just did it a couple of months ago and said that Express H2O intends to abide by the plan. And the plan says that DMA and Longbranch are going to get the treatment that they're entitled to under the final judgment. We have a final judgment and that final judgment says they have the right that runs with the land. So, that's the treatment they're entitled to and Express H2O has made unequivocal and

affirmative statements before this Court that it intends to abide by that. So, they --

THE COURT: Okay. Express H2O, let's say that Express H2O prevails, ultimately, over Westlake after appeals are done, two years from now. Who is running Express H2O?

MR. SHELTON: In the future or at this very moment?

THE COURT: Both. Now and two years from now.

MR. SHELTON: I have no idea about the future, Your Honor. I've simply -- I don't have that information.

THE COURT: Larry Wright? Who's running it now, Larry Wright?

MR. SHELTON: Mr. Sachitano right at the very moment, Your Honor.

THE COURT: Okay, but he's not an equity holder. He's working for the LLC, correct? That's --

MR. SHELTON: I believe that's correct, but I could let Mr. Sachitano confirm that. I'm not aware of him being transferred any equity. The equity holders were the trust that we discuss --

THE COURT: Right.

MR. SHELTON: -- approximately four months back.

THE COURT: So, who determines whether -- assume you win all the litigation against Westlake and others, who

determines whether the right of way gets developed or whether it gets sold? And I understand you're saying that you're protecting Longbranch and DMA. I understand you're saying that, but if it's sold, it's fairly simple, they get 20 and 20 percent each, right?

MR. SHELTON: Correct.

THE COURT: After the reimbursement of Mr. Wright for the money that he lost on the ranch issue, and after his attorneys' fees that he owes are paid. So, who decides whether it gets sold or developed?

MR. SHELTON: At the very moment, Mr. Sachitano does, Your Honor. I think the implication of your question is, could he be removed by Equity and somebody else replaced?

THE COURT: Well, and I'm not trying to remove him. I don't mean that. I'm just saying, somebody has to decide, are we going to sell this thing or are we going to try to develop it? Like, should we just continue to own it from now on and we'll try to go sign up Exxon and Texaco and Gulf to put pipelines in there, whether they're water, gas, whatever, wastewater, you know, that kind of stuff? What if Mr. Sachitano or whoever takes his place some day says, "We just want to keep it and develop it." I mean, why should this be delegated to someone that's not the reorganized debtor? I guess that's my question. The reorganized debtor

confirmed the plan and they said, "We'll respect the 20 percent of Longbranch and the 20 percent of DMA", but the reorganized debtor had the option on whether to sell it or whether to develop it. But right now, the reorganized debtor might have been forfeited. We don't really know. And the control is in Express H2O. So, we've deleted what the reorganized debtor was supposed to be able to do to a non-bankruptcy entity that is a stranger to the transaction other than it got transferred to Express H2O.

MR. SHELTON: Your Honor, if I --

THE COURT: It's like we gave it away on the hope that they could do it rather than the reorganized debtor doing it.

MR. SHELTON: Your Honor -- and I know this is a matter for the order to show cause hearing, so I don't want to get too far into it. But I do want to -- I disagree primarily because of what the plan actually says DMA and Longbranch get. The plan says that DMA and Longbranch are going to get the treatment that's afforded to them under the final judgment. And then --

THE COURT: Yeah, and they don't have control of what happens to it. They just get their 20 percent. I agree with that. They're not, like, the managing party of the right of way. I agree with that. They don't have the discretion to say, "No, we're not going to sell it, we want

to develop it" or "No, we don't want to develop it, we want to sell it." They just have to have their 20 percent protected because they have a profits interest.

MR. SHELTON: Correct.

THE COURT: But why are we letting Express H2O make all the decisions when this was a bankruptcy case and KrisJenn LLC got a plan confirmed saying that they would either develop or sell it?

MR. SHELTON: I understand that last component that the Court just added on, that KrisJenn said that it would develop or sell it.

THE COURT: Right, right.

MR. SHELTON: But from the point of view -- and this is part of the reason for the motion for clarification, Your Honor. From the point of view of DMA and Longbranch, my position, and I haven't seen anything contrary yet, is that they have been satisfied. The question of whether or not the Debtor is generally --

THE COURT: In what way have they been satisfied?

MR. SHELTON: Because they already have their 20 percent interest each that is being protected that runs with the right of way. Their rights --

THE COURT: By the constructive trust or what?

MR. SHELTON: Their rights -- well, they're entitled to the treatment that is --

THE COURT: Right, right. It's been reaffirmed by judicial order.

MR. SHELTON: -- that they get from the final judgment.

THE COURT: I agree.

MR. SHELTON: They're entitled to the treatment that they get from the final judgment. That's what the plan says.

THE COURT: Right.

MR. SHELTON: They got a final judgment from Rodriguez -- from this Court that went up to Rodriguez and then Rodriguez confirmed it, saying their interest runs with the land, they get their 20 percent interest and it is okay that the land stays in the hands of Express H2O. That's the final judgment that they got. That's the one that they didn't appeal, Your Honor. And so, they got the treatment under the plan that they're entitled to. That's it. And that's why the motion for clarification -- and I know it probably -- I don't know how the Court took that when -- if you've even thought about it yet, but it's not being -- I'm not trying to be flip or anything like that. It's really a question of, what are we trying to show? Are we trying to show that the Debtor performed a vis a vi in DMA and Longbranch only? Or am I trying to show that the Debtor hit every single item in the plan? Because they're completely

different efforts, right. And --

THE COURT: Well, that the confirmed plan hasn't been completely -- it was substantially consummated close to confirmation, but it hasn't been consummated, and they're arguably in material breach of it. And then the creditors are not being protected and it's just dragging out.

MR. SHELTON: Correct, Your Honor. And the only creditor that's complained is DMA and Longbranch, but they're getting the treatment under the plan that they're entitled to as a matter of law. That’s --

THE COURT: And you don't know whether other creditors were ever paid?

MR. SHELTON: Sitting here right now, no. And that's the reason I offered at the very beginning, Your Honor. I haven't been retained for that purpose and I'm not prepared. I did start, in the interest of just trying to do my professional best, I started looking at the claims register. I started trying to identify who was owed what under the plan, what possible creditors are out there. But I don't know if that's the burden that the Court's wanting us to show or not, right.

THE COURT: You didn't think to talk to Mr. Smeberg about that? To ask him some questions about it?

MR. SHELTON: I did start talking to Mr. Smeberg and that's how I got -- that was actually how I tried to

speed up that process of identifying. But if --

THE COURT: I mean, just from my review, it looks like they did pay some creditors. I don't know if all of them were paid, but I've actually looked at this issue in the docket sheet. And if you look at the monthly operating reports near the time of confirmation, it looks like they did pay some claims. So, I don't know if they did or not, but it looks like they did. So, you might want to look at that or if you're not going to be stepping into the case representing the Debtor, then whoever does needs to look at that.

MR. SHELTON: Understood.

THE COURT: But the Debtor needs to get counsel, I agree with that.

MR. SHELTON: Yeah. Understood, Your Honor. And I think I've -- I don't want to belabor it too much, and again, a lot of this is coming from an area of not yet being fully prepared, which is the basis for the -- again, a basis for the motion to continue. And just so everybody on the call is clear, I have -- again, I said this at the beginning, I've spoken with Mr. Wright to determine whether or not he wants me on for KrisJenn. He has not said that yet, he has not said yes, and he has not signed an engagement agreement yet and he has not paid a retainer yet. So, it's possible he does or it's possible he chooses other

counsel or it's possible he chooses no counsel. I don't know the answer to that question. But I do just want to be clear so nobody's surprised if it's not me and it turns out to be somebody else.

But regardless, the basis for the continuance is, you have a corporate entity, whether it's dissolved or not. Clearly, they don't have counsel. The two of them just dropped off this call about 30 minutes ago. And then you've got the second one, which is this concern about undermining Westlake -- Express H2O and the Westlake lawsuit. So, two different bases for cause. I will just agree. I don't think there's any real argument there that the timeframe -- if the Court says, "Well, (indiscernible) cause in the first one", I think that encourages a slightly shorter timeframe than if Your Honor grants one on the Westlake one, and different processes for addressing those continuances.

THE COURT: Okay. Ms. Ortiz, what else from your perspective? Anything?

MS. ORTIZ: Thank you. Thank you, Your Honor. We are not going to deny that KrisJenn needs counsel. We believe that the continuance is granted on that basis. We simply request that the continuance be short, only as necessary to allow KrisJenn to retain counsel. From our perspective, we believe 14 days to retain counsel should be sufficient. And with respect to the other basis with which

counsel is arguing that an extension should be further granted, we think the extension should certainly not be tied to the current state case that Express H2O is handling, as Your Honor knows, because this case has been brought up several times in the last year.

So, we've been hearing that this case will be done, that it will be final, that we're heading for final hearings since at least Fall of last year. It is an issue that delayed discovery. It's an issue that delayed the enforcement of the final judgment. And while I understand that it is counsel's sincere belief that this will bring finality to the issues and maybe simplify things from their perspective, as Your Honor has already emphasized, from our perspective, this was a situation that was created out of a fraudulent transfer. It was created out of, first, the breaches of fiduciary duty that Mr. Wright had through KrisJenn and then later through the fraudulent transfer, for no consideration, that Mr. Wright made to Express H2O, in violation of the bankruptcy claim.

Because of that and simply because of the logistics of the appeal and of any subsequent litigation that might come from it, we think that tying this extension to -- this continuance to the ongoing state litigation would simply lead to an indefinite stay that would prevent my clients, who have been waiting for now a couple of years to

be able to enforce this judgment, from getting their rights enforced and validated. Tied to that, we believe that, in fact, the resolution of the Express H2O litigation will not necessarily result in completely clean title for all issues that have been raised. Counsel has not raised the issue, for example, that there are outstanding condemnation proceedings involving the right of way. We've been served with paperwork related to (indiscernible) we've appeared on those proceedings. So, we think that there's actually a lot of outstanding issues.

We understand counsel's concern that changing this to a Chapter 7 will be detrimental to that project. We think that's better addressed through a hearing on the merits of the order to show cause and whether or not this should be converted. And precisely for this reason, we think there shouldn't be further delay on holding that hearing.

MR. JOHNS: Your Honor, this is Chris Johns. May I also just --

THE COURT: Yes, sir.

MR. JOHNS: -- add on.

THE COURT: Yes, sir.

MR. JOHNS: I want to clear up a couple of things too. I mean, there's been a suggestion that if it's a sale, then we get our 20 percent each, and then we're, somehow,

out of it. That's not what a real covenant that attaches and runs with the land means. Our interest goes on indefinitely until there's some buy down or some agreement that we're a part of. And so, I don't think it's right to just think that it's even realistic if they're going to be able to go work out some kind of deal and monetize or do a real sale to anybody to give any kind of value. Because our 40 percent collective interest attaches and runs with the land. It runs -- if there's a sale, fine, we would get our percentage of that sale. But then we would have an ongoing net profits interest that attaches and runs with the land until we bring it down. So, I think that's one issue we're concerned about.

I am concerned too about the length of appeals that can last. Again, as Ms. Ortiz alluded to, given domain cases can last years as well. And so, like, as far as finality with all of these issues, it bothers me, frankly, Your Honor, that they went and violated the Court's order. We did not know about the transfer until after the remand happened. Mr. Muller, if he were still on this call, was in that hearing where he told us. So, Mr. Shelton is just mistaken about that. We didn't know about it. We were upset about it. There was a representation made to Your Honor that things would be transferred back to the Debtor. That --

THE COURT: I remember that.

MR. JOHNS: That representation was also broken. They never did. And then, guess what they did after that? They voluntarily dissolved KrisJenn so they wouldn't be able to return it. And so, the idea that --

THE COURT: Have you verified that? Was it dissolved or what was the status of that?

MR. JOHNS: Yes, Your Honor. If you look on the Secretary of State's website and look at all the filings for KrisJenn. We did a name search. They also misrepresented to the Court that the KrisJenn name was unavailable. That wasn't true. That was false, as well. And then it also will show a voluntary dissolution that it was done, that Mr. Wright performed. And again, this was a fraudulent transfer from insiders to insiders. Our case came first. This asset was part of the bankruptcy estate years and years before the Westlake case. Years and years before the imminent domain cases.

And so to say that we go, somehow, to the back of the line and we're not going to be protected, it's just -- they are playing games with the Court and with the parties and it just -- it's time to just bring some finality to this whole thing. And we're okay with, if they need a 14-day continuance to go get counsel, that's great. Mr. Shelton is aware of many of the issues in the case. He represents one

of the people who was a part of the underlying proceeding -- the adversary proceeding, excuse me. They have a way to do this. I'm concerned that this is just another attempt to continue to delay facing the consequences of the final judgment.

And also, the suggestion that Judge Rodriguez somehow left it being in the hands of Express H2O, I'd invite Your Honor to look at the parties' briefing both sides. We did not find out that it had been -- that it was still in the hands of Express H2O because they had promised Your Honor and the parties that they would transfer it back to KrisJenn. It wasn't until after we had filed our opening brief that we even found out that it was still in the hands of Express H2O. And so, we've been consistent about that from the beginning. We came to Your Honor to -- we were surprised that it hadn't been transferred back to KrisJenn. And so, realized that we could go and just ask for a direct enforcement of the judgment and so that's why we came back to Your Honor. I understand that you stayed your order and then Mr. Wright to transfer the right of way to DMA, but we've been consistent about this. And there's been a revolving door of attorneys on the other side. But I think Your Honor has a memory of what has happened in this case and that these shell games just have to stop at some point. And we ask that we not just kick the can down the road

again.

THE COURT: Okay. One question and it's sort of a hypothetical, Mr. Johns. But suppose it wasn't Chapter 7 and the Trustee wants to sell the right of way, free and clear of liens and encumbrances? Obviously, you would object to it, but -- and it might even take an adversary proceeding to sell the interest of DMA and the other co-owner or the other profit center's holder, Longbranch. And you know, I don't want to generate more litigation, but the Trustee might sue DMA and Longbranch to sell their interest, which is a real estate interest, of course, along with the right of way. You understand what I'm saying?

MR. JOHNS: I do, Your Honor and --

THE COURT: I don't want to do that, but I mean, that's just one of the things that could happen down the road if the Trustees try to sell it free and clear.

MR. JOHNS: Understood, Your Honor.

THE COURT: Okay.

MR. JOHNS: And I would have to look at the Trustee's authority to do that. I understand that --

THE COURT: Well, they do it all the time. Now, I'm not saying they would be able to in this instance, but sometimes you'll have a piece of property that's co-owned by the debtor and a non-debtor, and so, you can't just sell both interests in a motion to sell. But the Trustee can

file an adversary proceeding to sell the Debtor's interest, as well as the co-owner's interest. Do you see what I'm saying? So, I'm just saying --

MR. JOHNS: Well, I see what you're saying, but --

THE COURT: -- that that's a possibility.

MR. JOHNS: I see what you're saying, Your Honor, and you've been doing bankruptcy way, way longer than I have, many multiples. But my understanding of the whole thing that went up to the whole point of, is this a personal covenant or is this a real covenant?

THE COURT: Right. It runs --

MR. JOHNS: It --

THE COURT: -- it runs with the land. I agree --

MR. JOHNS: It runs with the land. It -- it helps --

THE COURT: -- according to the District Court's judgment.

MR. JOHNS: Right. It's a separate bundle. It may have been originally part of the bundle of sticks, but by having that interest agreement done by my client --

THE COURT: Okay.

MR. JOHNS: -- I think what the Court held in the first appeal was that that was -- those were all transferred prior to the bankruptcy. Long time before the bankruptcy, they were -- our folks gave up real value in order to do

that.

THE COURT: Right.

MR. JOHNS: And these were property interests that they obtained that were separate from ownership and control of the right of way.

THE COURT: Right.

MR. JOHNS: I mean (indiscernible) originally part of the bundle of sticks, but they're not anymore and they haven't been since way before the bankruptcy.

THE COURT: I'm just saying the legal issues, maybe even factual issues are so complicated in this case that it's just unbelievable. And I've asked this question before and I think I know the answer, but have there ever been any mediations of the parties in this where we could try to work something out?

MR. JOHNS: Your Honor, we had one mediation with Mr. Muller in San Antonio.

THE COURT: Right.

MR. JOHNS: And I can't remember the timeframe. I mean --

THE COURT: Like five years ago.

MR. JOHNS: Well, maybe three or four years ago.

THE COURT: Okay.

MR. JOHNS: I mean, we wouldn't be opposed to that and so, if Your Honor ordered us to go back and mediate --

THE COURT: Well, I --

MR. JOHNS: -- with the Court.

THE COURT: Yeah, I'm not trying to increase the cost of this, but sometimes cases just seem to be never ending and just have this huge burn rate of attorneys' fees and I'm not criticizing the attorneys. You've got to charge whatever is reasonable, of course. And so, I'm not criticizing the attorneys, but sometimes cases just run amuck, just run out of control and you've got to get a handle on it by doing some kind of mediation just to stop the bleeding, in effect.

MR. JOHNS: Your Honor, I would suppose that there's less bleeding on our side than on the other side. Everybody on our side is on contingency fee that's appearing before you right now.

THE COURT: I think the Express H2O people might be also.

MR. JOHNS: Well, I understand that. We have not been able to get any discovery on that, so far. So, we -- that's a -- these are all concerns we have.

THE COURT: Well, go to Judge Xavier Rodriguez and see if you can get that mandamus released.

MR. JOHNS: I'm so uncomfortable, Your Honor, poking a Federal District Judge saying, "Please hurry up and --".

THE COURT: I'm not saying poke at him. I'm just saying, you know, get it resolved. That's all.

MR. JOHNS: Yeah.

MS. PRYOR-BAZE: Judge, would you like for me to respond to Mr. John's comments? He was just repeating all the arguments we made to you a couple of weeks ago in person, and I can go through --

THE COURT: Right, we're -- yeah, we're not deciding it today.

MS. PRYOR-BAZE: -- and I can rebut them if you'd like me to --

THE COURT: Go ahead.

MS. PRYOR-BAZE: -- because they were filled -- well, they were just filled with a lot of misrepresentations that we went through two weeks ago. I'd rather not, but Your Honor hasn't yet ruled on either motion that we argued.

THE COURT: Well, I'm going to continue the hearing, so if you want to make a brief rebuttal, that's fine. But don't go into the half hour version.

MS. PRYOR-BAZE: Sure, Your Honor. I think the big points would be that everyone knew the property was in the hands of Express. That was in the judgment after remand. We have yet to see any promise by Express to transfer the property back. That was never made. I don't believe that Mr. Muller --

THE COURT: Well, the Debtor said it on the record in a pleading, I believe, but certainly on the record.

MS. PRYOR-BAZE: I don't -- I have not seen that.

THE COURT: That was Mr. Muller.

MS. PRYOR-BAZE: Yes. Yeah, and I've heard everyone say that it's Mr. Muller, but I have not seen --

THE COURT: And we can dig it up if we need to. We'll dig it up if we need to.

MS. PRYOR-BAZE: Okay. We would have to see when in time that was because at the time that the final judgment was entered, it was clear it was in the hands of Express. DMA and Longbranch filed a brief on remedies where they asked the Court to disgorge the property from Express. And so, whether or not there was a representation made, a throw away representation made in a hearing, I can't speak to. I wasn't there. But they knew where the property belonged and they could have searched real property records, they could have asked this Court for clarification. They could have done all those things. But what they did was go appeal and again, ask for the property to be disgorged, that the constructive trust that they asked for was abuse of discretion. And Judge Rodriguez said, "No, it wasn't. The property can stay in the hands of Express."

So, I really -- I have to say that I'm very -- all of the inflammatory language that Mr. Johns continues to use

about intentional misrepresentations to this Court were certainly not by any lawyer on this call now, in this hearing now, and I really doubt that there was any intentional misrepresentation by an attorney before. Express is actively trying to sell the property. Because of the cloud of title by Westlake, there are certainly encumbrances to that. We also would disagree with Mr. Johns' interpretation of this covenant that runs with the land. But that point, I'm sure can be argued at a different time.

THE COURT: Well, are you saying that if you sell it, you sell it free and clear of the 20 percent?

MS. PRYOR-BAZE: The net profits interest that was in the original contract was on the Seller development by the Debtor. Well, I think by the Debtor or the company that owned it before the Debtor. We'd have to go back to that language. I don't believe there was a covenant that ran with the land that says, "I get 20 to 40 percent every time something is done to the property regardless of who owns the property 100 years from now." It is not that type of covenant that runs with the land. It's a covenant that attached to the property between KrisJenn and Express and went with your constructive trust. The constructive trust was the remedy for the covenant that runs with the land.

So, yes, I would argue that -- and I'm probably

not prepared today to talk about case law that supports it. We'd have to brief that entirely with a lot of research and explanation, but I do not believe that covenant runs with the land for every sale from now until eternity, from a nets profit interest. That just doesn't make sense at all. But --

THE COURT: I think that's what Judge (Indiscernible) said.

MS. PRYOR-BAZE: I'm not sure. I'd have to go back and look. I don't believe he said that it runs with the land from now to eternity throughout all of Texas history, that that attaches with every development and sale. That certainly isn't what the original contract said.

THE COURT: Okay. Well, we don't have to decide that today. It's out there. I understand. Okay. So, when do we set the show cause? July 15th sound okay? Got any trips to Europe that week? Anyone?

MR. SHELTON: July 15th is available --

THE COURT: Mr. Rose, you going to Europe that week?

MR. SHELTON: My apologies, Your Honor. Were you talking to me?

THE COURT: Mr. Rose?

MR. ROSE: Not that week, Your Honor. Thank you, though.

THE COURT: Not that week? Okay. How about you, Mr. (Indiscernible), July 15th? Go ahead.

MR. JOHNS: Your Honor, this is Chris Johns. I actually -- it's not to Europe, but I've got a trip to South America then.

THE COURT: Oh, okay. Well, they have Zoom, I think, don't they? We can do it the --

MR. JOHNS: I may be able to fly to darkest Peru, yeah.

THE COURT: Okay. How about the 22nd? Are you back from the south --

MR. JOHNS: Yes, Your Honor.

THE COURT: -- the southern hemisphere by then?

MR. JOHNS: Yes, Your Honor.

THE COURT: Okay. Mr. --

MS. PRYOR-BAZE: Your Honor, I'm actually in Europe that week.

THE COURT: Okay. Of course.

MS. PRYOR-BAZE: Well, I don't know why the "of course", Your Honor. I've been, like, one time in the two years I've been (indiscernible).

THE COURT: Because we always have conflicts. No matter what day I come up with, people have conflicts. And so I jokingly say --

MS. PRYOR-BAZE: I think it --

THE COURT: -- "Are you going to be in Europe?" and then a lot of times they are.

MS. PRYOR-BAZE: It is the summer, Your Honor.

THE COURT: This is the second time you've been in Europe for a proposed date that I came up with.

MS. PRYOR-BAZE: I would -- Your Honor, I think that, to give everyone enough time and to get time for counsel, I would ask for mid-August. I don't think, especially with summer vacations that apparently Mr. Johns and I both have, that's asking for too much time.

THE COURT: How about August the 5th? That's a Wednesday.

MR. JOHNS: Your Honor, I'll do what I need to do to be at a good (indiscernible) place.

THE COURT: Oh, no, no, no, no, no. No, I don't want you to do that. I mean, I want to get this thing wrapped up more than any of you do, so don't worry about that. But how about August the 5th? Anybody?

MS. PRYOR-BAZE: Mr. Shelton, that works for me, Your Honor. I don't know if it works for Mr. Shelton.

MR. SHELTON: Every date so far has worked for me.

THE COURT: Okay. That's a Wednesday. I'm sorry?

MR. JOHNS: I believe August 5th will work. I've got -- I've been notified that the Fifth Circuit is going to schedule an oral argument in another case that week.

THE COURT: Is this Mr. Johns?

MR. JOHNS: Yes, Your Honor.

THE COURT: Okay. Don't you have a cast of thousands in your firm?

MR. JOHNS: We'll figure out how to cover it, Your Honor. If it has to be August 5th, we'll do August 5th.

THE COURT: Yeah. If you have a conflict with it, let us know and we can move it back a day or forward a day, possibly.

MR. JOHNS: Thank you, Your Honor.

THE COURT: Yeah. I don't have anything that week other than a doctor appointment, so, it's fairly open right now. So, if you find out the Fifth Circuit sent you on the same day and time, then let us know and we might be able to adjust it. So, we don't want you to miss a trip to New Orleans. You don't want to do that.

MR. JOHNS: Well, Your Honor, one thing I'd just like to get on the record is, you know, we've got this order to show cause hearing. I'd really appreciate some protections against any further transfers or encumbrances of the right of way without this Court's approval.

THE COURT: There's no more transfers contemplated, are there Ms. Pryor-Baze?

MS. PRYOR-BAZE: No, Your Honor, there are not. And Express H2O has already said they would be bound by the

provisions of the plan and this Court's judgment, Your Honor.

THE COURT: All right. Well, I mean, I have the ultimate trap door on conversation. You know that. So, if they do any foolishness, Mr. Johns, then I will take some serious action. I'll just say that. So, obviously, I don't want them transferring the property, the right of way. So, I'll just say that. And if they do, then they will have you-know-what to pay. Okay, August the 5th at 10 o'clock by Zoom. We'll do the show cause then and I'm sure we'll get everything resolved that day.

MR. JOHNS: Thank you, Your Honor. I'll let you rest.

THE COURT: Thanks for appearing, everyone, and seriously consider some sort of mediation. I mean, is it even worth asking Westlake to engage in the mediation, as well?

MS. PRYOR-BAZE: Your Honor, we've mediated twice with them. They're not --

THE COURT: Okay.

MS. PRYOR-BAZE: They have not been amenable to any real settlement.

THE COURT: Is it, like, all or nothing? "Yeah, you give us what you want and we'll settle with you?" Is that the situation?

MS. PRYOR-BAZE: I should be careful not disclosing any terms of mediation, but that is --

THE COUT: No, no, I don't want to hear about settlement negotiations. But they're just, like -- there's no way.

MS. PRYOR-BAZE: As of right now, that's been their posture in the case.

THE COURT: Okay. So, is Mr. Finkelstein on the call right now? He usually asks for transcripts of hearing.

MS. PRYOR-BAZE: I'm sure that Ms. Ortiz will continue to --

THE COURT: If you look at the docket sheet, you'll see his name in there a lot.

MS. PRYOR-BAZE: Yes. Ms. Ortiz's office has collaborated a lot with Westlake, so I'm sure that they'll have the opportunity to work with her to get whatever they need.

MR. JOHNS: I don't appreciate that kind of comment. That's just not true. So, it's uncalled for. But thank you, Your Honor.

THE COURT: Okay. Well, I would look into some sort of mediation. If you don't think it's fruitful to include Westlake, then that's fine. But I mean, this thing has got to end someday. I mean, it's been going for years before I got the case six years ago. So, I mean, we've got

to stop the bleeding, and I'm talking about the loss of money by all parties. I mean, you can only go so long on a contingent fee case, and you can only go so long on an hourly case when the attorneys are getting paid by the hour. So --

MR. JOHNS: Your Honor --

THE COURT: -- this is way, way past where it should be. Yes?

MR. SHELTON: Your Honor, for what it's worth and this is for all parties, including my side, as well. A lot of what I hear and I've heard it from the last year is a lot of anger and animosity, which tends to undermine the ability to reach a settlement. But it also tends to suggest that a mediation may be appropriate.

THE COURT: Isn't there somebody that's a really good mediation that just keeps you in separate rooms. You don't have to be in the same room. If you're in separate rooms, it seems to work better with a really good mediator. And I can name you some names, but I don't want to favor anyone over another. But I would hope that that could be something that common sense could prevail.

MR. SHELTON: Your Honor, Judge Hale, I just had a mediation with him last --

THE COURT: Judge Hal would be great, yeah. I'm not --

MR. SHELTON: -- and he kept the parties separate.

THE COURT: -- pushing anybody in particular, but Judge Hale is great and he's very common sense and he'll push people to do the right thing.

MR. SHELTON: Well, we'll certainly communicate about it with our side. And we're always doing --

THE COURT: Yeah. Just think about it and think about it seriously is all I can say. He knows nothing about this case. I haven't talked to him about this case. He doesn't know anything about it, so he would be completely objective and would be amazed at this situation. All right. Well --

MR. SHELTON: Thank you.

THE COURT: -- we'll see everyone on August the 5th at 10 a.m. by Zoom.

MS. PRYOR-BAZE: Thank you, Your Honor.

MR. SHELTON: Thank you, Your Honor.

MR. JOHNS: Thank you, Your Honor.

THE COURT: We’re in recess.

(Proceedings adjourned at 3:12 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: June 16, 2026