Exhibit

M-5

exhibitsticker.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| *In re:* | § | |
| | § | CASE NO. 20-50805-rbk |
| KrisJenn Ranch, LLC, et al. | § | |
| | § | CHAPTER 11 |
| *Debtor*. | § | |

**BRIEF IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE AND IN SUPPORT OF CONVERSION FROM CHAPTER 11 TO CHAPTER 7**

Longbranch Energy LP ("Longbranch"), DMA Properties Inc. ("DMA"), and Frank Daniel Moore (collectively, "Creditors") file this brief related to the Court's May 22 order to show cause and respectfully ask the Court to convert this case from Chapter 11 to Chapter 7.

## INTRODUCTION

The policy undergirding Chapter 11 bankruptcy is to provide a fresh start for honest but unfortunate debtors. Larry Wright and the KrisJenn Ranch, LLC parties (the "Debtor parties") are neither honest nor unfortunate debtors. They are parties that have manipulated the bankruptcy process and, against this Court's final judgment, seek to deprive Creditors of their interests in the right of way ("ROW")—both their profits interests that run with the land and the constructive trust ordered to remedy the fraudulent transfer Wright engaged in. Among other bad-faith conduct, the Debtor parties:

- breached fiduciary duties to gain control of the ROW in the first place;
- violated the bankruptcy plan through an undisclosed and fraudulent transfer of the ROW—supported by no consideration—to Express H2O Pipeline & ROW, LLC ("Express H2O"), an entity controlled by Wright and his family;
- structured that fraudulent transfer so that Larry Wright would not personally own anything, in an attempt to thwart enforcement of any judgment against him;

- continue to deny that Creditors' ROW interests attach and run with the land, despite multiple court orders conclusively holding that the interests are real property interests that attach and run;
- have attempted to sell the ROW without disclosing Creditors' interests in it, both before and after plan confirmation; and
- have failed to pay a single dollar of the final judgment's $750,000 fee award.

These facts—which are indisputable—show why conversion to Chapter 7 is appropriate and necessary to protect Creditors' interests.

## BACKGROUND

After Larry Wright sought to steal DMA's net profits interests in a pipeline right-of-way ("ROW") in East Texas, DMA and Longbranch fought through over six years of litigation to protect their interests in the ROW. Along the way, the Debtor parties have used every tool at their disposal to avoid honoring the parties' agreements and dodge compliance with this Court's judgment and orders. The Court should not tolerate these efforts any longer.

A professional poker player, Wright convinced Daniel Moore and Darin Borders—the two men who had found and spent countless hours developing the ROW opportunity and securing the right to purchase it—to let Wright join the deal if he put up the money to buy the ROW. As part of that deal, Borders (through his entity Longbranch) assigned the right to purchase the ROW to Black Duck, the company that Moore and Wright owned 50/50. In exchange, Borders received a written assignment of 20% of the ROW's net profits; as the district court later held, that net-profits interest runs with the land.

Later, Wright grew hostile towards Moore and pushed for his resignation from Black Duck. Eventually, Moore agreed to give up his 50% interest in Black Duck in exchange for the same deal Borders had received. Since then, Wright and his entities—the KrisJenn entities and Express H2O—have repeatedly tried to dispose of the ROW while disregarding DMA and Longbranch's net-profits interests.

After years of litigation to enforce the net-profits interests, the District Court held on appeal that DMA and Longbranch's net-profits interests are real covenants that attach and run with the land. *In re KrisJenn Ranch*, *LLC*, 661 F. Supp. 3d 654, 679 (W.D. Tex. 2023). Subsequently, and consistent with the District Court's findings, this Court entered an opinion and final judgment in favor of DMA and Longbranch, upholding their interests in the ROW as real property interests that run with the land and bind successors and assigns, finding Wright liable for breach of fiduciary duty, imposing a constructive trust on the ROW for the benefit of DMA, and finding that DMA, Moore, and Longbranch were entitled to recover attorneys' fees—which the Debtor parties still haven't paid. Final Judgment on Remand (ECF No. 329); Opinion on Remand (ECF No. 330). The Court entered this final judgment in March 2024, over two years ago. There is no pending appeal of the final judgment, which is now both final and conclusive.

In the two years since the Court entered its final judgment, the Debtor parties have filed a spate of baseless and unsuccessful motions in this Court and in the District Court seeking to avoid the final judgment. For example, Wright has filed a motion to set aside ruling on constructive trust, *KrisJenn Ranch, LLC et al. v. DMA Properties, Inc., et al.*, 5:20-ap-05027 (ECF No. 382); a motion for relief from final judgment, *id.* (ECF No. 418); a motion for stay, *id.* (ECF No. 436); a motion to abate, *id.* (ECF No. 456); a motion to dismiss for lack of subject matter jurisdiction and alternatively to stay, *id.* (ECF No. 542); a motion for reconsideration and/or clarification of an order entered by Judge Rodriguez regarding the constructive trust entered in favor of DMA, *Wright v. King*, No. 5:52-CV-01452-XR (ECF No. 14); and motions for "clarification" of the opinion and final judgment entered by this Court and by Judge Pulliam in the appeal to the District Court. *id.* (ECF No. 48); *KrisJenn Ranch, LLC et al. v. DMA Properties, Inc., et al.*, 5:20-ap-05027 (ECF No. 616). Those motions uniformly lacked merit and have all been denied.

Given the Debtor parties' misconduct and evasion of the judgment, the Court has entered an order to show cause why the bankruptcy case should not be converted to

Chapter 7 in light of "substantial questions" regarding the debtor's non-compliance with the plan of reorganization. ECF No. 257. Because there is ample cause for conversion, Creditors respectfully request the Court convert this case to Chapter 7.

## ARGUMENT

Section 1112(b)(1) provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause . . . ." 11 U.S.C. § 1112(b)(1). "Cause" includes "gross mismanagement of the estate" and "failure to comply with an order of the court." *Id.* § 1112(b)(4)(B), (E). "Cause" also includes (1) diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (2) a material default with respect to the confirmed plan. *See id.* § 1112(b)(4)(A), (N). Courts also hold that a lack of good faith constitutes "cause" for purposes of § 1112(b)(4). *See, e.g.*, *In re SGL Carbon Corp.*, 200 F.3d 154, 159–62 (3d Cir. 1999); *Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986).

All of these factors exist here. Chapter 7 would be appropriate for *any* of the following reasons: (1) the Debtor parties violated the bankruptcy plan through a fraudulent and undisclosed transfer of the ROW to Express for no consideration; (2) the Debtor parties refused to transfer the ROW from Express back into the hands of the Debtor despite making on-the-record promises to this Court and Creditors; (3) the Debtor parties have repeatedly attempted to sell the ROW without disclosing the Creditors' interests; (4) the Debtor parties continue to characterize Creditors' interest in the ROW as personal covenants that do not run with the land, defying the District Court's appellate ruling and this Court's final judgment; (5) the Debtor parties only obtained the ROW in the first place by breaching fiduciary duties owed to Creditors; and (6) the Debtor parties have refused to pay any of the $750,000 fee award entered by this Court over a year ago.

Yet the Court need not rely on just one of these bad-faith acts. The Debtor parties have done all of these things. Neither honest nor simply unfortunate, the Debtor parties cannot be trusted to honor this Court's orders, its final judgment, or the Creditors' interests. Accordingly, conversion to a Chapter 7 proceeding is appropriate.

## I. Chapter 11 is for honest but unfortunate debtors.

The purpose of bankruptcy is to provide honest but unfortunate debtors a clean start. *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). Section 1112(b) contains an implied "good faith" requirement for Chapter 11 bankruptcy, grounded in the "equitable nature of bankruptcy" and "purposes underlying Chapter 11." *See In re LTL Mgmt., LLC*, 65 F.4th 84, 100 (3d Cir. 2023); *SGL Carbon Corp.*, 200 F.3d at 161–62; *see also Little Creek*, 779 F.2d at 1071 ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."). "The good faith standard protects the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *Elmwood Dev. Co. v. Gen. Elec. Pension Tr. (In re Elmwood Dev. Co.)*, 964 F.2d 508, 510 (5th Cir. 1992); *Little Creek*, 779 F.2d at 1072.

When a debtor fails to act in good faith, a court may dismiss a Chapter 11 case or convert a case under Chapter 11 to a case under Chapter 7 for cause if in the best interest of the creditors and the estate. *SGL Carbon Corp.*, 200 F.3d at 161–62; 11 U.S.C. § 1112. "[C]ause is any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process." *Little Creek*, 779 F.2d at 1072. Cause exists here because of the bad-faith, post-petition actions of the Debtor parties. *See In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 857 (Bankr. S.D. Tex. 2023) ("Analysis under

§ 1112(b)(4)(B) focuses solely on the post-petition management of the estate and does not include mismanagement of the pre-petition debtor.").

## II. The Debtor parties have proven time after time that they cannot be trusted to follow the Court's rulings or to protect the Creditors' interests.

The Debtor parties have repeatedly abused these bankruptcy proceedings in attempts to gut Creditors' ROW interests. As both this Court and the District Court have recognized, Larry Wright and his entities obtained the money to purchase the ROW—and then obtained the ROW itself—only by breaching fiduciary duties owed to the Creditors. *See In re KrisJenn Ranch, LLC*, 661 F. Supp. 3d 654, 683 (W.D. Tex. 2023). Wright then sold the ROW to TCRG East Texas Pipeline 1 LLC and sold a purchase option to McLeod Oil LLC, both times without disclosing Creditors' interests. *Id.* at 665. After initiating the bankruptcy proceedings, the Debtor parties committed several more bad-faith acts, including:

- violating the Court's bankruptcy plan and order by transferring the ROW to Express;[1]
- engaging in that fraudulent transfer (between insiders for no valuable consideration) and structuring it so that Larry Wright would not personally own any interest in Express, thereby thwarting attempts to collect against him on the final judgment;[2]
- failing to transfer the ROW back from Express despite their on-the-record promise to do so in the initial post-remand hearings following the first District Court appeal;[3]
- improperly withholding critical post-judgment discovery responses until the middle of the second appeal to the District Court and preventing the deposition of Larry Wright; [4]

---

[1] Final Judgment on Remand (EFC No. 329) at 4.
[2] Ex. 1 (Deed to Express H2O).
[3] Ex. 2 ( June 4, 2026 Hrg. Tr.) at 42:23–43:15; Ex. 3 (Feb. 5, 2025 Hrg. Tr.) at 22:1–22:6, 36:12–36:20.
[4] Mot. Quash Depo. Notices (ECF No. 437); Mot. Compel Wright to Attend Deposition (ECF No. 540).

- misrepresenting to the Court that the ROW could not be transferred to a KrisJenn entity and that Debtor could not be revived because the name "KrisJenn" was no longer available from the Texas Secretary of State;[5]
- arguing at the May 12, 2026 hearing that the constructive trust granted to DMA is meaningless and that the Court had no jurisdiction to enforce its final judgment;
- arguing in the May 12 and June 4, 2026 hearings (and related filings) that Creditors' interests do not actually attach and run with the land and are not binding on successors and assigns, in blatant disregard for the Court's final judgment;[6]
- attempting in recent weeks to market the ROW to third parties without disclosing Creditors' interests in the ROW; and
- failing to pay a single dollar of the $750,000 fee award.

Such actions show why conversion to Chapter 7 is needed: the Debtor parties simply cannot be trusted to honor the Court's judgment and protect Creditors' interests.

## III. Conversion to Chapter 7 is appropriate.

Conversion to Chapter 7 is appropriate and necessary in this case. "While one purpose of bankruptcy law is to provide a fresh start for the honest but unfortunate debtor, another primary purpose is to provide for equitable treatment of creditors in recovery of their claims." *Studensky v. Buttery Co., LLP (In re Argubright)*, 532 B.R. 888, 893 (Bankr. W.D. Tex. 2015) (internal citations omitted). With Larry Wright in control of the Debtor parties, this case is serving neither of those purposes.

The conduct of the Debtor parties, both before and throughout this case, has amply demonstrated their unclean hands. They have thereby frustrated the second purpose of a bankruptcy proceeding: providing creditors with equitable treatment in

[5] Ex. 2 (June 4, 2026 Hrg. Tr.) at 42:16–43:3; Ex. 3 (Feb. 5, 2025 Hrg. Tr.) at 22:10–22:12, 36:6–36:20.
[6] *See, e.g.*, Mot. Clarification, *KrisJenn Ranch, LLC et al. v. DMA Properties, Inc., et al.*, 5:20-ap-05027 (ECF No. 616).

recovery of their claims. At every turn, the Debtor parties have used this process to deny Creditors any recovery, despite the final judgment in the adversary proceeding.

There is ample cause to convert this case to one under Chapter 7. At a minimum, cause exists under § 1112(b)(4) for gross mismanagement of the estate and failure to comply with a court order. 11 U.S.C. § 1112(b)(4)(B), (E); *M.A.R. Designs*, 653 B.R. at 862 ("Cause to convert pursuant to § 1112(b)(4)(E) exists if a debtor fails to comply with a single order; a pattern of non-compliance is not required by the statute.").

Cause also exists because the Debtor parties have engaged in a post-confirmation fraudulent transfer that constitutes (1) a diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (2) a material default with respect to the confirmed plan. *See* 11 U.S.C. § 1112(b)(4)(A), (N). Larry Wright and his immediate family effected the transfer of the sole asset of the reorganized debtor—the ROW—to insiders (themselves) for no value.[7] This was an attempt to strip Creditors of their rights under the terms of the confirmed plan and to avoid satisfying the Debtor parties' obligations under what became the final judgment in the adversary proceeding. The Debtor parties' failure to conduct their business honestly and in the best interest of their creditors is sufficient cause to convert this case so that it can be administered by a neutral Chapter 7 Trustee.

It is also obvious that the Debtor parties cannot be "rehabilitated." Rehabilitation does not mean reorganization, which could involve liquidation. Instead, rehabilitation signifies more, being described as "to put back in good condition; re-establish on a firm, sound basis." "The issue of rehabilitation for purposes of § 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re TMT Procurement Corp.*, 534 B.R. 912, 920–21 (Bankr. S.D. Tex. 2015). Where the debtor exists solely to liquidate assets and has no business prospects, conversion is appropriate. *See id.*

[7] *See* Ex. 1 (Deed to Express H2O) at 2; Ex. 2 (June 4, 2026 Hrg. Tr.) at 42:23–43:15; Ex. 3 (Feb. 5, 2025 Hrg. Tr.) at 22:1–22:6, 36:12–36:20.

The Debtor parties' efforts to transfer the estate's only valuable asset for insufficient consideration, for the sole benefit of insiders, show that they cannot be "rehabilitated" as defined in the Bankruptcy Code.

Finally, converting this case to Chapter 7 would be in the best interests of Creditors. The Debtor parties have repeatedly demonstrated an unwillingness to abide by their fiduciary duties. As described above, the Debtor parties also engaged in fraudulent transfers. The recipients of those alleged fraudulent transfers are Larry Wright's wife, daughters, and a family trust. The Debtor parties cannot be trusted to adequately investigate or pursue fraudulent transfers against those potential defendants—namely, themselves, as the Wrights were both the transferors (as owners of KrisJenn) and the recipients of the fraudulent transfer (as owners of Express). The Debtor parties have also proven themselves unable to sell the ROW to a willing buyer for fair market value or to cause KrisJenn and Wright to pay the money judgment against them. A neutral Chapter 7 Trustee is required to carry out those functions.

**IV. There are no unusual circumstances preventing conversion.**

In his response to the Court's order to show cause, Wright argues that even if there is cause for conversion, the Court is precluded from converting to a Chapter 7 proceeding because "unusual circumstances establish[] that converting or dismissing the case is not in the best interest of creditors and the estate." Wright's Resp. Show Cause Order (ECF No. 293) at 7 (citing 11 U.S.C. § 1112(b)(2)). However, as noted above, converting the case would be in the best interest of the creditors because, at a minimum, the Debtor parties have grossly mismanaged the bankruptcy estate and repeatedly failed to follow this Court's orders, and no other unusual circumstances preclude conversion.

Relying on *In re Manges*, Wright first argues that conversion is not in the interest of the creditors and unusual circumstances apply because the bankruptcy reorganization plan has been substantially consummated. *Id.* at 5 (citing *Manges v. Seattle-First Nat'l Bank*

(*In re Manges*), 29 F.3d 1034, 1036 (5th Cir. 1994)). As an initial matter, Wright's reliance on *Manges* is inapposite: the court in *Manges* addressed whether the debtors' appeal of the bankruptcy plan was moot given that the estate's assets had already been irreversibly liquidated and sold to bona fide third-party purchasers. 29 F.3d at 1042–43. Here, in contrast, the Court is evaluating not an appeal but a conversion to address the Debtor parties' pattern of wrongdoing. Thus, *Manges* is inapplicable. Furthermore, as the Fifth Circuit stated in *Manges*, substantial consummation "does not necessarily make it impossible or inequitable for a[] . . . court to grant effective relief." *Id.* The Court can and should proceed with conversion because there is cause for it, and the fact that the plan may have been substantially consummated is not a sufficiently unusual circumstance to warrant otherwise. *See In re Seaview Estates, Inc.*, 213 B.R. 427, 430–32 (Bankr. E.D.N.Y. 1997) (allowing Chapter 7 conversion after plan consummation due to debtor's failure to perform under the plan and compiling cases).

Wright also argues that unusual circumstances apply and conversion is not in the interest of the creditors because Express H2O has agreed to comply with all plan obligations, including any set by this Court's final judgment. Wright's Resp. Show Cause Order (ECF No. 293) at 8–9. Wright has repeatedly claimed he does not speak on behalf of Express H2O and thus lacks authority or standing to argue that Express H2O will comply with the plan. But in any case, Express H2O and the Debtor parties have already failed to comply with the plan. The Debtor parties transferred the ROW to Express H2O in violation of the plan and of this Court's orders. And for two years the Debtor parties have failed to transfer the ROW back from Express despite their on-the-record promise to do so in the initial post-remand hearings following the first District Court appeal.[8] The Court should reject Express H2O and the Debtor parties' empty reassurances given their continued refusals to comply with the Court's orders.

---

[8] Ex. 2 (June 4, 2026 Hrg. Tr.) at 42:23–43:15; Ex. 3 (Feb. 5, 2025 Hrg. Tr.) at 22:1–22:6, 36:12–36:20.

Wright also claims that unusual circumstances apply because the bankruptcy plan and the final judgment already provide the Creditors with any relief to which they may be entitled. *Id.* at 9. However, Wright's argument glosses over the fact that, in the two years since the Court entered its final judgment, the Debtor parties have sought to undermine the final judgment multiple times. *See supra* Background at 3. Wright and his entities' evasion of the judgment and misconduct demonstrate the need for conversion.

Finally, Wright argues that unusual circumstances apply because Express H2O is currently in litigation over the ROW's title, and that litigation is likely to be favorably resolved in the near future. But Wright fails to show how the conversion's potential effect on Express H2O's litigation would be detrimental or not in the "best interest" of Creditors. Wright incorrectly assumes that it is in Creditor's best interest for Express H2O to remain in control of the ROW because it has "institutional knowledge." But as explained above, Express H2O and the Debtor parties have repeatedly failed to follow this Court's orders and sought to undermine Creditors' rights. Even if converting the case and adding a trustee could result in increased costs for the estate and delays for the ongoing litigation over the ROW's title (which is not guaranteed), it is in Creditors' best interest to have a neutral Chapter 7 trustee overseeing the estate. That Express H2O has chosen to pursue litigation over the ROW instead of transferring the ROW back to the Debtor parties does not change this analysis.

The Debtor parties have shown the Court who they are. The Court should believe them. After years of gamesmanship and bad-faith actions, the Debtor parties can be trusted to engage in more of the same, for as long as it takes, to vitiate the final judgment and Creditors' rights. The Court should not tolerate the Debtor parties' efforts to avoid its judgment and should instead convert this case from Chapter 11 to Chapter 7 and allow the U.S. Trustee to handle the Debtor parties' assets.

## CONCLUSION

This dispute has already lasted nearly a decade. For all of the reasons described above, Chapter 7 conversion is not only proper: it is the only process with any reasonable chance of (1) sparing the parties and the courts years more of litigation and (2) protecting Creditors' interests. Creditors thus respectfully ask the Court to convert this case from Chapter 11 to Chapter 7 and to instruct the U.S. Trustee to liquidate the ROW and take other appropriate measures to protect Creditors' interests.

Respectfully submitted,

*/s/ Austin H. Krist*

Christopher S. Johns
Texas Bar No. 24044849
JOHNS & COUNSEL PLLC
13341 W. US-290, Building 2
Austin, Texas 78737
512-399-3150
512-572-8005 fax
chris@johnsandcounsel.com

Timothy Cleveland
Texas Bar No. 24055318
Austin H. Krist
Texas Bar No. 24106170
CLEVELAND | KRIST PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandkrist.com
akrist@clevelandkrist.com

Natalie F. Wilson
Texas Bar No. 24076779
LANGLEY & BANACK
745 East Mulberry Avenue, Suite 700
San Antonio, Texas 78212
210-736-6600
210-735-6889 fax
nwilson@langleybanack.com

*Counsel for Longbranch Energy, DMA Properties, and Frank Daniel Moore*

## CERTIFICATE OF SERVICE

I certify that on September 22, 2026, this filing was served on counsel of record via the CM/ECF system and/or by email.

*/s/ Austin H. Krist*
Austin H. Krist

**Nacogdoches County**
**Sandra "Sandy" Yates**
**Nacogdoches County Clerk**

---

**Instrument Number:** 2023 - 1331

eRecording - Real Property

Parties: | Parties:

Recorded On: February 23, 2023 02:26 PM | Number of Pages: 32

---

**" Examined and Charged as Follows: "**

Total Recording: $146.00

---

*********** **THIS PAGE IS PART OF THE INSTRUMENT** ***********

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY because of color or race is invalid and unenforceable under federal law.

| **File Information:** | | **Record and Return To:** |
|---|---|---|
| Document Number: | 2023-1331 | CSC GLOBAL |
| Receipt Number: | 20230223000038 | |
| Recorded Date/Time: | February 23, 2023 02:26 PM | |
| User: | Jennifer A | |
| Station: | CLERK02 | |

---

**STATE OF TEXAS**
**COUNTY OF NACOGDOCHES**

**I hereby certify that this Instrument was** FILED **In the File Number sequence on the date/time printed hereon, and was duly** RECORDED **in the Official Records of County, Texas.**

Sandra "Sandy" Yates
Nacogdoches County Clerk
Nacogdoches County, TX

Sandra "Sandy" Yates

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## SPECIAL WARRANTY DEED

**Date:** February 22, 2023

**Grantor:** KRISJENN RANCH, L.L.C. – Series Pipeline ROW, a Texas series limited liability company

**Grantor's Mailing Address:**

Krisjenn Ranch, L.L.C. – Series Pipeline ROW
c/o Larry Wright, Manager
410 Spyglass
McQueeney, TX 78123
Guadalupe County

**Grantee:** EXPRESS H2O PIPELINE & ROW, L.L.C., a Texas limited liability company

**Grantee's Mailing Address:**

Express H2O Pipeline & ROW, L.L.C.
c/o Larry Wright, Manager
410 Spyglass
McQueeney, TX 78123
Guadalupe County

**Consideration:**

Membership interests in Grantee.

**Property (including any improvements):**

All of Grantor's right, title, and interest in and to the pipeline system and related facilities ("P-21 Pipeline"), rights-of-way, easements, permits, leases and other rights and properties situated in the State of Texas (the "ROW") that Grantor acquired by that certain Deed, Conveyance, Assignment, and Bill of Sale dated December 20, 2019 by and between TCRG East Texas Pipeline 1, LLC a Texas limited liability company, and Grantor attached

hereto as Exhibit A and incorporated herein by reference, and recorded under: (a) Instrument 2023-883, Official Public Records of Nacogdoches County, Texas; (b) Instrument No. 2020-00390181, Real Property Records of Angelina County, Texas; (c) Instrument No. 2020000150, Real Property Records of Shelby County, Texas; and (d) Instrument No. 0019469, Real Property Records of Rusk, County, Texas.

**Reservations from Conveyance:** None.

**Exceptions to Conveyance and Warranty:**

This conveyance is expressly made and accepted subject to all matters on the ground that a true and correct survey would reveal; all validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing instruments; and all zoning laws, regulations and ordinances of municipal and/or other governmental authorities relating to the above described property; and taxes for "the present year", which Grantee assumes and agrees to pay, and subsequent assessments for that and prior years due to change in land usage, ownership, or both, the payment of which Grantee assumes.

**Grant, Habendum, and Warranty:**

Grantor for the Consideration and subject to the Reservations from Conveyance and Exceptions to Conveyance and Warranty, grants, sells and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any wise belonging (including, without limitation, all permits, vested rights and related privileges with respect thereto, if any) to have and hold it to Grantee and Grantee's heirs, executors, administrators, successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof when the claim is by, through, or under Grantor but not otherwise, and except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

When the context requires, singular nouns and pronouns include the plural.

*This instrument was administratively prepared by Granstaff, Gaedke & Edgmon, P.C. from information provided by the Grantor. No opinion as to title is made or should be construed from this instrument. Granstaff, Gaedke & Edgmon, P.C. has not examined the title to the subject property or otherwise investigated the accuracy of the information provided.*

{Signature Page Follows}

GRANTOR:

Larry M. Wright

KrisJenn Ranch, LLC, - Series Pipeline ROW
A Texas Limited Liability Company
Larry Wright, Manager

THE STATE OF TEXAS §
§
COUNTY OF Bexar §

This instrument was acknowledged before me on February 22, 2023, by LARRY MICHAEL WRIGHT in the capacity stated.

BLANCA A LIMON
Notary Public, State of Texas
My Comm. Exp. 06-01-2026
Notary ID 13378979-2

Blanca Limon

Notary Public for the State of Texas

AFTER RECORDING RETURN TO:

**GRANSTAFF, GAEDKE & EDGMON, P.C.**
c/o Michael H. Rodgers
5535 Fredericksburg Rd., Suite 110
San Antonio, Texas 78229
Tel: (210) 348-6600
Fax: (210) 366-0892

P:\WP2\Clients T-Z\Wright, Larry & Gwynne\Express H2O Pipeline & ROW, L.L.C\Deed - Special Warranty.docx

**EXHIBIT "A"**

**All the described pipelines taps, and other facilities owned by KrisJenn Ranch, LLC in the State of Texas as set forth on "Exhibit A" attached hereto and by this reference (1 page: map)**

**EXHIBIT "B-1"**
**Shelby County, Texas**
**(10 pages)**

**EXHIBIT "B-2"**
**Rusk County, Texas**
**(1 page)**

**EXHIBIT "B-3"**
**Nacogdoches County, Texas**
**(9 pages)**

**EXHIBIT "B-4"**
**Angelina County, Texas**
**(1 page)**

**EXHIBIT "B-5"**
**Nacogdoches County, Texas**
**Exceptions as Noted in 1992 Tepco to Lancer Purchase Agreement**
**(2 pages)**

**EXHIBIT "B-6"**
**Nacogdoches, Rusk and Shelby County**
**Amendments, Release and New Rights of Ways and Easements Since Tepco to Lancer Sale**
**(3 pages)**

**EXHIBIT "A"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this ____ day of February, 2016, between The Express Gas Pipeline, LP and Longbranch Energy, LP



**EXHIBIT "B-1"**

Attached hereto and made a part of that certain Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| Date | Grantor | Grantee | Book | Page |
|---|---|---|---|---|
| 02/03/13 | Van J. Smith | Gulf Pipe Line Co. | 81 | 7 |
| 01/27/14 | E.W. Cockrell | Gulf Pipe Line Co. and Gulf Production Co. | 79 | 582 |
| 01/28/14 | D.D. Bazer, et ux. | Gulf Pipe Line Co. | 79 | 609 |
| 01/28/14 | I.E. Bazer, et ux. | Gulf Pipe Line Co. | 79 | 597 |
| 01/28/14 | W.H. Cammack | Gulf Pipe Line Co. | 79 | 594 |
| 01/28/14 | W.H. Cammack | Gulf Pipe Line Co. | 79 | 594 |
| 01/28/14 | W.H. Cammack | Gulf Pipe Line Co. | 79 | 594 |
| 01/28/14 | Bridie Carter, et vir. | Gulf Pipe Line Co. | 79 | 592 |
| 01/28/14 | Mrs. W.J. Cockrell | Gulf Pipe Line Co. | 79 | 593 |
| 01/28/14 | J.R. Joplin, et ux. | Gulf Pipe Line Co. | 79 | 574 |
| 01/28/14 | Ralph Jopling, et ux. | Gulf Pipe Line Co. | 81 | 19 |
| 01/28/14 | J.D. Majors, et ux. | Gulf Pipe Line Co. | 81 | 27 |
| 01/28/14 | J.W. Majors | Gulf Pipe Line Co. | 81 | 14 |
| 01/28/14 | A.W. Mathews, et ux. | Gulf Pipe Line Co. | 81 | 24 |
| 01/18/14 | W.R. Rains | Gulf Pipe Line Co. | 79 | 595 |
| 01/29/14 | Luke Motley | Gulf Pipe Line Co. | 81 | 8 |
| 01/29/14 | J.L. Norman | Gulf Pipe Line Co. | 81 | 18 |
| 01/29/14 | W.J. Shadowens, et ux. | Gulf Pipe Line Co. | 79 | 596 |
| 01/29/14 | John Turner, et ux. | Gulf Pipe Line Co. | 81 | 25 |
| 01/29/14 | John Turner, et ux. | Gulf Pipe Line Co. | 81 | 25-26 |
| 01/29/14 | John Turner, et us. | Gulf Pipe Line Co. | 81 | 25-26 |
| 01/31/14 | J.H. Hughes | Gulf Pipe Line Co. | 79 | 562 |
| 01/31/14 | J.R. Lewis | Gulf Pipe Line Co. | 79 | 576 |
| 02/02/14 | Charles F. Flakes | Gulf Pipe Line Co. | 79 | 607 |
| 02/02/14 | W.E. Parker | Gulf Pipe Line Co. | 81 | 16 |
| 02/02/14 | W.W. Rider, et ux. | Gulf Pipe Line Co. | 81 | 21 |
| 02/02/14 | J.H. Wall | Gulf Pipe Line Co. | 79 | 605 |
| 02/02/14 | Ben B. White, et ux. | Gulf Pipe Line Co. | 79 | 573 |
| 02/02/14 | W.D. White, et ux. | Gulf Pipe Line Co. | 79 | 598 |
| 02/03/14 | Luis Hooper, et al. | Gulf Pipe Line Co. | 79 | 579 |
| 02/03/14 | J. Nathan King | Gulf Pipe Line Co. | 79 | 564 |
| 02/03/14 | J. Nathan King | Gulf Pipe Line Co. | 79 | 564 |
| 02/03/14 | C. Riley, et ux. | Gulf Pipe Line Co. | 79 | 611 |
| 02/03/14 | Jno. A. White, et ux. | Gulf Pipe Line Co. | 79 | 571 |
| 02/04/14 | M.M. Bowlin, et ux. | Gulf Pipe Line Co. | 79 | 578 |
| 02/04/14 | John Kyle, et ux. | Gulf Pipe Line Co. | 79 | 563 |
| 02/04/14 | J.R. Weir | Gulf Pipe Line Co. | 79 | 568 |
| 02/05/14 | C.C. Hayden | Gulf Pipe Line Co. | 79 | 576 |
| 02/06/14 | W.L. Foster, et ux. | Gulf Pipe Line Co. | 79 | 572 |
| 02/06/14 | C.M. Horton, et ux. | Gulf Pipe Line Co. | 79 | 565 |
| 02/06/14 | O.M. Ramsey, et al. | Gulf Pipe Line Co. | 79 | 599 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express
Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| 02/06/14 | B.A. Roper | Gulf Pipe Line Co. | 79 | 561 |
| 02/07/14 | F.M. Bridwell, et al. | Gulf Pipe Line Co. | 79 | 550 |
| 02/09/14 | Rev. Mack Jones, et al. | Gulf Pipe Line Co. | 79 | 603 |
| 02/10/14 | G.W. Crenshaw, et ux. | Gulf Pipe Line Co. | 79 | 567 |
| 02/10/07 | J.H. Cruger, et ux. | Gulf Pipe Line Co. | 79 | 600 |
| 02/10/14 | F.D. Haden, et ux. | Gulf Pipe Line Co. | 81 | 6 |
| 02/10/14 | Henry Sears, et ux. | Gulf Pipe Line Co. | 79 | 569 |
| 02/11/14 | W.A. Cooper, et ux. | Gulf Pipe Line Co. | 79 | 557 |
| 02/11/14 | W.R. Harris, et ux. | Gulf Pipe Line Co. | 79 | 553 |
| 02/11/14 | J.M. Whiteside | Gulf Pipe Line Co. | 79 | 543 |
| 02/11/14 | C.O. Worsham, et ux. | Gulf Pipe Line Co. | 79 | 554 |
| 02/11/14 | W.T. Worsham, et ux. | Gulf Pipe Line Co. | 79 | 556 |
| 02/12/14 | W.F. Andrews | Gulf Pipe Line Co. | 79 | 562 |
| 02/12/14 | S.W. Wallace | Gulf Pipe Line Co. | 81 | 5 |
| 02/13/14 | E.H. Andrews, et ux. | Gulf Pipe Line Co. | 79 | 560 |
| 02/13/14 | Phil Bussy, Jr., et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr. et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr. et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr. et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr., et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr., et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr., et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr., et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr., et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | Phil Bussy, Jr., et al. | Gulf Pipe Line Co. | 79 | 610 |
| 02/13/14 | W.M. Byrn | Gulf Pipe Line Co. | 79 | 602 |
| 02/14/14 | F.O. Johnson | Gulf Pipe Line Co. | 79 | 580 |
| 02/14/14 | Allen Porter, Agent for Robert Porter | Gulf Pipe Line Co. | 79 | 604 |
| 02/16/14 | J.F. Beasley, et ux. | Gulf Pipe Line Co. | 81 | 11 |
| 02/16/14 | M.M. Carroll, Jr. | Gulf Pipe Line Co. | 79 | 581 |
| 02/16/14 | W.I. Deffenbaugh | Gulf Pipe Line Co. | 79 | 606 |
| 02/16/14 | G.W. Hanson, et ux. | Gulf Pipe Line Co. | 79 | 583 |
| 02/17/14 | E.A. Booth | Gulf Pipe Line Co. | 79 | 603 |
| 02/17/14 | Zach Brinson | Gulf Pipe Line Co. | 79 | 558 |
| 02/17/14 | J.B. Broadus, et ux. | Gulf Pipe Line Co. | 79 | 547 |
| 02/17/14 | J.R. Foster, et ux. | Gulf Pipe Line Co. | 79 | 612 |
| 02/17/14 | J. R. Foster, et ux. | Gulf Pipe Line Co. | 79 | 612 |
| 02/17/14 | J.L. Gilbert, et ux. | Gulf Pipe Line Co. | 81 | 23 |
| 02/18/14 | W.L. Barron, et ux. | Gulf Pipe Line Co. | 81 | 547 |
| 02/18/14 | J.T. Caldwell, et ux. | Gulf Pipe Line Co. | 79 | 546 |
| 02/18/14 | C.H. Freeman, et ux. | Gulf Pipe Line Co. | 79 | 545 |
| 02/18/07 | J.L. Hart | Gulf Pipe Line Co. | 79 | 570 |
| 02/18/14 | H.J. Hennigan, et ux. | Gulf Pipe Line Co. | 79 | 544 |
| 02/18/14 | R.A. Whiddon, et ux. | Gulf Pipe Line Co. | 79 | 585 |
| 02/18/14 | W.A. Whiddon, et ux. | Gulf Pipe Line Co. | 79 | 584 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| 02/18/14 | F.M. Whiteside, et ux. | Gulf Pipe Line Co. | 79 | 551 |
| 02/19/14 | J.D. Sholer | Gulf Pipe Line Co. | 79 | 613 |
| 02/19/14 | Whiddon, J.E., Gdn. for his two minor children Mary Etta Whiddon & James Floid Whiddon | Gulf Pipe Line Co. | 79 | 549 |
| 02/20/14 | R.A. Rushing, by W.A. Whiddon, Agt. | Gulf Pipe Line Co. | 81 | 478 |
| 02/23/14 | Cohron Davis, et ux. | Gulf Pipe Line Co. | 79 | 591 |
| 02/23/14 | Ima Odom, et al. | Gulf Pipe Line Co. | 81 | 9 |
| 02/23/14 | J.B. Paramore, et ux. | Gulf Pipe Line Co. | 81 | 15 |
| 02/23/14 | J.W. Sholar | Gulf Pipe Line Co. | 81 | 20 |
| 02/23/14 | R. Sholar | Gulf Pipe Line Co. | 81 | 17 |
| 02/23/14 | W.F. Taley, et ux. | Gulf Pipe Line Co. | 79 | 589 |
| 02/24/14 | W.R. Crawford, et ux. | Gulf Pipe Line Co. | 79 | 588 |
| 02/24/14 | C.P. Hooper, et ux. | Gulf Pipe Line Co. | 79 | 587 |
| 03/07/14 | L.N. Muren | Gulf Pipe Line Co. | 81 | 13 |
| 03/28/14 | H. Bryant, et al. | Gulf Pipe Line Co. | 81 | 10 |
| 05/26/14 | F.J. Hobbs | Gulf Pipe Line Co. | 81 | 548 |
| 12/16/14 | I.W. Willimas | Gulf Pipe Line Co. | 79 | 559 |
| 02/18/24 | W.F. Hollister, et ux. | Gulf Pipe Line Co. | 79 | 552 |
| 07/09/24 | F.M. Bridwell | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 440 |
| 07/09/24 | Mrs. W.H. Harris | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 441 |
| 07/09/24 | F.M. Whiteside, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 464 |
| 07/09/24 | Mrs. J.M. Whiteside | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 438 |
| 07/09/24 | W.T. Worsham | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 443 |
| 07/10/24 | E.H. Andrews, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 446 |
| 07/10/24 | E.A. Booth | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 463 |
| 07/10/24 | F.L. Brinson, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 458 |
| 07/10/24 | F.L. Brinson, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 458 |
| 07/10/24 | F.L. Brinson, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 458 |
| 07/10/24 | Zach Brinson | Gulf Pipe Line Co. | 127 | 456 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| | | and Gulf Production Co. | | |
| 07/10/24 | W.M. Byrn | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 459 |
| 07/10/24 | G.W Crenshaw, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 448 |
| 07/10/24 | J.H. Cruger, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 445 |
| 07/10/24 | Mrs. F.D. Haden | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 462 |
| 07/10/24 | C.O. Worsham, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 442 |
| 07/11/24 | F.H. Bailey, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 453 |
| 07/11/24 | F. H. Bailey, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 453 |
| 07/11/24 | F.H. Bailey, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 453 |
| 07/11/24 | Arthur Bussey, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 452 |
| 07/11/24 | John Bussey, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 450 |
| 07/11/24 | Phil Bussy Jr., et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 455 |
| 07/11/24 | J.G. Ellington | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 437 |
| 07/11/24 | F.O. Johnson | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 460 |
| 07/11/24 | I.N. Williams | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 449 |
| 07/14/24 | E.W. Cockrell, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 479 |
| 07/14/24 | Mrs. G.W. Hanson Adm. of G.W. Hanson Est. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 481 |
| 07/14/24 | T.A. King | Gulf Pipe Line Co. | 124 | 478 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express
Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| | | and Gulf Production Co. | | |
| 07/14/24 | Ima Odom Nutt, et al. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 485 |
| 07/14/24 | Mrs. W.F. Talley | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 476 |
| 07/14/24 | A.O. Whiddon | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 480 |
| 07/15/24 | Paul Barron, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 471 |
| 07/15/24 | J.T. Carroll | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 470 |
| 07/15/24 | C.H. Freeman, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 469 |
| 07/15/24 | Mrs. B.J. Hennigan | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 484 |
| 07/15/24 | C.P. Hooper, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 473 |
| 07/15/24 | J.D Sholar | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 483 |
| 07/16/24 | W.R. Crawford, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 487 |
| 07/17/24 | J.T. Caldwell, et al. | Gulf Pipe Line Co. and Gulf Production Co. | 131 | 497 |
| 07/21/24 | Arthur Bussey, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 496 |
| 07/21/24 | Mack Jones, et al. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 493 |
| 07/21/24 | C.D. Scogin | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 491 |
| 07/21/24 | H.S. Varnell, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 495 |
| 07/22/24 | Cleveland Bussey | Gulf Pipe Line Co. and Gulf Production Co. | 124 | 492 |
| 08/01/24 | W.A Cooper | Gulf Pipe Line Co. | 124 | 520 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| | | and Gulf Production Co. | | |
| 10/14/24 | Pierce Whiteside, et al. | Gulf Pipe Line Co. and Gulf Production Co. | 123 | 632 |
| 04/30/25 | J.A. Deaton, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 506 |
| 04/30/25 | Claude E. Fallin | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 52 |
| 04/30/25 | Alvin Gunter | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 503 |
| 04/30/25 | J.R. Jopling, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 55 |
| 04/30/25 | J.N. Majors | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 54 |
| 04/30/25 | C.C. McDonald | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 56 |
| 04/30/25 | Grover C. Peddy | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 500 |
| 04/30/25 | C. Riley, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 502 |
| 04/30/25 | F.B Taylor | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 504 |
| 04/30/25 | J.R. Weir, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 141 |
| 05/01/25 | Mrs. W. A. Bouland by J.L. Davis, Attorney-in-Fact | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 568 |
| 05/01/25 | Cicero Jopling, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 552 |
| 05/01/25 | J. N. King | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 62 |
| 05/01/25 | J.O. McCarver | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 187 |
| 05/01/25 | J.O. McCarver | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 187 |
| 05/01/25 | J.O. McCarver | Gulf Pipe Line Co. | 127 | 187 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| | | and Gulf Production Co. | | |
| 05/01/25 | Luke Motley | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 569 |
| 05/01/25 | Luke Motley | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 569 |
| 05/01/25 | Luke Motley | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 569 |
| 05/01/25 | Robert Porter | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 61 |
| 05/01/25 | Walter Scates, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 63 |
| 05/01/25 | A.H. Womack, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 566 |
| 05/02/25 | M.M. Bowlin, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 556 |
| 05/02/25 | H. Bryant, et al. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 562 |
| 05/02/25 | Harvey Crawford | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 364 |
| 05/02/25 | John Davis | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 551 |
| 05/02/25 | J.B. Foster by J.R. Foster, Gdn. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 60 |
| 05/02/25 | J.R. Foster, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 559 |
| 05/02/25 | Mrs. W.L. Foster | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 560 |
| 05/02/25 | P.L. Hooper, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 600 |
| 05/02/25 | J.R. Lewis | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 555 |
| 05/02/25 | Luke Motley | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 554 |
| 05/02/25 | A.N. Neal, et ux. | Gulf Pipe Line Co. | 126 | 559 |

**EXHIBIT "B-1"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| | | and Gulf Production Co. | | |
| 05/02/25 | Mrs. O.M. Ramsey | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 563 |
| 05/04/25 | C.H. Horton, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 532 |
| 05/04/25 | J.D. Majors, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 550 |
| 05/04/25 | H.M. Mitchell, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 548 |
| 05/04/25 | Dewey Parrish, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 537 |
| 05/04/25 | Allen Samford, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 539 |
| 05/04/25 | Elbert B. Samford by E.B Samford, Agent and Attorney-In-Fact | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 536 |
| 05/04/25 | J. B. Samford by E.B. Samford, Agent and Attorney-In-Fact | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 535 |
| 05/04/25 | W.A. Samford, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 541 |
| 05/04/25 | W.J. Shadowens, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 547 |
| 05/04/25 | R. Sholar, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 542 |
| 05/05/25 | Annie Broadus | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 138 |
| 05/05/25 | E.W. Cockrell | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 142 |
| 05/05/25 | J.W. Sholar, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 546 |
| 05/05/25 | Mrs. Bloom Wagstaff, et vir. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 529 |
| 05/05/25 | W.J. Walker, et al. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 533 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| 05/05/25 | B.C. Wheat, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 530 |
| 05/05/25 | B.C. Wheat, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 530 |
| 05/07/25 | D.D. Bazer, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 58 |
| 05/16/25 | Ralph Jopling, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 126 | 602 |
| 05/26/25 | Alma Davis, et vir. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 139 |
| 05/26/25 | George B. Goff, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 189 |
| 05/27/25 | Mary White, et al. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 216 |
| 07/31/25 | Robert Spivey | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 347 |
| 08/05/25 | Mrs. Viola Rushing by A.O. Whiddon, Agent & Attorney-In-Fact | Gulf Pipe Line Co. and Gulf Production Co. | | |
| 08/25/25 | W.F. Hollister, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 128 | 172 |
| 08/27/25 | Mrs. Viola RushingA.O. Whiddon, Agent & Attorney-in-Fact | Gulf Pipe Line Co. and Gulf Production Co. | | |
| 08/31/25 | C.H. Horton, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 128 | 190 |
| 09/08/25 | Arthur Bussey, et ux. | Gulf Pipe Line Co. and Gulf Production Co. | 127 | 503 |
| 09/23/25 | Mrs. M. Lochabay | Gulf Pipe Line Co. and Gulf Production Co. | 128 | 254 |
| 06/12/26 | C.C. Hayden | Gulf Pipe Line Co. and Gulf Production Co. | 131 | 137 |
| 07/17/42 | Texas Highway Dept. | Texas Eastern Transmission Corp. | | |
| 07/17/42 | Texas Highway Dept. | Texas Eastern Transmission Corp. | | |
| 05/04/48 | L.B. Dean | Gulf Refining Co. | 276 | 615 |

**EXHIBIT "B-1"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Shelby County, Texas

| | | | | |
|---|---|---|---|---|
| | | and Gulf Oil Corp. | | |
| 05/04/48 | C.H. Horton, et ux. | Gulf Refining Co. and Gulf Oil Corp. | 276 | 616 |
| 05/04/48 | R.W. Todd | Gulf Refining Co. and Gulf Oil Corp. | 276 | 617 |
| 05/06/48 | J.R. Anderson | Gulf Refining Co. and Gulf Oil Corp. | 277 | 329 |
| 11/09/51 | Earl Hanson, et al. | Gulf Refining Co | 306 | 192 |
| 06/10/52 | M.E. Bowlin, et ux. | Gulf Refining Co. and Gulf Oil Corp. | 311 | 258 |
| 06/10/52 | H.Q. Hoard, et ux. | Gulf Refining Co. and Gulf Oil Corp. | 311 | 256 |
| 03/23/54 | Texas Hwy. Dept. | Texas Eastern Transmission Corp. | | |
| 04/20/55 | Texas Hwy. Dept. | Texas Eastern Transmission Corp. | | |
| 04/20/55 | Texas Hwy. Dept. | Texas Eastern Transmission Corp. | | |
| 11/02/59 | Gulf Refining Co. | Texas Eastern Transmission Corp. | 381 | 347 |
| 12/18/59 | Gulf, Colorado& Sante Fe R.R. Co. and Gulf Refining Co. | Texas Eastern Transmission Corp. | | |
| 09/29/71 | Texas Hwy. Dept. | Texas Eastern Transmission Corp. | | |

**EXHIBIT "B-2"**

Attached hereto and made a part of that certain Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Rusk County, Texas

| Date | Grantor | Grantee | Book | Page |
|---|---|---|---|---|
| 07/08/54 | Ruby L. Dumas, et vir. | Texas Eastern Transmission Corp. | 530 | 153 |
| 08/23/54 | Commissioners Court, Panola Co. Texas | Texas Eastern Transmission Corp. | | |
| 06/27/10 | J.A. Anderson, et ux. | Gulf Pipe Line Co. | 67 | 150 |
| 06/27/10 | M.J. Barton, et ux. | Gulf Pipe Line Co. | 67 | 138 |
| 06/27/10 | T.S. Barton, et ux. | Gulf Pipe Line Co. | 67 | 1400 |
| 06/27/10 | R.F. Garrison, et ux. | Gulf Pipe Line Co. | 67 | 144 |
| 06/27/10 | F.L. Hudgins, et ux. | Gulf Pipe Line Co. | 67 | 136 |
| 06/27/10 | J.R. Latimer, et ux. | Gulf Pipe Line Co. | 67 | 142 |
| 06/27/10 | S.M. Moore, et ux. | Gulf Pipe Line Co. | 67 | 134 |
| 07/06/10 | M.L. Moore, et al. | Gulf Pipe Line Co. | 67 | 130 |
| 07/21/10 | W.Y. Garrison | Gulf Pipe Line Co. | 67 | 146 |
| 07/29/10 | S.M. Moore, Agent for Nannie Fountain, et al. | Gulf Pipe Line Co. | 67 | 132 |
| 07/29/10 | The Brown Brick & Tile Co. | Gulf Pipe Line Co. | 67 | 183 |
| 08/02/10 | J.R. Latimer | Gulf Pipe Line Co. | 67 | 152 |
| 08/20/10 | R.F. Garrison | Gulf Pipe Line Co. | 67 | 182 |
| 11/16/10 | E.A. Blount | Gulf Pipe Line Co. | 1676 | 741 |
| 12/07/10 | E.A. Blount | Gulf Pipe Line Co. | 1677 | 111 |
| 05/01/14 | Mrs. M.L. Moore | Gulf Pipe Line Co. | 83 | 193 |
| 07/03/23 | Marion C. Skelton, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 612 |
| 07/03/24 | Nora Anderson | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 627 |
| 07/03/24 | M.J. Barton, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 629 |
| 07/03/24 | T.S. Barton, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 614 |
| | | | | |
| 07/03/24 | R.F. Garrison, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 618 |
| 07/03/24 | J.R. Latimer, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 617 |
| 07/03/24 | G.W. Young | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 611 |
| 07/05/24 | George Harris, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 609 |
| 07/08/24 | Earnest Weaver, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 615 |
| 07/09/24 | Jack Garrison, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 123 | 634 |
| 10/28/42 | S.M. Adams | Gulf Refining Co. & Gulf Oil Co. | 360 | 190 |

**EXHIBIT "B-3"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| Date | Grantor | Grantee | Book | Page |
|---|---|---|---|---|
| 06/27/10 | Tom Crawford, et al. | Gulf Pipeline Co. | 72 | 647 |
| 06/27/10 | J.W. Hartt, et al. | Gulf Pipeline Co. | 74 | 16 |
| 06/27/10 | T.J. Melton, et al. | Gulf Pipeline Co. | 75 | 77 |
| 06/27/10 | J.A. Slay | Gulf Pipeline Co. | 72 | 644 |
| 06/28/10 | G.W. Faulkner, et ux. | Gulf Pipeline Co. | 74 | 21 |
| 06/28/10 | A.J. Fears, et ux. | Gulf Pipeline Co. | 72 | 642 |
| 06/28/10 | Mrs. M.I. Strode | Gulf Pipeline Co. | 74 | 189 |
| 06/28/10 | Dora Tims, et al. | Gulf Pipeline Co. | 74 | 192 |
| 06/29/10 | S.W. Hunt, et ux. | Gulf Pipeline Co. | 75 | 75 |
| 06/29/10 | F.W. Parrott | Gulf Pipeline Co. | 72 | 631 |
| 06/29/10 | Arthur Peterson, et al. | Gulf Pipeline Co. | 75 | 73 |
| 06/29/10 | J.L. William, et ux. | Gulf Pipeline Co. | 75 | 68 |
| 06/30/10 | J.W. Boyd, et ux. | Gulf Pipeline Co. | 74 | 22 |
| 06/30/10 | R.H. Burns, et ux. | Gulf Pipeline Co. | 74 | 63 |
| 06/30/10 | T.J. Peterson | Gulf Pipeline Co. | 75 | 66 |
| 06/30/10 | John M. Richards, et ux. | Gulf Pipeline Co. | 74 | 39 |
| 07/01/10 | W.G. Hartt, et ux. | Gulf Pipeline Co. | 74 | 8 |
| 07/04/10 | Angelina County Lumber Co. | Gulf Pipeline Co. | 72 | 634 |
| 07/04/19 | S.C. Parrott, et al. | Gulf Pipeline Co. | 74 | 107 |
| 07/05/10 | Joe Manchaca, et ux. | Gulf Pipeline Co. | 74 | 24 |
| 07/05/10 | S. Michelli | Gulf Pipeline Co. | 74 | 31 |
| 07/05/10 | T. Supulvado, et ux. | Gulf Pipeline Co. | 74 | 31 |
| 07/06/10 | M. Peterson, et ux. | Gulf Pipeline Co. | 74 | 17 |
| 07/08/10 | Tom Hinjosa, et ux. | Gulf Pipeline Co. | 74 | 4 |
| 07/08/10 | F.M. Richards, et ux. | Gulf Pipeline Co. | 74 | 23 |
| 07/09/10 | Chas Hoya, et al. | Gulf Pipeline Co. | 72 | 637 |
| 07/14/10 | Alice Fears | Gulf Pipeline Co. | 72 | 633 |
| 07/18/10 | Elareo Cordova, et ux. | Gulf Pipeline Co. | 74 | 29 |
| 07/18/10 | J.H. Summers | Gulf Pipeline Co. | 74 | 2 |
| 07/19/10 | Josh Henson | Gulf Pipeline Co. | 74 | 10 |
| 07/19/10 | V.E. Rathbone | Gulf Pipeline Co. | 74 | 38 |
| 07/20/10 | A.M. Evans, et ux. | Gulf Pipeline Co. | 74 | 13 |
| | | | | |
| 07/20/10 | Dixon Greer | Gulf Pipeline Co. | 72 | 630 |
| As Amended By: | | | | |
| 04/23/99 | Cendant Mobility Services Corp. | Lancer Resources Company | 1331 | 24 |
| 07/20/10 | Elma Greer | Gulf Pipeline Co. | 72 | 629 |
| As Amended By: | | | | |
| 04/23/99 | Cendant Mobility Services Corp. | Lancer Resources Company | 1331 | 24 |
| 07/20/10 | Chas Hoya | Gulf Pipeline Co. | 74 | 6 |

**EXHIBIT "B-3"**

Attached hereto and made a part of that certain Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 07/20/10 | Mrs. Antonia Manchaca, et al. | Gulf Pipeline Co. | 74 | 33 |
| 07/20/10 | Mrs. J.E. Patterson, et al. | Gulf Pipeline Co. | 90 | 429 |
| 07/20/10 | Moses Tims, et ux. | Gulf Pipeline Co. | 74 | 27 |
| 07/20/10 | Eli Westfall, et al. | Gulf Pipeline Co. | 74 | 101 |
| 07/21/10 | Jessie Greer | Gulf Pipeline Co. | 74 | 131 |
| 07/29/10 | C.S. Means, et ux. | Gulf Pipeline Co. | 74 | 58 |
| As Amended By: | | | | |
| 04/23/99 | Cendant Mobility Services Corp. | Lancer Resources Company | 1331 | 24 |
| 07/30/10 | Gladys Simpson, et al. | Gulf Pipeline Co. | 74 | 190 |
| 08/03/10 | Ida Barton, et vir. | Gulf Pipeline Co. | 75 | 68 |
| 08/08/10 | J.L. Williams | Gulf Pipeline Co. | 74 | 110 |
| 08/22/10 | Louis J. Wortham | Gulf Pipeline Co. | 74 | 62 |
| 08/23/10 | Eli Westfall, et al. | Gulf Pipeline Co. | 75 | 65 |
| 08/25/10 | Fred W. Halacher, et ux. | Gulf Pipeline Co. | 74 | 123 |
| 08/27/10 | Geo. S. McCarty, Ind. And as Gdn. | Gulf Pipeline Co. | 749 | 238 |
| 08/27/10 | Mrs. M. I. Strode, Ind. Et al. | Gulf Pipeline Co. | 74 | 102 |
| 09/01/10 | W.B. Melton, et ux. | Gulf Pipeline Co. | 74 | 507 |
| 09/01/10 | S.A. Smith, et ux. | Gulf Pipeline Co. | 75 | 30 |
| 09/30/10 | W.L. Moody | Gulf Pipeline Co. | 74 | 143 |
| 11/10/10 | Thos. E. Baker, et al. | Gulf Pipeline Co. | 74 | 188 |
| 11/12/10 | W.H. Davidson | Gulf Pipeline Co. | 75 | 77 |
| 11/16/10 | E.A. Blount | Gulf Pipeline Co. | 1676 | 741 |
| 12/07/10 | E.A. Blount | Gulf Pipeline Co. | 75 | 447 |
| 02/27/14 | S.C. Parrott, et al. | Gulf Pipeline Co. | 82 | 422 |
| 02/28/14 | Mrs. Antonia Manchaca | Gulf Pipeline Co. | 85 | 55 |
| 03/02/14 | T.L. Blackshear | Gulf Pipeline Co. | 82 | 382 |
| 03/02/14 | Mrs. F.W. Harlacher | Gulf Pipeline Co. | 85 | 53 |
| 03/02/14 | Josh Henson | Gulf Pipeline Co. | 82 | 407 |
| 03/02/14 | S.W. Hunt, et ux. | Gulf Pipeline Co. | 82 | 406 |
| 03/02/14 | Mrs. J.W. Strode | Gulf Pipeline Co. | 82 | 429 |
| 03/02/14 | R.C. White | Gulf Pipeline Co. | 82 | 435 |
| 03/03/14 | Angelina County Lumber Co. | Gulf Pipeline Co. | 82 | 376 |
| 03/03/14 | E.A. Blount | Gulf Pipeline Co. | 82 | 383 |
| 03/03/14 | G.A. Blount | Gulf Pipeline Co. | 82 | 379 |
| 03/03/14 | G.A. Blount | Gulf Pipeline Co. | 82 | 379 |
| 03/03/14 | Mrs. J.E. Patterson, et al. | Gulf Pipeline Co. | 82 | 424 |
| 03/03/14 | T. Supulvado, et ux. | Gulf Pipeline Co. | 82 | 426 |
| 03/04/14 | W. G. Aartt | Gulf Pipeline Co. | 82 | 410 |
| 03/05/14 | G.W. Faulkner, et ux. | Gulf Pipeline Co. | 85 | 52 |
| 03/05/14 | Alex Fears, et ux. | Gulf Pipeline Co. | 85 | 62 |

**EXHIBIT "B-3"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 03/05/14 | W.H. Hollis, et ux. | Gulf Pipeline Co. | 82 | 405 |
| 03/05/14 | Moses Tims, et ux. | Gulf Pipeline Co. | 85 | 59 |
| 03/06/14 | R.L. Collins, et ux. | Gulf Pipeline Co. | 82 | 385 |
| 03/06/14 | Ed Tims, et ux. | Gulf Pipeline Co. | 82 | 433 |
| 03/25/14 | Alice Fears | Gulf Pipeline Co. | 82 | 391 |
| 03/26/14 | Bunyan Greer | Gulf Pipeline Co. | 82 | 392 |
| 03/26/14 | Dixon Greer | Gulf Pipeline Co. | 82 | 395 |
| As Amended By: | | | | |
| 04/23/99 | Cendant Mobility Services Corp. | Lancer Resources Company | 1331 | 24 |
| 03/26/14 | Miss Elma Greer | Gulf Pipeline Co. | 82 | 394 |
| As Amended By: | | | | |
| 04/23/99 | Cendant Mobility Services Corp. | Lancer Resources Company | 1331 | 24 |
| 04/08/14 | Mrs. Jessie Greer | Gulf Pipeline Co. | 85 | 58 |
| 04/08/14 | Mrs. S.C. Parrott | Gulf Pipeline Co. | 85 | 58 |
| 04/08/14 | G.W. Tillery, Jr. | Gulf Pipeline Co. | 85 | 58 |
| 04/09/14 | Don Ceasar BeBiazzeon | Gulf Pipeline Co. | 85 | 51 |
| 04/10/14 | J.W. Christian | Gulf Pipeline Co. | 82 | 386 |
| 05/09/14 | Tom Hinjosa, et ux. | Gulf Pipeline Co. | 82 | 404 |
| 06/23/24 | C.W. Strode | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 601 |
| 06/23/24 | Mrs. M.I. Strode | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 600 |
| 06/30/24 | A.B. Crawford | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 626 |
| 06/30/24 | Tom Crawford, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 621 |
| 06/30/24 | Mart Melton | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 629 |
| 06/30/24 | Mrs. J.A. Slay | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 628 |
| 06/30/24 | Selener Smith, et vir. | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 623 |
| 06/30/24 | E.D. Stubblefield, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 625 |
| 07/01/24 | D.F. Barton, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 14 |
| 07/01/24 | J.W. Boyd, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 17 |
| 07/01/24 | G.F. Garrison | Gulf Pipe Line Co. & Gulf Production Co. | 124 | 14 |
| 07/01/24 | J.W. Hartt, Ind. and as Attorney in fact | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 619 |

**EXHIBIT "B-3"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 07/01/24 | J.M. McMillan | Gulf Pipe Line Co. & Gulf Production Co. | 110 | 620 |
| 07/01/24 | T.J. Peterson | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 13 |
| 07/24/24 | W.O. Richards, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 15 |
| 07/01/24 | Wm. B. Worthham | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 10 |
| 07/02/24 | D.M. McDuffie | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 25 |
| 07/02/24 | W.B. Melton, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 8 |
| 07/03/24 | Max W. Hart | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 11 |
| 07/14/24 | Mrs. Annie Mullins, Ind. et al. | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 37 |
| Replaced by: | | | | |
| 01/19/01 | Acme Brick Company | Lancer Resources Company | 1575 | 80 |
| 07/16/24 | R.H. Burns, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 112 | 81 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.A. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 134 |
| 04/28/25 | G.E. Stripling | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 130 |

**EXHIBIT "B-3"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express
Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 04/28/25 | G.W. Tillery, Jr., | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 131 |
| 04/29/25 | Mrs. F.W. Halacher | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 135 |
| 04/30/25 | Itasca P. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 132 |
| 05/05/25 | J. Thos. Hall | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 168 |
| 05/07/25 | L.L. Martin , et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 182 |
| 05/08/25 | R.A. Hall | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 191 |
| 05/08/25 | Mrs. A.L. Ramsey, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 219 |
| 05/09/25 | Josh Henson | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 229 |
| 05/09/25 | G.L. Olds, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 206 |
| 05/11/25 | Robert Berger | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 177 |
| 05/11/25 | Anna Brewer, Ind. and as Gdn. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 179 |
| 05/11/25 | R.J. Christian, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 172 |
| 05/11/25 | Rho Cox | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 178 |
| 05/11/25 | Josh Henson | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 165 |
| 05/11/25 | J.M. Miller, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 175 |
| 05/11/25 | Nacogdoches Ice Cream Co. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 171 |
| 05/11/25 | R. Partin, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 184 |
| 05/11/25 | Marion Earl Reid, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 166 |
| 05/11/25 | Edwin Tillery | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 169 |
| 05/12/25 | A. Bockman, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 181 |
| 05/12/25 | A.T. Garrard et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 193 |

**EXHIBIT "B-3"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express
Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 05/12/25 | Mrs. W.V Loveless | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 195 |
| 05/12/25 | L.B. Mast, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 237 |
| As Amended by | | | | |
| 05/29/2002 | AT Mast III, John C Mast, Patricia Mast George, & HGT Group, LP | Lancer Resources Company | 1747 | 97 |
| 05/12/25 | J.T. Smith, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 221 |
| 05/12/25 | I.L. Sturdevant | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 174 |
| 05/13/25 | Mrs. Julia Curl | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 218 |
| 05/13/25 | Geo. T. McNess | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 192 |
| 05/13/25 | J.W. Millard | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 215 |
| 05/14/25 | R. Partin, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 209 |
| 05/14/25 | Bill Thorn, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 232 |
| 05/14/25 | Jim W. Weatherly, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 227 |
| 05/15/25 | Itasca P. Blount | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 216 |
| 05/15/25 | G. W Falkner, | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 231 |
| 05/15/25 | Bob T. Millard, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 149 |
| 05/15/25 | Bob T. Millard, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 225 |
| 05/15/25 | L.S. Taylor, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 474 |
| As Amended By: | | | | |
| 07/01/99 | Nacogdoches Trade Days, L.C. | Lancer Resources Company | 1371 | 169 |
| 05/19/25 | Mrs. Jessie Greer | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 235 |
| 05/21/25 | J.R. Gray, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 234 |

**EXHIBIT "B-3"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 05/29/25 | Ollie Falkner, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 259 |
| 05/29/25 | Alex Fears, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 261 |
| 07/31/25 | Mrs. Elma Armfield | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 326 |
| As Amended By: | | | | |
| 04/23/99 | Cendant Mobility Services Corp. | Lancer Resources Company | 1331 | 24 |
| 07/31/25 | T.L. Blackshear | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 335 |
| 07/31/25 | Dixon Greer | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 328 |
| As Amended By: | | | | |
| 04/23/99 | Cendant Mobility Services Corp. | Lancer Resources Company | 1331 | 24 |
| 07/01/25 | E. S. Greer, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 329 |
| 07/31/25 | R.C. White | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 333 |
| 08/01/25 | W.C. Howard | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 330 |
| 08/01/25 | C.H. Muckelroy, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 336 |
| 08/01/25 | Mrs. J.W. Strode | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 339 |
| 08/01/25 | J.F. Wagner, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 332 |
| 08/06/25 | C.H. Loeckle | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 341 |
| 08/21/25 | James D. Greer | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 371 |
| 08/21/25 | J.D. Skeeters | Gulf Pipe Line Co. & Gulf Production Co. | 114 | 369 |
| 02/23/26 | George W. Tillery, Jr., Gdn., et al. | Gulf Pipe Line Co. & Gulf Production Co. | | |
| 11/22/26 | J.E. Garrett | Gulf Pipe Line Co. & Gulf Production Co. | 117 | 241 |
| 05/09/28 | Mrs. A. L. Ramsey, Gdn., et al. | Gulf Pipe Line Co. | 122 | 213 |
| 07/02/28 | J.H. Summers, Jr. | Gulf Pipe Line Co. & Gulf Production Co. | 122 | 234 |
| 09/10/29 | J.H. Franklin, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 126 | 52 |

**EXHIBIT "B-3"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 11/27/34 | Rosa Prince, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 138 | 306 |
| 06/03/42 | Ollie Falkner, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 157 | 527 |
| 06/03/42 | Dock Sexton, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 157 | 529 |
| 06/04/42 | Thos.E. Baker | Gulf Pipe Line Co. & Gulf Production Co. | 157 | 530 |
| 06/04/42 | W. W Falkner, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 157 | 520 |
| 06/04/42 | W.F. Greer, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 157 | 517 |
| 06/04/42 | L. B. Mast et al. | Gulf Pipe Line Co. & Gulf Production Co. | 157 | 519 |
| 07/18/42 | State Hwy. Dept. | Gulf Refining Co. | | |
| 07/18/42 | State Hwy. Dept. | Gulf Refining Co. | | |
| 10/28/42 | J. R. Gray, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 160 | 323 |
| 05/24/49 | State Hwy. Dept. | Gulf Refining Co. | | |
| 10/08/49 | State Hwy. Dept. | Gulf Refining Co. | | |
| 12/04/51 | Thomas E. Laird, et ux. | Gulf Refining Co. | 223 | 369 |
| 10/19/54 | Texas Hwy. Dept. | Gulf Refining Co. | | |
| 09/03/59 | J.W. Sutton, et al. | Texas Eastern Transmission Corp. | 285 | 32 |
| 11/02/59 | Gulf Refining Company | Texas Eastern Transmission Corp. | 285 | 581 |
| 11/02/59 | Gulf Refining Company | Texas Eastern Transmission Corp. | 285 | 581 |
| 03/02/60 | Gulf Refining Co. and Texas & New Orleans RR Co. | Texas Eastern Transmission Corp. | | N/R |
| 03/02/60 | Gulf Refining Co. and Texas & New Orleans RR Co. | Texas Eastern Transmission Corp. | | N/R |
| 12/18/64 | Texas Hwy. Dept. | Texas Eastern Transmission Corp. | | |
| 01/17/69 | Texas Eastern Transmission | E.W. Roark | 353 | 741 |
| 12/12/73 | Moore Business Forms, Inc. | Texas Eastern Transmission Corp. | 387 | 349 |
| 01/13/76 | Bethel Baptist Church | Texas Eastern Transmission Corp. | 404 | 254 |

2023 1331 02/23/2023 02:26 PM Page 26 of 32

**EXHIBIT "B-3"**

Attached hereto and made a part of that certain Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

Nacogdoches County, Texas

| | | | | |
|---|---|---|---|---|
| 05/29/81 | Lenvel Standland, et al. | Texas Eastern Transmission Corp. | 465 | 124 |
| 02/16/83 | Big Red Enterprises, Inc. | Texas Eastern Transmission Corp. | 485 | 211 |
| 02/21/83 | Glenn Layton | Texas Eastern Transmission Corp. | 485 | 205 |
| 03/03/83 | East Texas Portable Building Co. | Texas Eastern Transmission Corp. | 485 | 200 |

**EXHIBIT "B-4"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express
Gas Pipeline, LP and Black Duck Properties, LLC

Angelina County, Texas

| Date | Grantor | Grantee | Book | Page |
|---|---|---|---|---|
| 07/02/10 | W.H. Bonner | Gulf Pipe Line Co. | 40 | 543 |
| 07/02/10 | W.F. Heaton | Gulf Pipe Line Co. | 30 | 421 |
| 07/02/10 | M.A. Modissett, et. al. | Gulf Pipe Line Co. | 30 | 100 |
| 07/04/10 | Andy Modissett | Gulf Pipe Line Co. | 30 | 43 |
| 07/06/10 | J.L. Calvert | Gulf Pipe Line Co. | 30 | 44 |
| 02/27/14 | W.E. Massingill | Gulf Pipe Line Co. | 35 | 677 |
| 02/27/14 | J.C. Modissett, et ux. | Gulf Pipe Line Co. | 35 | 678 |
| 02/27/14 | M.A. Modissett, et. al. | Gulf Pipe Line Co. | 35 | 679 |
| 03/04/14 | J.W. Spears | Gulf Pipe Line Co. | 35 | 680 |
| 03/27/14 | W.F. Heaton, et ux. | Gulf Pipe Line Co. | 35 | 681 |
| 04/25/25 | E.C. Heaton, et al. | Gulf Pipe Line Co. & Gulf Production Co. | 63 | 157 |
| 04/25/25 | Mrs. W.E. Massingill | Gulf Pipe Line Co. & Gulf Production Co. | 63 | 160 |
| 04/25/25 | Mrs. Martha A Modisett | Gulf Pipe Line Co. & Gulf Production Co. | 63 | 159 |
| 04/25/25 | J.W Spears | Gulf Pipe Line Co. & Gulf Production Co. | 63 | 158 |
| 04/29/25 | J.C. Modisett, et ux. | Gulf Pipe Line Co. & Gulf Production Co. | 63 | 175 |
| 06/02/42 | J.C. Modisett, et ux. | Gulf Refining Co. & Gulf Oil Corp. | 101 | 204 |
| 08/29/50 | Texas Hwy. Dept. | Gulf Refining Co. | | |
| 12/02/59 | Gulf Refining Co. | Texas Eastern Transmission Corp. | 236 | 584 |

**EXHIBIT "B-5"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

**EXCEPTIONS AS NOTED**
**IN 1992 TEPCO TO LANCER PURCHASE AGREEMENT**
**Nacogdoches County, Texas**

1. Tracts 20, 21, 26, 46 and 67 in Nacogdoches County, Texas involve easements that have been released prior to the date of the Purchase and Sale Agreement or from which the pipe has been removed prior to the date of this Agreement.

2. (A) Amendatory Agreement ("Agreement"), dated 1/13/76, between Bethel Baptist Church, by Trustees ("Bethel"), and Texas Eastern Transmission Corporation ("Corporation"), recorded in Volume 404, Page 254, Deed Records, Nacogdoches County, Texas. Said Agreement amends three easements recorded in Volume 74, Page 8, Volume 82, Page 410 and Volume 114, Page 369, whereby Corporation agrees to remove its existing pipeline from that portion of the property owned by Bethel and Bethel grants to Corporation an alternate right of way within a portion of land for future pipeline construction, subject to stated conditions.

(B) Amendatory Agreement ("Agreement"), dated 03/03/83, between East Texas Portable Building Co., Inc. ("Owner"), and Texas Eastern Transmission Corporation ("Corporation"), recorded in Volume 485, Page 200, Deed Records, Nacogdoches County, Texas. Said Agreement amends easement recorded in Volume 114, Page 117, whereby Corporation agrees to re-route the pipeline and restrict easement to centerline as described therein, subject to certain rights reserved by Owner, as related to potential development of lands by Owner.

(C) Amendatory Agreement ("Agreement"), dated 02/21/83, between Glenn Layton ("Owner"), and Texas Eastern Transmission Corporation ("Corporation"), recorded in Volume 485, Page 205, Deed Records, Nacogdoches County, Texas. Said Agreement amends easement recorded in Volume 114, Page 117, whereby Corporation agrees to re-route the pipeline and restrict easement to centerline as described therein, subject to certain rights reserved by Owner, as related to potential development of lands by Owner.

(D) Amendatory Agreement ("Agreement"), dated 02/16/83, between Big Red Enterprises, Inc. ("Owner"), and Texas Eastern Transmission Corporation ("Corporation"), recorded in Volume 485, Page 211, Deed Records, Nacogdoches County, Texas. Said Agreement amends easement recorded in Volume 114, Page 177, whereby Corporation agrees to re-route the pipeline and restrict easement to centerline as described therein, subject to certain rights reserved by Owner, as related to potential development of lands by Owner.

(E) Amendatory Agreement ("Agreement"), dated 05/29/81, between Lenvel Stanaland, et al. ("Owners"), and Texas Eastern Transmission Corporation

**EXHIBIT "B-5"**

Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

("Corporation"), recorded in Volume 465, Page 124, Deed Records, Nacogdoches County, Texas. Said Agreement amends easement recorded in Volume 114, Page 174, whereby Corporation agrees to (i) cut and seal pipeline, (ii) Owners may then remove pipe and will own pipe, (iii) after removal of pipe Owners will be free to mine the sand and (iv) the easement of Corporation is restricted to centerline as described therein.

(F) Amendatory Agreement ("Agreement"), dated 12/12/73, between Moore Business Forms, Inc. ("Moore"), and Texas Eastern Transmission Corporation ("Corporation"), recorded in Volume 387, Page 349, Deed Records, Nacogdoches County, Texas. Said Agreement amends easement recorded in Volume 114, Page 149 and Volume 114, Page 239, whereby Corporation agrees to confine the right of way to centerline described therein and to abandon its existing 8" pipeline as it lies on the property owned by Moore.

(G) Partial Release, dated 1/17/69, from Texas Eastern Transmission Corporation ("Corporation") to E.W. Roark ("Owner"), recorded in Volume 353, Page 741, Deed Records, Nacogdoches County, Texas. Said Partial Release releases that portion of lands covered by Easements recorded in Volume 114 , Page 166 and Volume 114, Page 168 which lies south of Texas State Highway 7 and describes the centerline of new right of way,

**EXHIBIT "B-6"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

**AMENDMENTS, RELEASES AND NEW RIGHTS OF WAYS AND EASEMENTS SINCE TEPCO TO LANCER SALE**
Nacogdoches, Rusk and Shelby Counties

(1) Amended and Restated Release, Abandonment and Relocation of Easement, dated 04/23/99, between Cendant Mobility Services Corporation, ("Cendant"), and Lancer Resources Company, ("Lancer"), recorded in Volume 1331, Page 24, Deed Records, Nacogdoches County, Texas. Said Agreement amends easements recorded in Volume 72, Pages 629-630, Volume 82, Page 394-395, Volume 114, Page 328, Volume 74, Page 58, Volume 72, Page 630, Volume 82, Page 395, and Volume 114, Pages 326-327, whereby Lancer agrees to release a portion of the easements and relocate the existing easement around the perimeter boundary of the 5.65 acre tract.

(2) Amendment to Right of Way Agreement, effective July 1, 1999 by and between Lancer Resources Company and Nacogdoches Trade Days, LLC, recorded in Volume 1371, Page 169, whereby Lancer agrees to limit the right of way to a 20' permanent right of way and Lancer retained the right to utilize reasonable work space for the installation of a new pipeline or the replacement of the existing pipeline.

(3) Release of Easement, dated 01/19/2001, between Acme Brick Company, ("Acme"), and Lancer Resources Company, ("Lancer"), recorded in Volume 1560, Page 315, Deed Records, Nacogdoches County, Texas and Volume 2245, Page 656, Official Public Records, Rusk County, Texas. Said Agreement amends easement recorded in Volume 112, Page 37, whereby Lancer agrees to release easement in exchange for new Pipeline Right of Way Easement described below.

(4) Pipeline Right of Way Easement, dated 01/19/2001, between Lancer Resources Company, ("Lancer"), and Acme Brick Company, ("Acme"), recorded in Volume 1575, Page 80, Deed Records, Nacogdoches County, Texas and at Volume 2252, Page 355, Deed Records, Rusk County, Texas. Said agreement grants easement to Lancer as described in Agreement.

(5) Release, Abandonment and Relocation of Easement, effective 05/01/2002, between A.T. Mast III, John C. Mast, Patricia Mast George, ("Mast"), and Lancer Resources Company, ("Lancer"), recorded in Volume 1747, Page 97, Deed Records, Nacogdoches County, Texas. Said agreement amends easements recorded in Volume 114, Pages 237-238 of the Deed Records of Nacogdoches County, Texas and relocated easement as described in Agreement.

**EXHIBIT "B-6"**
Attached hereto and made a part of that certain
Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

(6) Ratification of Right of Way Agreement by and between Florence J. Bowlin, Linda K. Knight and Robert D. Templin and The Express Gas Pipeline, L.P. dated May 11, 2011 and filed of record at Document Number 2011003582 of the Shelby County Deed Records ("SCDR") and the Letter Agreement referenced therein. Said agreement amends an easement recorded in Volume 126, Page 539, et seq., of the SCDR as described in said Letter Agreement.

(7) Agreed Judgment in Cause No. 09CV30,712 styled *Donald Lewis Scrimsher and Chhavy Khorn v. The Express Gas Pipeline, L.P.* in the District Court of Shelby County Texas and filed at Document Number 2011003023 of the SCDR and the Ratification of Right of Way Agreement by and between Donald Lewis Scrimsher and Chhavy Khourn and The Express Gas Pipeline, L.P. dated March 8, 2011 and filed of record at Document Number 2011003024 of the SCDR and the Agreement referenced in said Ratification. Said Agreement, and the subsequent Addendum thereto, amends easements recorded in Volume 131, Page 137, et seq., and Volume 126, Page 503, et seq., of the SCDR as described in said Agreement.

(8) Agreed Judgment in Cause No. 09CV30,448 styled *Steve Biel and wife Regina Biel v. The Express Gas Pipeline, L.P.* in the District Court of Shelby County Texas and filed at Document Number 20100013501 of the SCDR and the Ratification of Right of Way Agreement by and between Steve Biel and Regina Biel and The Express Gas Pipeline, L.P. dated October 30, 2010 and filed of record at Document Number 20100013500 of the SCDR and the Agreement referenced in said Ratification. Said Agreement, and the subsequent Addendum thereto dated November 15, 2013, amends an easement recorded in Volume 127, Page 54, et seq., of the SCDR as described in said Agreement.

(9) Ratification of Right of Way Agreement by and between Steve Cockrell, Truitt Cockrell and Carolyn Cockrell Daw and The Express Gas Pipeline, L.P. dated May 27, 2015 and filed of record at Document Number 2015002621 of the SCDR and the Agreement referenced in said Ratification dated June 26, 2015. Said Agreement amends easements recorded in Volume 127, Page 142, et seq., and Volume 124, Page 479, et seq., of the SCDR as described in said Agreement.

(10) Ratification of Right of Way Agreement by and between Cecil McCune and Deborah J. McCune and The Express Gas Pipeline, L.P. dated May 27, 2015 and filed of record at Document Number 2015002620 of the SCDR and the Agreement referenced in said Ratification dated May 25, 2015. Said Agreement amends easements recorded in Volume 126, Page 528, et seq., and Volume 127, Page 138, et seq., of the SCDR as described in said Agreement.

**EXHIBIT "B-6"**

Attached hereto and made a part of that certain Purchase & Sale Agreement dated this 14th day of August, 2017, between The Express Gas Pipeline, LP and Black Duck Properties, LLC

(11)Letter Agreement by and between Classic Hydrocarbons Operating, Inc. and The Express Gas Pipeline, L.P. dated April 18, 2012 regarding the re-routing of the 8" pipeline around the Widdon Gas Unit #2 pad site location and the R&M Farms Unit #3 pad site location in Shelby County, Texas.

Exhibit
A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| | ) | CASE NO: 20-50805-rbk |
| KRISJENN RANCH, LLC, | ) | San Antonio, Texas |
| Debtor. | ) | Thursday, June 4, 2026 |
| | ) | 1:18 p.m. to 3:12 p.m. |

HEARING

BEFORE THE HONORABLE RONALD B. KING
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

| | |
|---|---|
| For Debtor: | RONALD J. SMEBERG<br>Smeberg Law Firm, PLLC<br>4 Imperial Oaks<br>San Antonio, TX 78248 |
| | CHARLES JOHN MULLER, IV<br>Chamberlain Hrdlicka White Williams & Au<br>111 W. Sunset Road<br>San Antonio, TX 78209 |
| For Express H2O Pipeline & Row, LLC: | HERBERT C. SHELTON, II<br>Hayward PLLC<br>7600 Burnet Road<br>Austin, TX 78757 |
| | HOLLI PRYOR-BAZE<br>Skelton Slusher Barnhill Watkins Wells<br>1616 S. Chestnut Street<br>Lufkin, TX 75901 |
| For U.S. Trustee: | JIM ROSE<br>US Trustee's Office<br>615 E. Houston<br>San Antonio, TX 78295 |

Case 5:21-cv-00358-JKP Document 48-1 Filed 09/22/26 Page 2 of 60


For DMA Properties, Inc. and Longbranch Energy LP:
LOURDES LULU ORTIZ
Cleveland Krist PLLC
303 Camp Craft Road
West Lake Hills, TX 78746

CHRIS JOHNS
Johns & Counsel PLLC
13341 W. U.S. Highway 290
Austin, TX 78737

ALSO APPEARING: MR. SACHITANO

Court Reporter: UNKNOWN

Courtroom Deputy: UNKNOWN

Transcribed by:
Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

SAN ANTONIO, TEXAS; THURSDAY, JUNE 4, 2026; 1:18 PM

(Call to Order)

CLERK: This is the United States Bankruptcy Court of the Western District of Texas. Today is the 4th of June 2026 where the Honorable Ronald B. King will be presiding in San Antonio, Texas to hear a San Antonio matter, 20-50805.

THE COURT: (Indiscernible) San Antonio, our 2 o'clock case is KrisJenn Ranch LLC, No. 20-50805. Just going to get announcements from those of you that intend to speak.

MR. SMEBERG: Good afternoon, Your Honor. Ron Smeberg. I am the withdrawing counsel for KrisJenn Ranch and the other debtors.

THE COURT: All right.

MR. MULLER: Your Honor -- good morning, Your Honor. Apologies. John Muller on behalf of the same parties.

THE COURT: All right.

MR. SHELTON: Your Honor, this is Charlie Shelton with Hayward PLLC, appearing on behalf of Express H2O and Larry Wright.

THE COURT: All right. Ms. Pryor-Baze, I think you're muted or not working sound. Yeah, we still can't hear you. You might want to check on that. Ms. Ortiz, are you representing DMA and --

MS. ORTIZ: Yes, Your Honor. Lulu Ortiz on behalf of DMA, Mr. Moore and Longbranch, and I'm here with my colleague, Chris Johns.

THE COURT: Okay, and Mr. Sachitano, you're with H2O?

MR. SACHITANO: Yes, Your Honor. I don't intend to speak today, but I'm the manager of Express H2O.

THE COURT: All right, and Mr. Rose with the U.S. Trustee?

MR. ROSE: Yes, Your Honor. Jim Rose here for the U.S. Trustee.

THE COURT: Okay. Ms. Pryor-Baze, were you able to get your sound working?

MS. PRYOR-BAZE: I hope so, Your Honor. Can you hear me?

THE COURT: There you go.

MS. PRYOR-BAZE: Okay.

THE COURT: We can hear you.

MS. PRYOR-BAZE: Thank you very much. I'm appearing for the same parties Mr. Shelton (indiscernible).

THE COURT: Let me say first, that we have limited things that we're hearing today. We're not hearing the merits, as you all are aware. We have two motions for continuance and two motions to withdraw. So, we'll just do them all at the same time, if that's okay. I don't want to

have inconsistencies for any reason. But Mr. Smeberg and Mr. Muller have both filed motions to withdraw. I think Mr. Muller actually withdrew from the adversary a couple of years ago. Is anyone objecting to the two motions to withdraw by Mr. Smeberg and Mr. Muller?

MS. ORTIZ: Your Honor, we didn't object originally. Our only concern at this point, on behalf of GMA and Longbranch is that, to the extent a continuance is being sought precisely because of the withdrawal of counsel from representing KrisJenn. We just want to make sure that that is not going to cause an excessive delay.

THE COURT: Okay. So, who would be speaking on behalf of the Debtor here, KrisJenn? I mean, would that be -- obviously, Mr. Smeberg and Mr. Muller are trying to withdraw. Mr. Shelton, are you representing KrisJenn?

MR. SHELTON: No, I'm not, Your Honor. So, that's precisely -- well, that's the issue. When I was engaged, and I can share the engagement agreement, it's not a secret, it's very clear that I only represented Express H2O and Larry Wright. I think there was one hearing in the adversary proceeding. It may have been related to a motion for protective order in which I announced for KrisJenn, and that was in the adversary proceeding. Shortly after that, we had a hearing in which, I forget who it was, maybe Austin Krist, indicated that I represented KrisJenn and I tried to

clarify the record, this was almost a year ago, that no, I actually don't. I represented them for that one discreet issue, but that was the end of it. And so, if the -- and to be clear, I'm not opposed to the withdrawals. But if they're allowed today, then KrisJenn will just be a classically unrepresented entity. I have started the conversation with Mr. Wright to ask the question, do you want me to represent KrisJenn in this order to show cause, and if so, how are you going to pay it, how much is it (indiscernible)?

THE COURT: Well, that's next week as I was alluding to a minute ago. That's not today.

MR. SHELTON: I understand. Yeah, and I'm not getting today, but my point is, the actual -- my engagement was pretty clearly constrained to just express -- sorry, yeah, to express -- one too many entities for me, to just Express H2O and Larry Wright. And so, I've started that conversation with Mr. Wright. As of today, I haven't been engaged, I haven't been paid a retainer, I haven't even been asked to do it. So, I don't --

THE COURT: And nobody else is representing, other than the two that are withdrawing, anyone else on this call today is representing to the Debtor, KrisJenn, right?

MR. SHELTON: I believe that's correct, Your Honor.

THE COURT: Okay. And so, Ms. Ortiz, you don't object to withdrawal unless it ends up delaying things?

MS. ORTIZ: Yes, Your Honor. I think we just don't want to end up in a situation where this is delayed indefinitely when KrisJenn should be able to relatively, easily found counsel given that Mr. Wright or the principal has all of these very esteemed colleagues in the field with us.

THE COURT: Okay. Mr. Smeberg, you have been involved since 2022, right, and pretty much the same for you, Mr. Muller, maybe 2024 for you, Mr. Muller?

MR. MULLER: Yes, Your Honor.

THE COURT: Okay. All right. Well, my inclination is to let them out, let them withdraw. They don't know what's happened in the case in the last two years. We'd have to catch them up and we're not even sure that Mr. Wright or any others involved in KrisJenn would want to hire them at this point or retain them in the case. Mr. Rose, you didn't have any objection to the two motions to withdraw?

MR. ROSE: Your Honor, Jim Rose for the U.S. Trustee. Your Honor, my only concern is the local rule about a corporate debtor not being able to be pro se. KrisJenn would need to find another attorney, I would think. That's the only concern I have.

THE COURT: Right. Okay.

MR. JOHNS: Your Honor, this is Chris Johns, and I apologize I'm not showing my face. I'm on the way to a funeral right now.

THE COURT: Okay.

MR. JOHNS: But I do have a question that's a little perplexing. You'll remember that counsel who was on this phone, represented to the Court that KrisJenn was -- you know, didn't even exist anymore. And so, I'm curious whether that's -- you know, what's true and what isn't. And I'm a little concerned about having a hangup over finding counsel for an entity that, unless I've misunderstood things, doesn't even exist. So, that's kind of confusing to me and it doesn't seem like a good basis for continuing the hearing that we have scheduled for next week. But if -- you know, obviously, if KrisJenn doesn't exist, as has been represented by at least a couple of the counsel for the other side, then I don't see how I can object to the withdrawal of counsel for an entity that doesn't even exist.

THE COURT: Okay. Well, I don't independently know what has happened to KrisJenn, LLC and it would not be appropriate for me to go do any outside-the-record research to find out. But my speculation, from the hearings that we've had, is that they quit paying the franchise taxes, and so it got forfeited or terminated by the Secretary of State.

But I don't know that to be the case, that's just my belief based on what I've heard from hearings over the past two or three years. So, Mr. Shelton, do you know?

MR. SHELTON: I don't, Your Honor.

THE COURT: Okay.

MR. SHELTON: I'm not entirely sure that an entity that once existed that has forfeited its charter by some sort of -- other than, maybe, a direct termination, but even in that case, I'm not entirely sure that that entity can't still hire counsel. That's kind of what's being implied by Mr. Johns' statement. I don't know that to be true, but I do understand the point that --

THE COURT: Yeah, well --

MR. SHELTON: -- if somebody's going to stand up in Court and make a representation on behalf of KrisJenn, that they should be able to at least articulate the legal basis by which KrisJenn -- sorry, yeah, by which KrisJenn could make those statements.

THE COURT: Yeah. This question would make a good question for a moot court competition on what happens when the Chapter 11 reorganized debtor loses its charter and the case converts to 7. So, it might make an interesting legal issue. My understanding is it doesn't have to have a charter for there to be a Chapter 7 estate, so, I'll just tell you that. Otherwise, I wouldn't have done the show

cause order. But I'll listen and look at any authority that anybody has on this. But after some preliminary review, I don't think you get out of the plan by letting your charter get forfeited. If it converts to 7, I think there still can be a Chapter 7 estate. That's all I'm saying. But if somebody's got authority to the contrary, I'll certainly be glad to look at it and change my mind if it's persuasive.

Okay. Well, Mr. Smeberg and Mr. Muller, there's no reason to delay you any further. Your motions can be granted today, and I can sign your orders. So, you can be on your merry way if you want to drop off now.

MR. SMEBERG: Thanks, Your Honor.

MR. MULLER: Thank you, Your Honor.

THE COURT: Okay. But we did have a memorable trial. Everybody got Covid and even though it was on Zoom or Webex or whatever, everybody got sick. But it wasn't my fault because I didn't make you come to Court.

MR. MULLER: Correct.

MR. SMEBERG: Yeah, it was interesting.

THE COURT: All right.

MR. SMEBERG: Thank you, Your Honor.

THE COURT: Good luck. Feel free to drop off. All right, let's talk about the motion for continuance. So, I think the first one was filed by you, Mr. Shelton, or -- oh, the other one was filed by Mr. Smeberg, so --

MR. SMEBERG: Yeah.

THE COURT: -- we can just moot his motion. He represented the Debtor but no longer represents the Debtor. So, go ahead, Mr. Shelton.

MR. SHELTON: Yeah, Your Honor. There's -- sort of, it comes in two parts and the first is the one that we just talked about which is that KrisJenn apparently, as of today, has no counsel for the main bankruptcy case.

THE COURT: Let's go back one step before we get to your arguments, and I'll listen to everything you have to say. But is Express H2O a party in interest in this case? It's not a creditor.

MR. SHELTON: Is Express a party in interest?

THE COURT: Does it have standing to come in and object to anything in the case? I mean, you all have been arguing legal points for what, a couple of years now, but do you have standing? Are you a party in interest?

MR. SHELTON: In the main bankruptcy case?

THE COURT: Yes.

MR. SHELTON: I would need to think about that a little bit more. Certainly, Larry Wright does as of --

THE COURT: Okay. You represent Mr. Wright?

MR. SHELTON: I do, Your Honor, yes.

THE COURT: Individually?

MR. SHELTON: Correct.

THE COURT: Okay. All right.

MR. SHELTON: I can -- I need to think longer. I had thought through this exact question about four or five days ago and I forgot where I came down on. I came down on yes, but I'm having a hard time pulling the top of my mind why.

THE COURT: Okay.

MR. SHELTON: But nonetheless --

THE COURT: That's always an important thing because you hate to try a case and it go to the Fifth Circuit and them say, "You idiot. There's no standing here. It's all dismissed." So, we don't want that to happen on appeal.

MR. SHELTON: Understood. Well, to be clear, the motion could stand on just Larry Wright's property --

THE COURT: Okay.

MR. SHELTON: -- I think on its own. I believe --

THE COURT: All right. Well, go ahead.

MR. SHELTON: My apologies. Go ahead, Your Honor.

THE COURT: That's -- yes, go ahead.

MR. SHELTON: The -- so, nonetheless, the thrust of the motion comes in two components. The first one is, sort of, I think, fairly basic and Mr. Rose talked about the Local Rules saying that a corporate entity can't appear without counsel (indiscernible).

THE COURT: Right. If it's converted to 7, it's got to get counsel, at least to update the schedules and do some minimal representation of the Debtor.

MR. SHELTON: I think that, but I also think that, in order just to present a case at the order to show cause hearing, I think that whoever is standing up and doing that is going to be doing it on behalf of KrisJenn, the Debtor. And right now, there is no counsel for KrisJenn, the Debtor. Ergo I think, sort of, as a matter of opinion, there's a very strong basis, a very strong basis under cause to continue the hearing for that reason alone. The second --

THE COURT: Well, if the Debtor doesn't have counsel, I'm powerless to go forward?

MR. SHELTON: No, Your Honor. No, I wouldn't say that at all. But typically, the way I've seen it done is that there's some sort of reasonable deadline put for the Debtor to get counsel or else we're going to go forward regardless. I do agree with Ms. Ortiz, there should not be some indefinite suspension. You know, if I just keep coming back in July and say, "Still no counsel", and then, August, "Still no counsel", that doesn't work.

THE COURT: Well, haven't we been doing that for two years?

MR. SHELTON: Well, no, not -- no, there's been a couple of different set of issues for two years.

THE COURT: Every time we have a hearing, it's like, "Well, we need more time."

MR. SHELTON: I understand, but for entirely different reasons. So, when -- I think what Your Honor is referring to is the progress that's been made in the Westlake case over time.

THE COURT: Right.

MR. SHELTON: And yes, and I would actually say that that progress that the Court has allowed us to make, the time that the Court has allowed, has paid really good dividends as I attached to the motion to continue, Your Honor, several different summary judgment orders that are getting very close to a dispositive resolution on this case, completely. I also --

THE COURT: Are we going to have an appeal to the Court of Appeals, the State Court of Appeals?

MR. SHELTON: Yes, but the equivalent, and Ms. Pryor-Baze can correct me. I'm probably butchering the exact procedural setup, but the equivalent of a direct certification, in order to get that question answered once, right. So, it's not going to be answered by the State Court and then go up on appeal and then come back down. The main -- the primary dispositive issue is yesterday, the Angelina Court entered an order allowing the direct appeal or at least asked for the direct appeal up to the Appellate Court.

And so, presuming that that is granted and that the Appellate Court hears it, it's only going to be heard one time. We're going to shorten this time frame. But if Your Honor recalls --

THE COURT: Well, what do you need to appeal it? I thought everything was getting granted by the State Court trial judge?

MR. SHELTON: I might pass it over to Ms. Pryor-Baze, so I don't misspeak too much here. But go ahead. If Your Honor doesn't mind my passing the podium.

THE COURT: Okay. Go ahead.

MS. PRYOR-BAZE: Yes, Your Honor. The State Court judge did grant the parties consent to appeal --

MR. SHELTON: I'm having a hard time hearing you, Ms. Pryor-Baze.

THE COURT: Yeah, your sound is really, very high pitched --

MS. PRYOR-BAZE: Is that any better?

THE COURT: -- for some reason. Are you on your computer sound or telephone or what?

MS. PRYOR-BAZE: Yes, I'm on my computer. Is that any better?

THE COURT: No, it's not good. Maybe you need to log off and try to log back on.

MS. PRYOR-BAZE: I apologize. Is that any better,

Your Honor?

THE COURT: That is. What'd you do?

MS. PRYOR-BAZE: Okay.

THE COURT: Tell us the secret so that we'll know.

MS. PRYOR-BAZE: Now, I can't hear you all. I really apologize. This is not -- this does not happen to me.

THE COURT: We can hear you.

MS. PRYOR-BAZE: Can you hear me now?

THE COURT: Yes.

MR. SHELTON: Yes.

THE COURT: Can you hear us?

MS. PRYOR-BAZE: Charlie, you might have to talk about this. You were right -- I can't -- because I can't hear you all, and I'm sorry. This really has never happened. But there is a permissive appeal. It's on an accelerated basis and it will appeal the title issues. That is -- we're very pleased with this development. It will speed up the appellate process and it's heard on an accelerated basis. And so, typically, the Tyler Court of Appeals gets those done really quickly. It doesn't take a year like the normal process in Tyler, it takes closer to three to six months. And so, we're real pleased with that.

This will appeal the title issues for once and for good. There'll be a final -- there'll be a finality to it,

Case 5:21-cv-00257-XR Document 48-1 Filed 09/22/26 Page 17 of 60



and we look forward to that resolution by the Appellate Court to confirm Judge Kassaw's title opinions, title summary judgment. As you know, Your Honor, and we've presented those orders to the Court a couple of times. He's confirmed superior and valid title to Express H2O. He's quieted title against Westlake and so we are -- the Appellate Court has heard, on a mandamus once before, some of the issues and rejected that mandamus and said, "Instead, comes here -- come to a full appeal." And so, that's what we're doing now with permission.

THE COURT: Okay, and she may not be able to hear me, but don't you have to be not a prevailing party in order to appeal. I mean, you can't be a prevailing party and say, "We won but we're still appealing." So, what did Express H2O lose with the trial judge that needs to be appealed?

MS. PRYOR-BAZE: Your Honor, we didn't lose anything. We asked the Court to let us appeal that summary judgment title action and the Court said yes and identified the controlling issues of law. And so, we can appeal that grant of summary judgment now and the parties can hash it out. It is a --

THE COURT: I've never heard of appealing an order that you prevailed on.

MS. PRYOR-BAZE: We'd like finality now instead of having to fight about it after a final judgment, and so, the

Court agreed. The Tyler Court does have to accept the appeal, but that's also on an accelerated process. We file a petition within 15 days of the order. Westlake has a very short period to respond and the Court has to decide that within 30 days, whether or not they'll accept the permissive appeal.

THE COURT: So, it's an interrogatory appeal and they call it "permissive appeal"?

MS. PRYOR-BAZE: Yes, Your Honor. Mm-hmm. It's by permission of the State Court judge and then by permission of the Appellate Court. The Texas --

THE COURT: Is there a rule in the Texas Rules of Civil Procedure that allows this?

MS. PRYOR-BAZE: Yes, Your Honor, there is. I believe it's 168, but I might need to check if that's correct.

THE COURT: Okay. Okay.

MS. PRYOR-BAZE: Yes. The Texas Supreme Court actually encourages these types of permissive appeals, so you don't go through a whole trial and wait to the end and then appeal, if there are only controlling issues of law, not any fact dispute, which this is. The superiority and validity of the express title over the Westlake challenges is truly an issue of law with no fact questions.

THE COURT: Okay, and suppose you appeal it and

you win, then Westlake can seek review by the Texas Supreme Court?

MS. PRYOR-BAZE: Yes, Your Honor. And that also would be on an accelerated basis.

THE COURT: By virtue of what the Rule says or what other reason?

MS. PRYOR-BAZE: Yes. It goes under the accelerated appeal rules throughout the appeal. As far as I understand it, that's correct.

THE COURT: So, Westlake isn't agreeing that you've won, they're just still fighting it, basically. Right?

MS. PRYOR-BAZE: That's correct. Yes, Your Honor.

THE COURT: Okay. So, we're really talking about another one to two years for the Texas Supreme Court, assuming they seek review of the Texas Supreme Court, either denies review or grants it and affirms. And then the question is, what if they reverse or what if the Tyler Court reverses? Then you're back in the Trial Court. What do you do then if the Tyler Court reverses? You get the trial judge to go ahead and do a final judgment, disposing of all issues?

MS. PRYOR-BAZE: I --

THE COURT: Why doesn't he just do a final judgment disposing of all issues and all parties? Maybe

Case 5:24-cv-00297-XR Document 48-1 Filed 09/22/26 Page 20 of 60



that's the question.

MS. PRYOR-BAZE: We still have the injunction phase and we had intervenors, Your Honor.

THE COURT: Okay.

MS. PRYOR-BAZE: And so, we -- the intervenors were the landowners. They intervened at the last minute, and the Trial Court allowed them to intervene. And so, finality in Angelina County, without severing, might take longer than the time period to appeal. And so, we were looking at, we really want that judgment affirmed by the Appellate Court. You asked what happens if the Appellate Court reverses, if they send it down for fact-finding. The trial judge could do that if they reversed and rendered, which I cannot imagine that would be a complete upset in all title law, especially property law in Texas. Then, we would likely appeal to the Supreme Court because that would be completely wrong. But if they found a fact issue, I guess it would go back to the trial court to determine the fact issue. So far, all the parties agree --

THE COURT: So, would there be a jury -- would there be a possibility of a jury trial on those fact issues?

MS. PRYOR-BAZE: If the Appellate Court identified one. So far, all the -- both Westlake and Express have agreed that there are no fact issues. We didn't have a trial, if the Court were to recall, in December when we were

set for a jury trial because the parties all agreed there were no fact issues.

THE COURT: Is there some sort of stipulation of facts that the parties have signed or that they could sign?

MS. PRYOR-BAZE: I think they are undisputed facts, and that includes all of the title work. If the Court recalls, 1907-1925 are the original gulf easements that were conveyed from the landowners to Gulf Oil. And those titles then changed hand again around 1959 or so, and then a few more times in the 1990s and 2000s. The current landowners received their rights in the 1990s. And so, the first recorded, plus -- the first recorded titles, the superior titles are those that created the gulf easements from 1907 to 1925. And all hostile users to those superior easements must be excluded and so, we are -- we believe that the Appellate Court will affirm that because that's based on pretty clear Texas law.

THE COURT: What's clear about it?

MS. PRYOR-BAZE: That the first given and the first recorded titles are superior to titles later on, on the exact same property and rights.

THE COURT: In other words, first in time?

MS. PRYOR-BAZE: Yes, Your Honor. There were no more rights for those landowners to give, and all of those landowners took the property subject to the easements. And

all of the easements conveyed to Westlake's predecessor, were subject to all first in time recorded easements. And so, we have a number of arguments there that the gulf easements are valid and superior to any after-acquired easements.

THE COURT: Is it different in each county or are they all the same?

MS. PRYOR-BAZE: The Angelina County lawsuit is three grants and Angelina and Nacogdoches County for three landowners.

THE COURT: Mm-hmm, and what about the other two counties?

MS. PRYOR-BAZE: The other two counties, our title is clear as far as I understand. I work on the litigation in Angelina County. We haven't worked on Shelby or Rusk County, so I can't speak about that, the title there. But we have not filed a lawsuit trying to clear the title there.

THE COURT: And so, you've got all these intervenors that are property owners that own the fee, presumably maybe subject to the easements, right?

MS. PRYOR-BAZE: Yes, Your Honor. There are three landowners that now own the property. Their predecessors were granted the property in the 1990s subject to our easements. And the Court considered all of those grants and invalidated those grants back in July of '25 in the Court's

summary judgment order on title and then quieted the title. The intervenors claim that those orders do not apply to them and they've challenged that summary judgment order from before they were in the case.

THE COURT: Do you have a certified copy of the judgments finding that they are subject to the easements?

MS. PRYOR-BAZE: We have -- Your Honor, we do have evidence that those landowners took the property subject to the gulf easements, yes. We submitted that evidence to the trial court.

THE COURT: Was it expressly in their deeds, like, disclosed in their deed or was it just that maybe they didn't even know about it and it was subject to it because it was in the chain of title?

MS. PRYOR-BAZE: I'd have to go back and look at each of the three, Your Honor, in order to make sure I'm testifying -- I'm telling the Court correctly. I believe, at least, and Mr. Sachitano might recall better than I can right now, but at least two of them had the gulf easements listed precisely and specifically in their deed. But I'm not sure about the third. The easement conveyance also to Mustang, Westlake's predecessor, included a provision that accepted all previously given easements and told Mustang, "You better check out the property records to make sure there are no additional easements", which ours were properly

recorded.

THE COURT: And so, you've got certified copies of those documents from the 1920s?

MS. PRYOR-BAZE: We have the certified property records, yes, Your Honor, that were publicly recorded. And we have -- we also have certified land records, property records from all of those other transactions. Yes, Your Honor. That was submitted all to the Court in our motion for summary judgment that led to the title summary judgment order.

THE COURT: So, it sounds like we're still years away from getting some final resolution, right?

MS. PRYOR-BAZE: I don't believe we're years away, Your Honor. I think Tyler will come up with a decision in about three months, and the Texas Supreme Court is trying to reach these very quickly. I think that that process shouldn't take -- it's not a two-year process any longer like it used to be, and this is on an accelerated appeal. So, I believe we'll have some additional -- we'll have more, definitely more resolution in three months. And then, I think that it'll move quickly if anyone appeals to the Supreme Court.

THE COURT: It sounds like, to me, that Westlake is going to appeal if they don't win in the Court of Appeals. And if they don't win in the Texas Supreme Court,

they'll probably try to take it to the U.S. Supreme Court. I mean, they're not giving up.

MS. PRYOR-BAZE: They aren't giving up, Your Honor. But I don't see -- they did not -- we -- they've already mandamused this judge once and their mandamus was denied, and the Court said, "Come back on appeal."

THE COURT: They're not the only ones.

MS. PRYOR-BAZE: Well taken, Your Honor. And they did not go to the Texas Supreme Court on that mandamus, on the Tyler Court decision. So, I can't really project what they do. I cannot see the United States Supreme Court wanting this at all. It's not really --

THE COURT: No, of course not.

MS. PRYOR-BAZE: -- their kind of issue.

THE COURT: It's a delay while they consider the application for (indiscernible).

MS. PRYOR-BAZE: And I don't see, Your Honor, the Texas Supreme Court taking it either. The legal principles that are title, that that order was granted on, are very old Texas principles of property law. So, unless the Tyler Court throws out something brand new, then I don't see the Texas Supreme Court having any interest in this because it's not -- it wouldn't be for the purpose of reversal, except if the Tyler Court got it wrong, then the Texas Supreme Court might want to take it for purposes of reversal.

THE COURT: Okay. Mr. Shelton, what else?

MR. SHELTON: Your Honor, so the -- ultimately, the motion for continuance, as I was saying, comes in those two discreet rationales and probably two different time frames. One would be, even without the Westlake issue would we give KrisJenn time to get counsel and then get counsel up to speed in order to properly present an argument at the order to show cause hearing. If the Local Rules are followed, I think, as written, we would have a witness and exhibit list due tomorrow, and we don't even have counsel yet. So, that would be one request, would be to --

THE COURT: Well, you represent Mr. Wright.

MR. SHELTON: Correct, Your Honor.

THE COURT: You signed the petition in this case.

MR. SHELTON: That is true, Your Honor, but the -- I have not analyzed the monthly operating reports. I have analyzed the plan, to some extent. But I have not analyzed the creditor matrix. I'm not -- I don't know what the claims register was. I haven't looked at the disclosure statement. I truly don't have the ability to answer the question whether or not the Debtor performed under all of its terms under the plan. I just don't -- I'm currently not up to that speed. So, that would be one and that would probably suggest a shorter, although still reasonable, extension.

The second one or the second reason would be the Westlake issue, which we've identified in our motion. The Westlake issue, as Ms. Pryor-Baze indicated and as our motion indicated, the concern -- so, we also filed -- let me go back one step. I mean, I know Your Honor set it for June 11th. I'm not trying to argue this, but we also filed a motion for clarification. I assume, just sitting here right now, unless I'm told otherwise, that what the performance that the Court is concerned with is the transfer of the right of way to Express H2O. If that's the only narrow issue, then if a Chapter 7 trustee is appointed, if we go forward on June 11th, which again, I'm asking for a continuance, that the Court goes forward on June 11th, converts the case and then on June 12th, we have Chapter 7 trustee, I think, my experience has been that when a court does that, the Chapter 7 trustee feels nearly compelled, not legally compelled, but nearly compelled to bring a fraudulent transfer action, or at least to start digging pretty extensively on that issue.

THE COURT: Or he might file an abandonment, or he might file a motion to dismiss the case.

MR. SHELTON: He might. Yeah, and I'm certainly --

THE COURT: Certainly, fraudulent transfers is one possibility, of course.

MR. SHELTON: Understood, and I'm not trying to imply, at all, that our Chapter 7 Trustees don't have the ability to do their own diligence. I mean, they certainly can. Nonetheless, if a Chapter 7 trustee shows up in the Westlake case or somehow makes a demand on Express H2O and says, "I should be either the party in interest or your fraudulent transferee and I demand a return of the asset or the value of the asset." The moment that demand happens, if it happens, it may not. But if it happens in a public forum, it's going to completely undermine Express H2O's -- well, not completely undermine, it's going to undermine their ability to -- if they enter into settlement negotiations with Westlake, it's going to undermine, potentially, their credibility in front of the State Court judge. And even if it doesn't do those two things, it's going to make everybody in that Express H2O, Westlake lawsuit, want to say, "Oh, wait a minute. Are we dealing with the right party or should we be dealing with the Chapter 7 Trustee?" That's the second basis for cause, and they are slightly different.

And I think, just to be -- if you just ask me to be judge for a half second, they probably split into two different timeframes. I think the one where KrisJenn doesn't have counsel is probably a slightly shorter timeframe, probably a few weeks. Give them a deadline and

Case 5:24-cv-00597-XR Document 48-1 Filed 09/22/26 Page 29 of 60



say, "If you're going to have counsel, we're going to reset the hearing for this date. If you're going to have counsel, get them and make sure that you have them in time for that hearing." And if, for some reason, they can't, they could file a second motion, but I don't expect that to happen. But that would be, probably, a shorter timeframe, which, as Your Honor will recall in our original motions, we were talking about probably about a month.

The second one that Your Honor is talking about, I think there is a desire to avoid, to the extent humanly possible, having this hearing occur while the Westlake case is still active. Because, as we've discussed, the benefits of that Westlake case inure to the benefit of DMA and Longbranch, as well. And if that case is undermined, then the creditors of this very estate that we're trying to protect, are going to be undermined immediately. Not just the creditors, but also the equity interest. And that's the reason for the -- so, like I said, Your Honor, it's two separate causes, two separate timeframes. I do understand what the Court is saying that, "Hey, the Westlake case could go on for years." That's, I think, irrebuttably true, that it could go on that long. But I think it's also irrebuttably true that the work that Mr. Sachitano, Mr. Bailey, and Ms. Pryor-Baze have put in have gotten that case right up on the precipice of a resolution, at least an

initial resolution.

THE COURT: Did you say Mr. Bailey?

MR. SHELTON: Sorry, Mr. Wingate. Sorry, his name is Bailey Wingate. He's counsel for --

THE COURT: Oh, okay.

MR. SHELTON: He's counsel for Express H2O.

THE COURT: I didn't know who that was.

MR. SHELTON: Yeah, I'm sorry. That was a misspeak on my part.

THE COURT: Okay.

MR. SHELTON: I don't know. Maybe his kids call him Mr. Bailey, I don't know. But nonetheless, they've done a great amount of work to get that case a long way. And I would really like to avoid anything that would undermine that effort, especially because DMA and Longbranch's interest is already protected as a matter of law by this Court and by --

THE COURT: They don't feel very protected.

MR. SHELTON: I do understand that, Your Honor. Which is -- I understand that concern, and we've offered to -- we've offered reporting, we've offered all kinds of things to try to -- to assuage their concerns. They don't seem particularly assuageable with anything short of a complete decimation of Express' efforts to monetize this (indiscernible) through the Westlake lawsuit, and I --

THE COURT: Well, I mean, they think you're trying to take it away from them.

MR. SHELTON: I understand that, Your Honor, and they've presented absolutely -- they've never presented any evidence other than just they're concerned that we're trying to take it away.

THE COURT: What about the evidence that it was transferred from the reorganized debtor to Express H2O? That doesn't count?

MR. SHELTON: No, Your Honor. For two reasons, one, the plan indicated that they would -- I think at the time of the judgment, that transfer was already known, for one thing. And the judgment itself put a constructive trust on the right of way in the hands of Express H2O.

THE COURT: Right.

MR. SHELTON: So, their rights have4 always been protected from that point. Second, Express H2O has come before this Court on several occasions, and I think Mr. Sachitano just did it a couple of months ago and said that Express H2O intends to abide by the plan. And the plan says that DMA and Longbranch are going to get the treatment that they're entitled to under the final judgment. We have a final judgment and that final judgment says they have the right that runs with the land. So, that's the treatment they're entitled to and Express H2O has made unequivocal and

affirmative statements before this Court that it intends to abide by that. So, they --

THE COURT: Okay. Express H2O, let's say that Express H2O prevails, ultimately, over Westlake after appeals are done, two years from now. Who is running Express H2O?

MR. SHELTON: In the future or at this very moment?

THE COURT: Both. Now and two years from now.

MR. SHELTON: I have no idea about the future, Your Honor. I've simply -- I don't have that information.

THE COURT: Larry Wright? Who's running it now, Larry Wright?

MR. SHELTON: Mr. Sachitano right at the very moment, Your Honor.

THE COURT: Okay, but he's not an equity holder. He's working for the LLC, correct? That's --

MR. SHELTON: I believe that's correct, but I could let Mr. Sachitano confirm that. I'm not aware of him being transferred any equity. The equity holders were the trust that we discuss --

THE COURT: Right.

MR. SHELTON: -- approximately four months back.

THE COURT: So, who determines whether -- assume you win all the litigation against Westlake and others, who

determines whether the right of way gets developed or whether it gets sold? And I understand you're saying that you're protecting Longbranch and DMA. I understand you're saying that, but if it's sold, it's fairly simple, they get 20 and 20 percent each, right?

MR. SHELTON: Correct.

THE COURT: After the reimbursement of Mr. Wright for the money that he lost on the ranch issue, and after his attorneys' fees that he owes are paid. So, who decides whether it gets sold or developed?

MR. SHELTON: At the very moment, Mr. Sachitano does, Your Honor. I think the implication of your question is, could he be removed by Equity and somebody else replaced?

THE COURT: Well, and I'm not trying to remove him. I don't mean that. I'm just saying, somebody has to decide, are we going to sell this thing or are we going to try to develop it? Like, should we just continue to own it from now on and we'll try to go sign up Exxon and Texaco and Gulf to put pipelines in there, whether they're water, gas, whatever, wastewater, you know, that kind of stuff? What if Mr. Sachitano or whoever takes his place some day says, "We just want to keep it and develop it." I mean, why should this be delegated to someone that's not the reorganized debtor? I guess that's my question. The reorganized debtor

confirmed the plan and they said, "We'll respect the 20 percent of Longbranch and the 20 percent of DMA", but the reorganized debtor had the option on whether to sell it or whether to develop it. But right now, the reorganized debtor might have been forfeited. We don't really know. And the control is in Express H2O. So, we've deleted what the reorganized debtor was supposed to be able to do to a non-bankruptcy entity that is a stranger to the transaction other than it got transferred to Express H2O.

MR. SHELTON: Your Honor, if I --

THE COURT: It's like we gave it away on the hope that they could do it rather than the reorganized debtor doing it.

MR. SHELTON: Your Honor -- and I know this is a matter for the order to show cause hearing, so I don't want to get too far into it. But I do want to -- I disagree primarily because of what the plan actually says DMA and Longbranch get. The plan says that DMA and Longbranch are going to get the treatment that's afforded to them under the final judgment. And then --

THE COURT: Yeah, and they don't have control of what happens to it. They just get their 20 percent. I agree with that. They're not, like, the managing party of the right of way. I agree with that. They don't have the discretion to say, "No, we're not going to sell it, we want

to develop it" or "No, we don't want to develop it, we want to sell it." They just have to have their 20 percent protected because they have a profits interest.

MR. SHELTON: Correct.

THE COURT: But why are we letting Express H2O make all the decisions when this was a bankruptcy case and KrisJenn LLC got a plan confirmed saying that they would either develop or sell it?

MR. SHELTON: I understand that last component that the Court just added on, that KrisJenn said that it would develop or sell it.

THE COURT: Right, right.

MR. SHELTON: But from the point of view -- and this is part of the reason for the motion for clarification, Your Honor. From the point of view of DMA and Longbranch, my position, and I haven't seen anything contrary yet, is that they have been satisfied. The question of whether or not the Debtor is generally --

THE COURT: In what way have they been satisfied?

MR. SHELTON: Because they already have their 20 percent interest each that is being protected that runs with the right of way. Their rights --

THE COURT: By the constructive trust or what?

MR. SHELTON: Their rights -- well, they're entitled to the treatment that is --

THE COURT: Right, right. It's been reaffirmed by judicial order.

MR. SHELTON: -- that they get from the final judgment.

THE COURT: I agree.

MR. SHELTON: They're entitled to the treatment that they get from the final judgment. That's what the plan says.

THE COURT: Right.

MR. SHELTON: They got a final judgment from Rodriguez -- from this Court that went up to Rodriguez and then Rodriguez confirmed it, saying their interest runs with the land, they get their 20 percent interest and it is okay that the land stays in the hands of Express H2O. That's the final judgment that they got. That's the one that they didn't appeal, Your Honor. And so, they got the treatment under the plan that they're entitled to. That's it. And that's why the motion for clarification -- and I know it probably -- I don't know how the Court took that when -- if you've even thought about it yet, but it's not being -- I'm not trying to be flip or anything like that. It's really a question of, what are we trying to show? Are we trying to show that the Debtor performed a vis a vi in DMA and Longbranch only? Or am I trying to show that the Debtor hit every single item in the plan? Because they're completely

different efforts, right. And --

THE COURT: Well, that the confirmed plan hasn't been completely -- it was substantially consummated close to confirmation, but it hasn't been consummated, and they're arguably in material breach of it. And then the creditors are not being protected and it's just dragging out.

MR. SHELTON: Correct, Your Honor. And the only creditor that's complained is DMA and Longbranch, but they're getting the treatment under the plan that they're entitled to as a matter of law. That’s --

THE COURT: And you don't know whether other creditors were ever paid?

MR. SHELTON: Sitting here right now, no. And that's the reason I offered at the very beginning, Your Honor. I haven't been retained for that purpose and I'm not prepared. I did start, in the interest of just trying to do my professional best, I started looking at the claims register. I started trying to identify who was owed what under the plan, what possible creditors are out there. But I don't know if that's the burden that the Court's wanting us to show or not, right.

THE COURT: You didn't think to talk to Mr. Smeberg about that? To ask him some questions about it?

MR. SHELTON: I did start talking to Mr. Smeberg and that's how I got -- that was actually how I tried to

speed up that process of identifying. But if --

THE COURT: I mean, just from my review, it looks like they did pay some creditors. I don't know if all of them were paid, but I've actually looked at this issue in the docket sheet. And if you look at the monthly operating reports near the time of confirmation, it looks like they did pay some claims. So, I don't know if they did or not, but it looks like they did. So, you might want to look at that or if you're not going to be stepping into the case representing the Debtor, then whoever does needs to look at that.

MR. SHELTON: Understood.

THE COURT: But the Debtor needs to get counsel, I agree with that.

MR. SHELTON: Yeah. Understood, Your Honor. And I think I've -- I don't want to belabor it too much, and again, a lot of this is coming from an area of not yet being fully prepared, which is the basis for the -- again, a basis for the motion to continue. And just so everybody on the call is clear, I have -- again, I said this at the beginning, I've spoken with Mr. Wright to determine whether or not he wants me on for KrisJenn. He has not said that yet, he has not said yes, and he has not signed an engagement agreement yet and he has not paid a retainer yet. So, it's possible he does or it's possible he chooses other

counsel or it's possible he chooses no counsel. I don't know the answer to that question. But I do just want to be clear so nobody's surprised if it's not me and it turns out to be somebody else.

But regardless, the basis for the continuance is, you have a corporate entity, whether it's dissolved or not. Clearly, they don't have counsel. The two of them just dropped off this call about 30 minutes ago. And then you've got the second one, which is this concern about undermining Westlake -- Express H2O and the Westlake lawsuit. So, two different bases for cause. I will just agree. I don't think there's any real argument there that the timeframe -- if the Court says, "Well, (indiscernible) cause in the first one", I think that encourages a slightly shorter timeframe than if Your Honor grants one on the Westlake one, and different processes for addressing those continuances.

THE COURT: Okay. Ms. Ortiz, what else from your perspective? Anything?

MS. ORTIZ: Thank you. Thank you, Your Honor. We are not going to deny that KrisJenn needs counsel. We believe that the continuance is granted on that basis. We simply request that the continuance be short, only as necessary to allow KrisJenn to retain counsel. From our perspective, we believe 14 days to retain counsel should be sufficient. And with respect to the other basis with which

counsel is arguing that an extension should be further granted, we think the extension should certainly not be tied to the current state case that Express H2O is handling, as Your Honor knows, because this case has been brought up several times in the last year.

So, we've been hearing that this case will be done, that it will be final, that we're heading for final hearings since at least Fall of last year. It is an issue that delayed discovery. It's an issue that delayed the enforcement of the final judgment. And while I understand that it is counsel's sincere belief that this will bring finality to the issues and maybe simplify things from their perspective, as Your Honor has already emphasized, from our perspective, this was a situation that was created out of a fraudulent transfer. It was created out of, first, the breaches of fiduciary duty that Mr. Wright had through KrisJenn and then later through the fraudulent transfer, for no consideration, that Mr. Wright made to Express H2O, in violation of the bankruptcy claim.

Because of that and simply because of the logistics of the appeal and of any subsequent litigation that might come from it, we think that tying this extension to -- this continuance to the ongoing state litigation would simply lead to an indefinite stay that would prevent my clients, who have been waiting for now a couple of years to

be able to enforce this judgment, from getting their rights enforced and validated. Tied to that, we believe that, in fact, the resolution of the Express H2O litigation will not necessarily result in completely clean title for all issues that have been raised. Counsel has not raised the issue, for example, that there are outstanding condemnation proceedings involving the right of way. We've been served with paperwork related to (indiscernible) we've appeared on those proceedings. So, we think that there's actually a lot of outstanding issues.

We understand counsel's concern that changing this to a Chapter 7 will be detrimental to that project. We think that's better addressed through a hearing on the merits of the order to show cause and whether or not this should be converted. And precisely for this reason, we think there shouldn't be further delay on holding that hearing.

MR. JOHNS: Your Honor, this is Chris Johns. May I also just --

THE COURT: Yes, sir.

MR. JOHNS: -- add on.

THE COURT: Yes, sir.

MR. JOHNS: I want to clear up a couple of things too. I mean, there's been a suggestion that if it's a sale, then we get our 20 percent each, and then we're, somehow,

out of it. That's not what a real covenant that attaches and runs with the land means. Our interest goes on indefinitely until there's some buy down or some agreement that we're a part of. And so, I don't think it's right to just think that it's even realistic if they're going to be able to go work out some kind of deal and monetize or do a real sale to anybody to give any kind of value. Because our 40 percent collective interest attaches and runs with the land. It runs -- if there's a sale, fine, we would get our percentage of that sale. But then we would have an ongoing net profits interest that attaches and runs with the land until we bring it down. So, I think that's one issue we're concerned about.

I am concerned too about the length of appeals that can last. Again, as Ms. Ortiz alluded to, given domain cases can last years as well. And so, like, as far as finality with all of these issues, it bothers me, frankly, Your Honor, that they went and violated the Court's order. We did not know about the transfer until after the remand happened. Mr. Muller, if he were still on this call, was in that hearing where he told us. So, Mr. Shelton is just mistaken about that. We didn't know about it. We were upset about it. There was a representation made to Your Honor that things would be transferred back to the Debtor. That --

THE COURT: I remember that.

MR. JOHNS: That representation was also broken. They never did. And then, guess what they did after that? They voluntarily dissolved KrisJenn so they wouldn't be able to return it. And so, the idea that --

THE COURT: Have you verified that? Was it dissolved or what was the status of that?

MR. JOHNS: Yes, Your Honor. If you look on the Secretary of State's website and look at all the filings for KrisJenn. We did a name search. They also misrepresented to the Court that the KrisJenn name was unavailable. That wasn't true. That was false, as well. And then it also will show a voluntary dissolution that it was done, that Mr. Wright performed. And again, this was a fraudulent transfer from insiders to insiders. Our case came first. This asset was part of the bankruptcy estate years and years before the Westlake case. Years and years before the imminent domain cases.

And so to say that we go, somehow, to the back of the line and we're not going to be protected, it's just -- they are playing games with the Court and with the parties and it just -- it's time to just bring some finality to this whole thing. And we're okay with, if they need a 14-day continuance to go get counsel, that's great. Mr. Shelton is aware of many of the issues in the case. He represents one

of the people who was a part of the underlying proceeding -- the adversary proceeding, excuse me. They have a way to do this. I'm concerned that this is just another attempt to continue to delay facing the consequences of the final judgment.

And also, the suggestion that Judge Rodriguez somehow left it being in the hands of Express H2O, I'd invite Your Honor to look at the parties' briefing both sides. We did not find out that it had been -- that it was still in the hands of Express H2O because they had promised Your Honor and the parties that they would transfer it back to KrisJenn. It wasn't until after we had filed our opening brief that we even found out that it was still in the hands of Express H2O. And so, we've been consistent about that from the beginning. We came to Your Honor to -- we were surprised that it hadn't been transferred back to KrisJenn. And so, realized that we could go and just ask for a direct enforcement of the judgment and so that's why we came back to Your Honor. I understand that you stayed your order and then Mr. Wright to transfer the right of way to DMA, but we've been consistent about this. And there's been a revolving door of attorneys on the other side. But I think Your Honor has a memory of what has happened in this case and that these shell games just have to stop at some point. And we ask that we not just kick the can down the road

again.

THE COURT: Okay. One question and it's sort of a hypothetical, Mr. Johns. But suppose it wasn't Chapter 7 and the Trustee wants to sell the right of way, free and clear of liens and encumbrances? Obviously, you would object to it, but -- and it might even take an adversary proceeding to sell the interest of DMA and the other co-owner or the other profit center's holder, Longbranch. And you know, I don't want to generate more litigation, but the Trustee might sue DMA and Longbranch to sell their interest, which is a real estate interest, of course, along with the right of way. You understand what I'm saying?

MR. JOHNS: I do, Your Honor and --

THE COURT: I don't want to do that, but I mean, that's just one of the things that could happen down the road if the Trustees try to sell it free and clear.

MR. JOHNS: Understood, Your Honor.

THE COURT: Okay.

MR. JOHNS: And I would have to look at the Trustee's authority to do that. I understand that --

THE COURT: Well, they do it all the time. Now, I'm not saying they would be able to in this instance, but sometimes you'll have a piece of property that's co-owned by the debtor and a non-debtor, and so, you can't just sell both interests in a motion to sell. But the Trustee can

file an adversary proceeding to sell the Debtor's interest, as well as the co-owner's interest. Do you see what I'm saying? So, I'm just saying --

MR. JOHNS: Well, I see what you're saying, but --

THE COURT: -- that that's a possibility.

MR. JOHNS: I see what you're saying, Your Honor, and you've been doing bankruptcy way, way longer than I have, many multiples. But my understanding of the whole thing that went up to the whole point of, is this a personal covenant or is this a real covenant?

THE COURT: Right. It runs --

MR. JOHNS: It --

THE COURT: -- it runs with the land. I agree --

MR. JOHNS: It runs with the land. It -- it helps --

THE COURT: -- according to the District Court's judgment.

MR. JOHNS: Right. It's a separate bundle. It may have been originally part of the bundle of sticks, but by having that interest agreement done by my client --

THE COURT: Okay.

MR. JOHNS: -- I think what the Court held in the first appeal was that that was -- those were all transferred prior to the bankruptcy. Long time before the bankruptcy, they were -- our folks gave up real value in order to do

that.

THE COURT: Right.

MR. JOHNS: And these were property interests that they obtained that were separate from ownership and control of the right of way.

THE COURT: Right.

MR. JOHNS: I mean (indiscernible) originally part of the bundle of sticks, but they're not anymore and they haven't been since way before the bankruptcy.

THE COURT: I'm just saying the legal issues, maybe even factual issues are so complicated in this case that it's just unbelievable. And I've asked this question before and I think I know the answer, but have there ever been any mediations of the parties in this where we could try to work something out?

MR. JOHNS: Your Honor, we had one mediation with Mr. Muller in San Antonio.

THE COURT: Right.

MR. JOHNS: And I can't remember the timeframe. I mean --

THE COURT: Like five years ago.

MR. JOHNS: Well, maybe three or four years ago.

THE COURT: Okay.

MR. JOHNS: I mean, we wouldn't be opposed to that and so, if Your Honor ordered us to go back and mediate --

THE COURT: Well, I --

MR. JOHNS: -- with the Court.

THE COURT: Yeah, I'm not trying to increase the cost of this, but sometimes cases just seem to be never ending and just have this huge burn rate of attorneys' fees and I'm not criticizing the attorneys. You've got to charge whatever is reasonable, of course. And so, I'm not criticizing the attorneys, but sometimes cases just run amuck, just run out of control and you've got to get a handle on it by doing some kind of mediation just to stop the bleeding, in effect.

MR. JOHNS: Your Honor, I would suppose that there's less bleeding on our side than on the other side. Everybody on our side is on contingency fee that's appearing before you right now.

THE COURT: I think the Express H2O people might be also.

MR. JOHNS: Well, I understand that. We have not been able to get any discovery on that, so far. So, we -- that's a -- these are all concerns we have.

THE COURT: Well, go to Judge Xavier Rodriguez and see if you can get that mandamus released.

MR. JOHNS: I'm so uncomfortable, Your Honor, poking a Federal District Judge saying, "Please hurry up and --".

THE COURT: I'm not saying poke at him. I'm just saying, you know, get it resolved. That's all.

MR. JOHNS: Yeah.

MS. PRYOR-BAZE: Judge, would you like for me to respond to Mr. John's comments? He was just repeating all the arguments we made to you a couple of weeks ago in person, and I can go through --

THE COURT: Right, we're -- yeah, we're not deciding it today.

MS. PRYOR-BAZE: -- and I can rebut them if you'd like me to --

THE COURT: Go ahead.

MS. PRYOR-BAZE: -- because they were filled -- well, they were just filled with a lot of misrepresentations that we went through two weeks ago. I'd rather not, but Your Honor hasn't yet ruled on either motion that we argued.

THE COURT: Well, I'm going to continue the hearing, so if you want to make a brief rebuttal, that's fine. But don't go into the half hour version.

MS. PRYOR-BAZE: Sure, Your Honor. I think the big points would be that everyone knew the property was in the hands of Express. That was in the judgment after remand. We have yet to see any promise by Express to transfer the property back. That was never made. I don't believe that Mr. Muller --

THE COURT: Well, the Debtor said it on the record in a pleading, I believe, but certainly on the record.

MS. PRYOR-BAZE: I don't -- I have not seen that.

THE COURT: That was Mr. Muller.

MS. PRYOR-BAZE: Yes. Yeah, and I've heard everyone say that it's Mr. Muller, but I have not seen --

THE COURT: And we can dig it up if we need to. We'll dig it up if we need to.

MS. PRYOR-BAZE: Okay. We would have to see when in time that was because at the time that the final judgment was entered, it was clear it was in the hands of Express. DMA and Longbranch filed a brief on remedies where they asked the Court to disgorge the property from Express. And so, whether or not there was a representation made, a throw away representation made in a hearing, I can't speak to. I wasn't there. But they knew where the property belonged and they could have searched real property records, they could have asked this Court for clarification. They could have done all those things. But what they did was go appeal and again, ask for the property to be disgorged, that the constructive trust that they asked for was abuse of discretion. And Judge Rodriguez said, "No, it wasn't. The property can stay in the hands of Express."

So, I really -- I have to say that I'm very -- all of the inflammatory language that Mr. Johns continues to use

about intentional misrepresentations to this Court were certainly not by any lawyer on this call now, in this hearing now, and I really doubt that there was any intentional misrepresentation by an attorney before. Express is actively trying to sell the property. Because of the cloud of title by Westlake, there are certainly encumbrances to that. We also would disagree with Mr. Johns' interpretation of this covenant that runs with the land. But that point, I'm sure can be argued at a different time.

THE COURT: Well, are you saying that if you sell it, you sell it free and clear of the 20 percent?

MS. PRYOR-BAZE: The net profits interest that was in the original contract was on the Seller development by the Debtor. Well, I think by the Debtor or the company that owned it before the Debtor. We'd have to go back to that language. I don't believe there was a covenant that ran with the land that says, "I get 20 to 40 percent every time something is done to the property regardless of who owns the property 100 years from now." It is not that type of covenant that runs with the land. It's a covenant that attached to the property between KrisJenn and Express and went with your constructive trust. The constructive trust was the remedy for the covenant that runs with the land.

So, yes, I would argue that -- and I'm probably

not prepared today to talk about case law that supports it. We'd have to brief that entirely with a lot of research and explanation, but I do not believe that covenant runs with the land for every sale from now until eternity, from a nets profit interest. That just doesn't make sense at all. But --

THE COURT: I think that's what Judge (Indiscernible) said.

MS. PRYOR-BAZE: I'm not sure. I'd have to go back and look. I don't believe he said that it runs with the land from now to eternity throughout all of Texas history, that that attaches with every development and sale. That certainly isn't what the original contract said.

THE COURT: Okay. Well, we don't have to decide that today. It's out there. I understand. Okay. So, when do we set the show cause? July 15th sound okay? Got any trips to Europe that week? Anyone?

MR. SHELTON: July 15th is available --

THE COURT: Mr. Rose, you going to Europe that week?

MR. SHELTON: My apologies, Your Honor. Were you talking to me?

THE COURT: Mr. Rose?

MR. ROSE: Not that week, Your Honor. Thank you, though.

THE COURT: Not that week? Okay. How about you, Mr. (Indiscernible), July 15th? Go ahead.

MR. JOHNS: Your Honor, this is Chris Johns. I actually -- it's not to Europe, but I've got a trip to South America then.

THE COURT: Oh, okay. Well, they have Zoom, I think, don't they? We can do it the --

MR. JOHNS: I may be able to fly to darkest Peru, yeah.

THE COURT: Okay. How about the 22nd? Are you back from the south --

MR. JOHNS: Yes, Your Honor.

THE COURT: -- the southern hemisphere by then?

MR. JOHNS: Yes, Your Honor.

THE COURT: Okay. Mr. --

MS. PRYOR-BAZE: Your Honor, I'm actually in Europe that week.

THE COURT: Okay. Of course.

MS. PRYOR-BAZE: Well, I don't know why the "of course", Your Honor. I've been, like, one time in the two years I've been (indiscernible).

THE COURT: Because we always have conflicts. No matter what day I come up with, people have conflicts. And so I jokingly say --

MS. PRYOR-BAZE: I think it --

THE COURT: -- "Are you going to be in Europe?" and then a lot of times they are.

MS. PRYOR-BAZE: It is the summer, Your Honor.

THE COURT: This is the second time you've been in Europe for a proposed date that I came up with.

MS. PRYOR-BAZE: I would -- Your Honor, I think that, to give everyone enough time and to get time for counsel, I would ask for mid-August. I don't think, especially with summer vacations that apparently Mr. Johns and I both have, that's asking for too much time.

THE COURT: How about August the 5th? That's a Wednesday.

MR. JOHNS: Your Honor, I'll do what I need to do to be at a good (indiscernible) place.

THE COURT: Oh, no, no, no, no, no. No, I don't want you to do that. I mean, I want to get this thing wrapped up more than any of you do, so don't worry about that. But how about August the 5th? Anybody?

MS. PRYOR-BAZE: Mr. Shelton, that works for me, Your Honor. I don't know if it works for Mr. Shelton.

MR. SHELTON: Every date so far has worked for me.

THE COURT: Okay. That's a Wednesday. I'm sorry?

MR. JOHNS: I believe August 5th will work. I've got -- I've been notified that the Fifth Circuit is going to schedule an oral argument in another case that week.

THE COURT: Is this Mr. Johns?

MR. JOHNS: Yes, Your Honor.

THE COURT: Okay. Don't you have a cast of thousands in your firm?

MR. JOHNS: We'll figure out how to cover it, Your Honor. If it has to be August 5th, we'll do August 5th.

THE COURT: Yeah. If you have a conflict with it, let us know and we can move it back a day or forward a day, possibly.

MR. JOHNS: Thank you, Your Honor.

THE COURT: Yeah. I don't have anything that week other than a doctor appointment, so, it’s fairly open right now. So, if you find out the Fifth Circuit sent you on the same day and time, then let us know and we might be able to adjust it. So, we don't want you to miss a trip to New Orleans. You don't want to do that.

MR. JOHNS: Well, Your Honor, one thing I'd just like to get on the record is, you know, we've got this order to show cause hearing. I'd really appreciate some protections against any further transfers or encumbrances of the right of way without this Court's approval.

THE COURT: There's no more transfers contemplated, are there Ms. Pryor-Baze?

MS. PRYOR-BAZE: No, Your Honor, there are not. And Express H2O has already said they would be bound by the

provisions of the plan and this Court's judgment, Your Honor.

THE COURT: All right. Well, I mean, I have the ultimate trap door on conversation. You know that. So, if they do any foolishness, Mr. Johns, then I will take some serious action. I'll just say that. So, obviously, I don't want them transferring the property, the right of way. So, I'll just say that. And if they do, then they will have you-know-what to pay. Okay, August the 5th at 10 o'clock by Zoom. We'll do the show cause then and I'm sure we'll get everything resolved that day.

MR. JOHNS: Thank you, Your Honor. I’ll let you rest.

THE COURT: Thanks for appearing, everyone, and seriously consider some sort of mediation. I mean, is it even worth asking Westlake to engage in the mediation, as well?

MS. PRYOR-BAZE: Your Honor, we've mediated twice with them. They're not --

THE COURT: Okay.

MS. PRYOR-BAZE: They have not been amenable to any real settlement.

THE COURT: Is it, like, all or nothing? "Yeah, you give us what you want and we'll settle with you?" Is that the situation?

MS. PRYOR-BAZE: I should be careful not disclosing any terms of mediation, but that is --

THE COUT: No, no, I don't want to hear about settlement negotiations. But they're just, like -- there's no way.

MS. PRYOR-BAZE: As of right now, that's been their posture in the case.

THE COURT: Okay. So, is Mr. Finkelstein on the call right now? He usually asks for transcripts of hearing.

MS. PRYOR-BAZE: I'm sure that Ms. Ortiz will continue to --

THE COURT: If you look at the docket sheet, you'll see his name in there a lot.

MS. PRYOR-BAZE: Yes. Ms. Ortiz's office has collaborated a lot with Westlake, so I'm sure that they'll have the opportunity to work with her to get whatever they need.

MR. JOHNS: I don't appreciate that kind of comment. That's just not true. So, it's uncalled for. But thank you, Your Honor.

THE COURT: Okay. Well, I would look into some sort of mediation. If you don't think it's fruitful to include Westlake, then that's fine. But I mean, this thing has got to end someday. I mean, it's been going for years before I got the case six years ago. So, I mean, we've got

to stop the bleeding, and I'm talking about the loss of money by all parties. I mean, you can only go so long on a contingent fee case, and you can only go so long on an hourly case when the attorneys are getting paid by the hour. So --

MR. JOHNS: Your Honor --

THE COURT: -- this is way, way past where it should be. Yes?

MR. SHELTON: Your Honor, for what it's worth and this is for all parties, including my side, as well. A lot of what I hear and I've heard it from the last year is a lot of anger and animosity, which tends to undermine the ability to reach a settlement. But it also tends to suggest that a mediation may be appropriate.

THE COURT: Isn't there somebody that's a really good mediation that just keeps you in separate rooms. You don't have to be in the same room. If you're in separate rooms, it seems to work better with a really good mediator. And I can name you some names, but I don't want to favor anyone over another. But I would hope that that could be something that common sense could prevail.

MR. SHELTON: Your Honor, Judge Hale, I just had a mediation with him last --

THE COURT: Judge Hal would be great, yeah. I'm not --

Case 5:21-cv-00... Document 48-1 Filed 09/22/26 Page 59 of 60



MR. SHELTON: -- and he kept the parties separate.

THE COURT: -- pushing anybody in particular, but Judge Hale is great and he's very common sense and he'll push people to do the right thing.

MR. SHELTON: Well, we'll certainly communicate about it with our side. And we're always doing --

THE COURT: Yeah. Just think about it and think about it seriously is all I can say. He knows nothing about this case. I haven't talked to him about this case. He doesn't know anything about it, so he would be completely objective and would be amazed at this situation. All right. Well --

MR. SHELTON: Thank you.

THE COURT: -- we'll see everyone on August the 5th at 10 a.m. by Zoom.

MS. PRYOR-BAZE: Thank you, Your Honor.

MR. SHELTON: Thank you, Your Honor.

MR. JOHNS: Thank you, Your Honor.

THE COURT: We’re in recess.

(Proceedings adjourned at 3:12 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: June 16, 2026

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| KRISJENN RANCH, LLC, ET AL, ) | CASE NO: 20-05027-rbk |
| ) | ADVERSARY |
| Plaintiffs, ) | |
| ) | San Antonio, Texas |
| vs. ) | |
| ) | Wednesday, February 5, 2025 |
| DMA PROPERTIES, INC, ET AL, ) | |
| ) | 9:59 a.m. to 10:53 a.m. |
| Defendants. ) | |

LEAD CASE: 20-50805-rbk
KrisJenn Ranch, LLC

HEARING RE:
MOTION TO ENFORCE CONSTRUCTIVE TRUST [DKT.NO.368]

BEFORE THE HONORABLE RONALD B. KING,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For Plaintiffs: | CHARLES JOHN MULLER, IV, ESQ.<br>C.J. Muller & Associates<br>111 W. Sunset Rd.<br>San Antonio, TX 78209 |
| For Defendants: | WILLIAM P. GERMANY, ESQ.<br>Germany Law<br>1250 N.E. Loop 410<br>Suite 725<br>San Antonio, TX 78209 |
| | AUSTIN H. KRIST, ESQ.<br>LOURDES ORTIZ, ESQ.<br>Cleveland Krist<br>303 Camp Craft Road<br>Suite 325<br>Austin, TX 78746<br>737-900-7107 |
| | CHRISTOPHER S. JOHNS, ESQ.<br>Johns & Counsel, PLLC<br>14101 Hwy. 290 West<br>Suite 400A<br>Austin, TX 78737 |

**San Antonio, Texas; Wednesday, February 5, 2025; 9:59 a.m.**

**(Call to order)**

**THE COURT:** Good morning. This is Judge King in San Antonio. Our 10:00 o'clock case is *Krisjenn Ranch, LLC versus DMA Properties*.

Could I get announcements from those of you who intend to speak this morning?

**MR. GERMANY:** Yes, Your Honor. Good --

**MR. SPEAKER:** Your Honor, --

**MR. GERMANY:** -- morning. This is William Germany for Larry Wright.

**THE COURT:** All right.

**MR. MULLER:** Your Honor, --

**MR. KRIST:** And, Your Honor, Austin --

**MR. SPEAKER:** Try again.

**MR. MULLER:** Apologies, Your Honor. John Muller. I'm here for the Krisjenn entities. I don't intend to make argument today.

**THE COURT:** Okay.

**MR. KRIST:** And, Your Honor, Austin Krist on behalf of DMA Properties, Frank Daniel Moore, and Longbranch Energy. I'll be making argument for our side today.

We also have several other attorneys on our side here, including Chris Johns, (Inaudible) Ortiz, and (inaudible).

**THE COURT:** Okay. Anyone else?

(No audible response.)

Okay. Go ahead, Mr. Krist.

**MR. KRIST:** So, Your Honor, if I may, I -- we have a short handout that we prepared in the vane of a PowerPoint, except for it's in a Word document that I'll share if the Court will allow me to.

**THE COURT:** Okay.

**MR. GERMANY:** And, Your Honor, this is William Germany. I apologize but Mr. Muller and I are actually here at the courthouse and so we cannot see that. But I'm sure it won't -- we're not going to object to it.

**THE COURT:** Okay. We'll describe it if you want us to as it goes.

**MR. GERMANY:** I'll just listen to Mr. Krist's argument. Thank you, Your Honor.

**THE COURT:** Okay.

**MR. GERMANY:** And we are way overdressed for this phone conference.

**THE COURT:** Okay.

**MR. KRIST:** And, Mr. Germany, I can assure you the things that are in the handout are really just a summary of what I'll be presenting here today, so there shouldn't be anything that you're not already hearing.

So, Your Honor, to start, in the final judgment in

this case, the Court awarded the following relief to my clients, DMA Properties, Frank Daniel Moore, and Longbranch Energy.

First, the Court entered a declaratory judgment that DMA and Longbranch have 20 percent net profits interest that are valid covenants running with the right-of-way. That's not in dispute. It's not really an issue that we're here to raise today.

Second, the Court found that Larry Wright breached fiduciary duties owed to Mr. Moore in connection with Mr. Wright's schemes to gain control of the right-of-way in the first place.

On that basis the Court awarded DMA and Moore a constructive trust over the right-of-way as an equitable remedy for breach of fiduciary duty. That's relevant here -- well, actually let me back up.

So, Your Honor, that's relevant for multiple reasons, including that Mr. Wright previously transferred the right-of-way to another entity that he controlled, Express H2O, while this proceeding was pending.

And as you might recall, in its final judgment the Court ordered that it was imposing a constructive trust on the right-of-way in the hands of Express H2O if Mr. Wright did not transfer the right-of-way back to Krisjenn.

And then, third, Your Honor, the Court awarded DMA,

Moore, and Longbranch their attorneys' fees. I understand that Mr. Germany had an objection to us raising that issue today because we added it in an amended motion.

And so we're not going to be pressing that here today if Mr. Germany is continuing to object.

But the motion for constructive trust is fully briefed, and that's the primary issue that we have here. And so, Your Honor, --

**MR. GERMANY:** Sorry. I am continuing with my objection. They filed an amended motion on Monday evening, Your Honor.

**MR. KRIST:** And so, --

**THE COURT:** Okay.

**MR. KRIST:** -- Your Honor, because Mr. Germany's objecting to the request for substitute service and I guess is not prepared to address it, we've agreed that we won't proceed on that issue and we'll just be moving forward on the constructive trust issues that are fully briefed in the response.

**THE COURT:** The substituted service, was that the only thing you added to the amended motion?

**MR. KRIST:** That's correct, Your Honor.

**THE COURT:** Okay. Go ahead.

**MR. KRIST:** And so, Your Honor, we're centered on the constructive trust here today.

And at bottom, the basic reason that we are here before the Court is because Mr. Wright has made no attempt to comply with this Court's final judgment in any way, including with respect to the constructive trust.

So moving on to the meat of our argument here, under the final judgment, as I mentioned, the Court ordered that DMA and Moore shall recover a constructive trust on the right-of-way as a remedy for Wright's breaches of fiduciary duty. That's on page two of the judgment, Your Honor.

And the Court then further explained in its opinion accompanying the final judgment that unless Mr. Wright transferred the right-of-way back from Express H2O to Krisjenn, the Court would impose a constructive trust on the right-of-way which would allow Larry Wright to recover his investment for the $4.7 million purchase price prior to the breaches of fiduciary duty.

And the Court didn't award anything else to Mr. Wright.

Now, Your Honor might remember that at the last hearing before entry of the final judgment Defendants' counsel Mr. Muller represented to this Court that Defendants would in fact transfer the right-of-way back to Krisjenn.

Well, that never happened, and we know that for two reasons. First, Defendants served post-judgment discovery requests which revealed that the right-of-way was not

transferred back to any of the Krisjenn entities.

Second, we learned a couple weeks ago that not only did Mr. Wright refuse to transfer the right-of-way back to Krisjenn, in violation of this Court's order and in violation of the Chapter 11 plan, but on top of that Express H2O, which continues to hold the right-of-way, is now out there filing lawsuits against third parties and claiming that Express H2O is the rightful owner of the right-of-way.

And that's problematic for a whole host of reasons. Number one, because Express H2O is not the lawful owner of the right-of-way in light of this Court's order imposing a constructive trust.

And, number two, because Express H2O is not -- excuse me. Number two, because Express H2O is out there engaging in litigation and taking positions as to the scope and rights under the right-of-way, that could seriously prejudice my clients.

I'm going to scroll ahead in our handout here, Your Honor, because I realize I skipped a page.

Now, Your Honor, with that context in mind, the reason we are here before the Court today is because we are asking this Court to enforce the constructive trust that it imposed under the final judgment for Mr. Wright's fiduciary breaches by ordering Mr. Wright to transfer the right-of-way to DMA and Mr. Moore.

Now, in his response, Mr. Wright argues that this Court can't require him to transfer title to DMA and Mr. Moore because, according to Mr. Wright, we weren't granted that relief in the final judgment.

And to be blunt, Your Honor, that's wrong. And it misunderstands what a constructive trust is under Texas law.

Under Texas law, a constructive trust is an equitable remedy that subjects the person holding title to property to an equitable duty to convey it to another.

That language is from In Re Gouge (phonetic), which is a Southern District of Texas bankruptcy case from 2008 that we cited in our briefing.

And the Texas Supreme Court has likewise reiterated the same principle and affirmed that when a court imposes a constructive trust on real property, the effect of the constructive trust is to create an equitable duty on the party holding the property to convey it.

That's from *Tally v. Howsley*, which is another Texas Supreme Court case that we've cited in our briefing.

And, Your Honor, the reason that a constructive trust requires transfer of title is because under Texas law, fiduciaries who have breached their duties, like Mr. Wright, are not allowed to keep the fruits of their malfeasance.

That's from *ERI Consulting*, a Texas Supreme Court case from 2010 which again we've cited in our briefing.

And concomitantly, when a fiduciary acquires legal title to property in violation of a fiduciary relationship, the imposition of a constructive trust subjects the breaching fiduciary to an equitable duty to convey the property.

And that's exactly the situation that we are in here. In this case, the Court expressly found that Mr. Wright obtained control of the right-of-way through breaches of fiduciary duties that he owed to Mr. Moore.

And in its final judgment, the Court explicitly imposed a constructive trust on the right-of-way as a remedy for those breaches of fiduciary duty.

Under that constructive trust, Mr. Wright gets to recover a first monies obligation of 4.7 million from any sale or monetization of the right-of-way. And we're not disputing that.

But what he can't recover are profits or amounts in excess of that contribution because, as I mentioned, Texas law does not allow fiduciaries to profit from breaches of their fiduciary duties.

And here, Mr. Wright obtained control of the right-of-way in the first place by breaching fiduciary duties that he owed to Mr. Moore.

And, Your Honor, that's what this Court's final judgment ordered. It ordered that it was imposing a constructive trust that would allow Larry Wright to recover his

investment for the $4.7 million purchase price and nothing more.

And, finally, Your Honor --

**THE COURT:** Doesn't he get 60 percent after the 40 percent held by Moore and Borders?

**MR. KRIST:** Well, Your Honor, I believe that the answer to that question is no because under Texas law, Mr. Wright cannot profit from his breaches of fiduciary duty.

And we don't dispute that Mr. Wright would get back the money that he paid in, the 4.9 million or, excuse me, 4.7 million. And so he would be made whole under the constructive trust. And it was within Your Honor's discretion to craft equitable relief in that way.

But under Texas law and under the Texas Supreme Court's case *ERI Consulting*, what Mr. Wright cannot do is he cannot then recover additional 60 percent profits on top of getting paid back because he only obtained that interest in the right-of-way through his breaches of fiduciary duty in the first place.

**THE COURT:** What does the judgment provide?

**MR. KRIST:** Your Honor, the judgment provides -- it says: as to DMA and Moore's claim for breach of fiduciary duty against Wright regarding the unauthorized Black Duck loan, the Court renders judgment that DMA and Moore recover a constructive trust on the right-of-way in the hands of Express

H2O.

And, Your Honor, we believe that that constructive trust was the correct remedy here because Mr. Wright obtained the right-of-way through his breaches of fiduciary duty. And it is the remedy that this Court ordered for breach of fiduciary duty.

And under Texas law, the effect of that constructive trust, which has already been awarded in the Court's final judgment, is to subject Mr. Wright to an equitable duty to convey the property to DMA and Mr. Moore, subject to the first monies obligation that Your Honor ordered, because that's what a constructive trust is under Texas law.

And we think that issue is clear, Your Honor. The reason that we're here today is because Mr. Wright has made no effort to comply with the Court's judgment. He has not effectuated a transfer pursuant to the constructive trust.

And he didn't even transfer the right-of-way back to Krisjenn as this Court originally requested in light of his breaches of the Chapter 11 plan.

And, Your Honor, finally just to wrap up, in terms of equities here, fundamentally Mr. Wright has not been -- excuse me, has not proven that he can be trusted with the right-of-way or that he is the appropriate steward to monetize that.

As I mentioned, he originally got control through his breaches of fiduciary duty. And he subsequently attempted to

transfer the right-of-way to this other entity, Express H2O, in violation of the Chapter 11 plan in an attempt to evade this Court's judgment.

He didn't honor his lawyer's representations that it would be transferred back to Krisjenn. And now he's litigating with third parties claiming that Express H2O is the owner of the right-of-way, in spite of the constructive trust, which risks seriously prejudicing my clients' rights.

And, in sum, we're respectfully asking the Court to enforce the constructive trust it awarded by ordering Mr. Wright to transfer the right-of-way to DMA and Mr. Moore, subject to that $4.7 million first monies obligation because that is what Texas law requires under the judgment entered by this Court.

Your Honor, at this point, if you have further questions I'm happy to answer them. Otherwise I'm happy to cede the --

**THE COURT:** Yeah.

**MR. KRIST:** -- floor to Mr. Germany.

**THE COURT:** I have three questions. What's the status of the appeal? I saw that an appeal was filed and some appeals were consolidated by Judge Xavier Rodriguez.

**MR. KRIST:** Yes, Your Honor. So the appeal is still pending. We have filed our affirmative briefing. The Defendants have filed their responsive briefing. They, to the

best of my knowledge, have not filed any affirmative brief laying out their own arguments (inaudible) --

**THE COURT:** Well, is the appeal filed by your side, by DMA and Moore and so forth?

**MR. KRIST:** Your Honor, both sides filed a notice of appeal but only my side filed a substantive brief urging arguments for reversal --

**THE COURT:** Okay.

**MR. KRIST:** -- or action by the appellate court.

**THE COURT:** Okay. And you don't know anything about when that might come out, the -- Judge Rodriguez hasn't scheduled an oral argument or anything like that.

**MR. KRIST:** I don't believe so, Your Honor. I believe that the reply brief is due in the next week or two here.

**THE COURT:** Okay. And they --

**MR. KRIST:** Although --

**THE COURT:** -- he may just do it on the papers obviously. He may not schedule argument.

**MR. KRIST:** That's correct, Your Honor.

And one other issue I'll note in connection with the appeal is that the fact that the appeal's pending does not affect this Court's ancillary and continuing jurisdiction to enforce its judgment.

There's plenty of Fifth Circuit law that says that

the district court retains jurisdiction to enforce its judgment.

And what we're asking for here is for the Court to enforce the constructive trust that it has already awarded. And that should not interfere with the appellate court's jurisdiction or this Court's jurisdiction in any way.

**THE COURT:** Okay. This is kind of outside the record and so I'm not going to base any decision on this. But does the right-of-way still have value?

**MR. KRIST:** Your Honor, absolutely we believe that the right-of-way has value.

And in the Express H2O Pipeline petition that I mentioned we recently became aware of where Mr. Wright is filing lawsuits claiming to own the right-of-way through Express H2O, he even mentions that in 2023 he was engaged in discussions attempting to sell it with John Terrill, who you might remember from the trial.

So, yes, within the last two years Mr. Wright has been out there trying to monetize the right-of-way.

And on top of that he's filing lawsuits claiming to own the right-of-way, seeking money from third parties for allegedly violating Express H2O's rights with respect to the right-of-way which, as I mentioned, is problematic and we believe improper.

**THE COURT:** Do you know if in -- as a part of those

negotiations he's disclosing the interest of DMA, Borders, and Moore?

**MR. KRIST:** Your Honor, my impression is that he is not. It is not mentioned in the petition.

The Defendants in that case learned of this case filing I believe through the public record and reached out to us about it. And the best of my knowledge, at that point they were not aware of any interest.

I'm not -- candidly, I'm not sure that that would be an issue affecting them because in that litigation that the net profits interest wouldn't strictly speaking be germane to the claims that were brought.

So I have no reason to believe that Mr. Wright is disclosing my clients' net profits interests in any of his conversations with third parties about this right-of-way.

**THE COURT:** So you're concerned that it's a repeat of what happened in the prior sale that was rescinded, that he's not disclosing the 20 and 20 percent net profits interests?

**MR. KRIST:** Well, Your Honor, I'd say that we have really three concerns.

Number one, yes, we're concerned that Mr. Wright is not disclosing my clients' net profits interests.

Number two, we believe that Mr. Wright shouldn't be in a position to go out there and use Express H2O to try and monetize this right-of-way and then get amounts over the first

monies obligation imposed by this Court because of the constructive trust.

And we believe that the constructive trust requires transfer of title to our clients under Texas law because, again, that's what a constructive trust is.

The third issue that I would say that we have is that because my clients have these net profits interests and because of Mr. Wright's continued and documented malfeasance and in my view wrongful actions, he's just not an appropriate steward for this right-of-way.

He's not going to be able to monetize it. He shouldn't be allowed to monetize it for his own profit in light of his fiduciary breaches.

And we believe that the judgment imposed by this Court requires transfer of title to the right-of-way to our clients, subject to that first monies obligation.

**THE COURT:** And who's your client? Is it DMA and Mr. Borders individually or Mr. Moore or who is it?

**MR. KRIST:** Your Honor, I represent Frank Daniel Moore individually, DMA Properties, and then Longbranch Energy. I don't represent Mr. Borders in his individual capacity.

But the request for the constructive trust specifically concerns really Mr. Moore and DMA Properties, to the extent that he's the full owner of that entity, because the breaches of fiduciary duty were breaches of fiduciary duty that

Mr. Wright owed to Mr. Moore, not to Mr. Borders.

**THE COURT:** Well, which person or entity owns the 20 percent; either Mr. Moore or DMA?

**MR. KRIST:** Your Honor, my understanding, and Mr. Johns can correct me if I'm wrong because I'm a little rusty on this issue, but my understanding is that the net profits interest was transferred and owned by DMA Properties.

It originally belonged to Mr. Moore but was subsequently transferred.

**THE COURT:** And then Borders is not represented today, but his 20 percent was owned by Longbranch.

**MR. KRIST:** That's correct, Your Honor.

**THE COURT:** Is he active in the appeal or is he just sort of in the background?

**MR. KRIST:** He is active in the appeal to the extent that Longbranch Energy is one of the appealing parties and he is represented by our side and by Mr. Johns.

**THE COURT:** Now, does Mr. Johns also represent Moore and DMA or just Longbranch?

**MR. KRIST:** All three, Your Honor.

**THE COURT:** All three. And you represent all three, Mr. Krist?

**MR. KRIST:** That's correct, Your Honor.

**THE COURT:** Oh, okay. And then the Express lawsuits, I mean, you're saying that Mr. Wright is negotiating with

people and that is about a purchase of the right-of-way. And you're saying that that's resulted in some lawsuits; what, for specific performance or damages or what?

**MR. KRIST:** My understanding, Your Honor, is that Mr. Wright's filed a petition against somebody else claiming that their actions or asserted property interest infringe on the right-of-way. And so he's now engaged in litigation as to the scope and validity of the right-of-way.

And obviously, to the extent that those issues are determined adverse to Mr. Wright with respect to the right-of-way, that would prejudice my clients.

**THE COURT:** Is it one --

**MR. KRIST:** The --

**THE COURT:** -- lawsuit or more than one lawsuit?

**MR. KRIST:** I am only aware of one lawsuit at --

**THE COURT:** Okay.

**MR. KRIST:** -- this time.

**THE COURT:** Where is that pending, what county?

**MR. KRIST:** Your Honor, --

**THE COURT:** Do you know?

**MR. KRIST:** -- Mr. Germany or Mr. Muller might be able to better speak to that. I believe it's pending in the eastern -- excuse me, it's pending in eastern Texas where the right-of-way is located.

**THE COURT:** Okay.

**MR. KRIST:** Off the top of my head I don't remember the specific county. But I'm sure that I could pull up the petition (inaudible) --

**THE COURT:** Like Nacogdoches or Angelina or something like that?

**MR. KRIST:** Yes, that's correct, Your Honor.

**THE COURT:** Okay. So what you're asking for today is to compel Krisjenn and/or Mr. Wright to transfer the right-of-way from Express H2O to DMA and Longbranch; is that right?

**MR. KRIST:** Really it would be DMA and Mr. Moore, Your Honor. They're -- Mr. Moore is a hundred percent owner of DMA.

We would be seeking to have this Court order Mr. Wright to transfer title pursuant to the constructive trust because this Court's final judgment imposed a constructive trust on the right-of-way as a remedy for breach of fiduciary duty in the hands of Express H2O.

**THE COURT:** Okay. And wasn't it DMA and Longbranch?

**MR. KRIST:** Your Honor, the breaches of fiduciary duty were specifically respect to -- Longbranch has a 20 percent interest pursuant to --

**THE COURT:** Right.

**MR. KRIST:** -- a different contract that it entered. But that does not implicate the constructive trust or breaches of fiduciary duty.

Your Honor, at this point, unless Your Honor has further questions, I'm happy to cede the floor to Mr. Germany and respond to the -- whatever arguments he has.

**THE COURT:** Okay. Mr. Germany.

**MR. GERMANY:** Yes, Your Honor. Actually Mr. Muller is well-versed on some of these issues that need to be addressed and he will address the Court on some of the factual background and the pending lawsuit.

**THE COURT:** Okay.

**MR. MULLER:** Yes, Your Honor. Yes, I don't want to interfere with Mr. Germany's argument which he's well-prepared for.

I just would like to correct the record on four discreet issues which came up during the trial and I think the Court is well aware of.

But a representation made was made that there was no evidence that Mr. Wright has attempted to comply with the Court's constructive trust issue. And I don't believe that to be true.

If you will recall, there is -- there's a bankruptcy plan in place which is, you know, a contract between the parties allowing the row to be sold free and clear.

One of the issues there was, of course, that the Krisjenn name had been shown in a poor light during the trial, and there were very few prospective buyers.

So Mr. Wright had transferred the row into a new entity in the hopes of cleaning up and marketing the property, which is exactly he was supposed to do.

When it was reported to the Court in the sanctions motion that that was inappropriate, I told the Court that we would be glad to move it back.

I don't -- I didn't handle those transfers and I'm not handling those transfers. But we did tell the attorneys who had made that transfer, just put it right back in Krisjenn.

Too much time had passed and the Krisjenn name was no longer available. And so pretrial we once again reported that we could not put it into the Krisjenn name.

However, H2O stood ready to stand in the shoes of Krisjenn and would comply with not only the Court's orders but the bankruptcy plan to its full extent.

And that issue was heard and litigated at trial on remand; keeping in mind that that's not a proper remand issue. Those were not facts and issues that happened at trial. They were not part of the record and they were not remanded.

It was almost like a sanctions motion that was a kind of an issue addressed on the side.

I think the Court appropriate and wisely ruled that the -- although we could not return the title to Krisjenn, that an -- the constructive trust would be imposed on H2O in the hands of Larry Wright as manager to make sure that when the row

was sold and monetized, that the proceeds of sale would be distributed as the Court ordered in its constructive trust, the first I believe 4.7 to Mr. Wright, the remaining at a 60, 20, 20 rate.

Mr. Wright is aware of that order; again, by and through me confirms his intent to comply with that order. There has been no sale. And if there is a sale, I can assure the Court that that will be exactly how we proceed.

I will say that to the extent we've now come back on an order to readdress that issue, I would say that we are *res judicata* in trying the case.

I also want to address the issue of fruits of his malfeasance and that the Court had somehow ruled that Larry's breach of fiduciary duty was in -- accomplished by wrongfully transferring the row.

And that's not true. And I think everyone knows that that's not true. And that is not in the record.

Privity was a very expensive issue argued in this case. It is undeniably true and, in fact, part of closing argument that privity of the row went from (inaudible) originally named Express into Krisjenn, and then to TCRG, which was an entity owned by Bobby Wright, and then into Krisjenn.

There was no proof and no allegation that Krisjenn had wrongfully foreclosed upon the row and taken it by that way, the fruits of their malfeasance as it were said.

That issue had to do with the Bigfoot note. It was addressed on summary judgment. That was what was foreclosed upon. It was the note and the note only.

And the Court ordered that, you know, that those funds be released from I believe the Shelby County court, and attorneys' fees be paid. And all of that happened.

But as to the breach of fiduciary duty, the only findings and holding there was that Mr. Wright had breached his fiduciary duty in not properly presenting in a proposing alone agreement, which was collateralized by the row.

But that collateral was never foreclosed, there was no transfer. And so to be clear, not only did Mr. Moore and Mr. Wright never own -- I'm sorry, Mr. Moore and Mr. Borders never own the row, but their deals insisted that they not. They wanted only silent net profits interest.

They wanted only upside. They did not want the expense and trouble of holding and owning these rows. And so, again, there was no -- absolutely no finding that the row was transferred wrongfully as a breach of fiduciary duty.

My third point I would like to make is there's this -- you know, in prior proceedings it has been alleged that Mr. Wright is a bad owner of the row. He is the owner of the row.

There was no claim -- there was 33 counterclaims; none for trespass to try title, none for quiet title. They --

these gentlemen never wanted to own the row. They wanted -- they want the fruits of owning it but they don't want the expense and trouble of it.

And so the -- I'm sorry, can I look at my notes here?

I'm -- the issue about -- that came up previously was that Mr. Wright was a poor owner of the row because he didn't do things to take care of it, to be a good steward. Like, for instance, filing lawsuits for infringement and encroachment up on the row and trying to recover for damage to the row.

Now Mr. Wright has gone out and done that. Again, I'm not -- that's being handled by Houston lawyers. There's a bunch of them, there's like 30 of them. It's pending in Atascosa. It's big lawsuit.

**THE COURT:** A bunch of --

**MR. MULLER:** It's not (inaudible) --

**THE COURT:** -- lawyers or a bunch of parties?

**MR. MULLER:** I'm sorry, there's two, three parties. I believe it is -- again, I'm not on pleadings there, Your Honor, but I have spoken to these lawyers. There's many of them. It is Express H2O as a party plaintiff against an entity named Westlake.

Westlake is a pipeline company that moves Olefins through east Texas. Their pipeline crosses over the row, encroaches up on the row, and it is damaging to the row.

And so as a good owner and steward of the property,

when Mr. Wright figured that out, he filed this lawsuit. And, you know, it's very expensive and very time consuming.

In the past, we have been accused of being poor stewards of the row for not filing these lawsuits. Now we -- the lawsuit's been filed and we're a poor steward of the row for filing these lawsuits.

And I want to say -- point something out. And this is really important and dangerous. You saw this in the TCRG case where Larry did go out and he made a productive deal that would have made everyone a lot of money. I think $10,000 a day would have gone to Borders and Moore.

And they came in and said, no, he's a fraudster, he's a bad guy, coming back with this fraud thing. And the deal's unwound and it's lost.

Contemporaneously with the filing of this very motion before this Court, magically and miraculously the attorneys for Westlake have filed a similar motion on their side.

Their motion says that the case must be dismissed for want of jurisdiction because H2O doesn't really own the low -- row; because the row was transferred with this constructive trust imposed upon its proceeds, that therefore means that there is no title and standing for the plaintiff to assert the claim.

That would result not only in the lawsuit being dismissed but forever lost because limitations would have

already passed.

So if -- what the movants are trying to prove today would once again cost millions of dollars of damages to the row and, therefore, and they're shooting themselves in the foot on their own interest to collect on the row.

But in closing -- and, again, I don't want to get into argument, but those are the factual statements I know for the Court. I don't believe the constructive trust has -- implicates title.

I think when Mr. Wright says to the court in Atascosa I, H2O, owns the row, he's telling the truth. And I think he would be sanctioned and troubled if he said otherwise.

I don't know if they have disclosed the constructive trust or not. It's not a secret. I mean, I think if they were required to, they absolutely would. But I don't know if they have. I don't know if anyone's asked.

And factually that's all I have. I'm sorry if I went too long. I'll pass to Germany.

**MR. GERMANY:** Your Honor, --

**THE COURT:** Go ahead.

**MR. GERMANY:** Sorry. Yeah, he covered a lot of my points, Your Honor. I was just going to get to the meat of the issue here on the constructive trust.

Legally the constructive trust is just a creature of this judgment, and that is all it is, as I briefed the Court

on, Your Honor.

They are trying to alter the final judgment. As Mr. Muller mentioned, this is *res judicata* at this point. They're trying to alter and have terms put into the trust that just do not exist.

And the factual basis and background that Mr. Muller refreshed the Court's memory of go to exactly what we are trying to prevent from happening, and Mr. Wright is trying to prevent from happening, and that is hurting the row and its future value.

And at this point, even that aside, Your Honor, the issues -- they've not done anything, and that is DMA has not shown anything to this Court to show that he has violated any of the terms of the constructive trust and paragraphs two and three of the final judgment.

It simply says he has to hold it in trust, which he is doing. He is also pursuing those claims in east Texas to hopefully increase the value of the row and protect it and preserve it.

All he has to do at a given point in time is if it is sold or monetized, he gets the first $4.7 million. It's simple. That's the first part of the trust.

And then after that there's a split of the net profits interest. It is clearly and explicitly spelled out in the judgment.

None of those events have happened. The post-judgment discovery has not even touched upon that or even asked about that to my knowledge.

Maybe they have asked Krisjenn, but Krisjenn is a defunct company. It is not there. There is nothing there to receive profits. That would be through Larry Wright, Your Honor, and Express H2O.

He just cannot offload this whole row and then get away with it. It's sitting there out in east Texas. And he -- all he has to do on that is account for any net profits or any income to it. And he gets the first 4.7 million, and then after that they split 60, 20, 20.

**THE COURT:** Well, I don't think --

**MR. SPEAKER:** And that --

**THE COURT:** -- the judgment mentions the 60. I mean, I agree with the 20, 20, but where does it say the 60?

**MR. GERMANY:** It does not, Your Honor. But it's implied. And it says, after that, DMA and Longbranch will each receive 20 out of the net profits from the sale of future development of the row.

And so there would have to be somebody else there that would receive the 60 percent. And I would say that would be the then current owner, whether it's H2O or if it's been sold, wherever that 60 percent interest went.

**MR. MULLER:** If I may add, Your Honor, --

**THE COURT:** Why is it --

**MR. MULLER:** -- just one more --

**THE COURT:** -- pending in Atascosa County, just out of curiosity, the lawsuit?

**MR. GERMANY:** I think the encroachment of the row, if you'll remember, Your Honor, crosses four counties. And I think that Westlake's portion -- Westlake's Pipeline crosses the portion of the row that is in Atascosa. And so I think that the (inaudible) --

**THE COURT:** Well, I mean, the row is in east Texas. Atascosa's probably --

**MR. MULLER:** (Inaudible) --

**THE COURT:** -- hundred and fifty miles away.

**MR. GERMANY:** I'm misspeaking then. I am misspeaking. It is the southernmost county that begins with an "A." I cannot remember what it is but --

**THE COURT:** Oh.

**MR. GERMANY:** -- they filed it (inaudible) --

**THE COURT:** Angelina maybe.

**MR. GERMANY:** Angelina, yeah. I think it's mandatory jurisdiction in that county because that's where the --

**THE COURT:** Okay.

**MR. GERMANY:** -- (inaudible) is. I would --

**THE COURT:** Okay.

**MR. GERMANY:** -- like to add one jurisdictional point

I think hasn't been brought up yet, is we did not -- yes, we got reversed by the district court. It was heard on remand and entered. We didn't -- we filed a notice of appeal. We did not pursue that appeal.

The appeal -- the only appeal that's pending is on breach of fiduciary duty. And the argument being made there -- and correct me if I'm wrong, Mr. Krist -- but is that your constructive trust is inappropriate because you didn't award, among other things, title, that you should have given a more relief, equitable relief than what you did.

You should have also given them title, even though it wasn't pled for or any evidence was presented.

And now that same issue's being raised at the trial court again. I would think jurisdictionally that issue is now before the district court or the Fifth Circuit, wherever that's at. Sam Houston and Greta McFarland are handling that part of the case.

But I don't think we can try that issue in two different courts at the same time.

**THE COURT:** Well, the appeal's pending in U.S. District Court in San Antonio. I don't know of anything in the Fifth Circuit.

**MR. GERMANY:** Well, I think that's right. It hasn't made its way to the Fifth Circuit yet. But I think the appellate briefing says the constructive trust is erroneous and

that title is not granted.

**MR. KRIST:** Your Honor, if I may.

**THE COURT:** Yeah, go ahead.

**MR. KRIST:** So I'll start with the last point raised by I think that was Mr. Muller. You know, he just suggested that the appeal concerns this constructive trust issue and that, therefore, this Court doesn't have jurisdiction. I don't believe that's accurate, Your Honor.

The -- number one, this Court has jurisdiction to enforce its final judgment, notwithstanding the appeal. And we've cited to ample law on that in our brief and previously in our argument.

The issue with the appeal is, candidly, we believe that the constructive trust shouldn't have even provided Mr. Wright with an option to transfer the right-of-way back to Krisjenn because we believe the constructive trust should apply regardless of whether he transferred it back to Krisjenn because he cannot profit from his fiduciary breaches.

At this point that's really beside the point because there's no dispute that Mr. Wright failed to transfer it back.

And on top of that, the Court's final judgment did award the constructive trust on the right-of-way in the hands of Express H2O.

There's no dispute that the right-of-way still remains in the hands of Express H2O. And there's nothing

barring this Court from enforcing the constructive trust.

Number two, I believe it was suggested that the constructive trust is just for proceeds of any sale to be distributed. And, Your Honor, the Defendants haven't put forward any law to that effect.

The law in Texas is to the contrary very clear that a constructive trust is an equitable device that requires transfer of title. That's what it is. And they can't claim it's something else in contravention of this Court's order, and try and insert additional terms that just aren't there.

But the Court did order a constructive trust. And under Texas law, that does require a transfer of title.

Number three, Your Honor, I believe Mr. Muller suggested that Mr. Wright has complied with this Court's order. I'm not aware of any way in which Mr. Wright has complied with this Court's order.

Defendants have done nothing to satisfy the judgment on attorneys' fees for $750,000.

We believe that Mr. Wright is evading service of the writ of execution that we've been attempting to serve on that point.

And then on top of that, as Your Honor already knows, he's made no attempt to transfer the right-of-way back to Krisjenn. He didn't timely do so. And the right-of-way still remains in the hands of Express H2O.

Fourth, Your Honor, it was suggested a minute ago that there's no evidence that Krisjenn wrongfully foreclosed and that the foreclosure related to -- just to the Bigfoot note. That's simply not true, Your Honor.

The way that Mr. Wright got control of the right-of-way in the first place is he entered a conflicted loan transaction with Krisjenn, his own entity, without disclosing it.

And this Court found that that unauthorized loan transaction allowed Mr. Wright to obtain control of the right-of-way by foreclosing on it. And that leads us to where we are today. There's -- there is simply no basis for saying that there's no evidence of wrongful foreclosure.

And I believe that that's a misstatement of the facts of the case and this Court's findings where the Court did explicitly find that there were breaches of fiduciary duty and that Mr. Wright had entered this conflicted loan transaction in breach of those fiduciary duties.

Finally, Your Honor, we're not trying to alter the final judgment or add additional terms.

We're just asking the Court to enforce the constructive trust that it has already awarded because under Texas law, constructive trust means one thing. It means an equitable duty to convey title. And that's what we're asking for here.

Mr. Wright could have complied with the Court's order by transferring title, or he could have complied, as the Court allowed, by transferring it to Krisjenn. He did neither.

And as a result, this Court's final judgment requires transfer of the right-of-way pursuant to that equitable duty under the constructive trust.

I have one final point to rise, Your Honor. It was also suggested that my clients don't want to own the right-of-way and that imposition of a constructive trust would cost millions of dollars in damages. That's -- none of those things are true.

My clients are seeking title to the right-of-way pursuant to the constructive trust. That's why we're here today. The whole reason for this case is because Mr. Wright engaged in breaches of fiduciary duty to gain sole control of the right-of-way from my clients.

And there is no evidence or basis for saying that imposition of a constructive trust would cost millions of dollars in damages. To the contrary, it would put the right-of-way in the hands of the people to whom it rightfully belongs, in light of Mr. Wright's fiduciary breaches.

And it would actually increase the ability of the parties to actually monetize this thing, and for Mr. Wright to get his money back on his first monies obligation.

**THE COURT:** Okay (inaudible) --

**MR. KRIST:** And so --

**THE COURT:** I was just looking at the docket sheet for the appeal in U.S. District Court. And I see that Krisjenn has filed their appellees brief. So are they still a active -- an active corporation or LLC?

**MR. GERMANY:** It's an appellant to the briefing. I don't know if they're still active or not. I think that that name has already been lost and has been taken by someone else. That's my understanding.

**THE COURT:** I mean, seriously, somebody else took the name Krisjenn and so you couldn't get it.

**MR. GERMANY:** I don't know, Your Honor. You know, after I spoke to you, I said, put it back. He wanted to. He spoke with the lawyers who transferred it. And they were unable to accomplish that, and that's why we returned to you.

There was a motion for sanctions before trial. I -- you know, I objected to it being tried as -- at the same time as the remand on trial, but nevertheless reported to you and reported to -- or reported to the Court -- because I had previously told you we would transfer it back.

And that was absolutely my, you know, legal advice and my intent. But he was unable to do so.

And for whatever reason, the corporate attorneys who handled that could not put the -- reform the Krisjenn entity. And so it stayed in the hands of this new entity.

But as I stated at trial and will reaffirm now, I have -- my client assures me that it will -- that he will comply with the Court's order and follow the constructive trust.

I don't think this idea that Mr. Wright got control of the row by breaching a fiduciary true is not truthful.

He got sole control when they said, we don't want control, we want net profits interest only, we want (inaudible) and interest, and we don't want to share in the downside, so if you lose then million, we don't want to pay five.

We only want upside on a silent net profits interest. And so by contract they didn't want to have ownership and control. The fiduciary issues have nothing to do with that.

But, yes, Your Honor, I think you make a good point. I think the appellate is in the name of Krisjenn. My understanding is that he could not reform it to take title and possession to the row.

And if you need further evidence and affirmation of that, I will gladly present it and provide it to the Court.

**THE COURT:** Okay. So, Mr. Krist, what about the argument that the lawsuit, if there's a transfer of the right-of-way back to either Krisjenn or let's say DMA, that the lawsuit would end up being dismissed and limitations would bar relief in that instance; do you know anything about that?

**MR. KRIST:** Your Honor, I would be speaking to some

degree out of turn. But I believe that --

**THE COURT:** Yeah.

**MR. KRIST:** -- to the extent the right-of-way is transferred back pursuant to the constructive trust, my clients would have standing to intervene in that lawsuit and they would be able to steward it on that basis.

I don't believe that, and I'm not aware of, a statute of limitations argument that would result in millions of dollars in damages. And at the end of --

**THE COURT:** So basically try to slip into the shoes of Krisjenn or Express H2O as plaintiff.

**MR. KRIST:** That's correct, Your Honor. We would seek to substitute as the proper party that actually owns the right-of-way. And I believe that would be sufficient to get around any statute of limitations arguments, to the extent there are any. And I don't know that there are.

**THE COURT:** Okay. So -- and I realize you said you're withdrawing the request to have substituted service. But, I mean, shouldn't that be fairly noncontroversial?

I mean, if somebody's evading service, you can tack it onto their front door under State rules. And, you know, we can sort of adopt State rules. I mean, does he still live --

**MR. KRIST:** Well, --

**THE COURT:** -- in the same place or do you know, out at McQueeney?

**MR. KRIST:** Your Honor, to the best of my knowledge Mr. Wright and/or Krisjenn have two houses around the corner from each other still out there.

**THE COURT:** At Lake McQueeney?

**MR. KRIST:** I believe so, yes, Your Honor. And one of those addresses is actually -- the 410 Spyglass address is actually registered street address with the Texas Secretary of State for Express H2O.

**THE COURT:** Okay.

**MR. KRIST:** And so -- and as far --

**THE COURT:** Well let me ask --

**MR. KRIST:** -- as we can tell from the --

**THE COURT:** -- Mr. Germany. Mr. Germany, I mean, isn't substituted service contemplated when you can't find somebody to serve?

**MR. GERMANY:** I'll answer, Your Honor, only because I had this pending -- same issue pending before you in the State (phonetic) versus Amarillo National Corp. case which is -- has -- it's with an action on debt.

Yes, there is a Rule 106 under State law. But he could easily come back and ask for substitute service. Those rules and proceedings relate to service of process, not service of a writ of execution; a writ of execution of course being an order from the Court to the Marshals service to go seize upon assets.

The way that is accomplished and served is that the DMA and Longbranch would file an application with your Court. I believe Your Honor's clerk would then send notice to the Marshal's service, and then the Marshal's service would then execute on the writ of execution.

In other words, you don't serve a writ of execution on Larry, you serve it on the Marshal.

And so I really -- again, this is part of the amended briefing that was filed late last night. But I don't understand -- first of all, I don't understand there's no -- why there's a need for substitute (inaudible).

But, also, why are they trying to execute on Larry Wright? They did not take a monetary judgment against Larry Wright. The only relief as stated at the beginning of this case against Larry Wright individually was a constructive trust on the row in his hands as by and through H2O.

**MR. KRIST:** Your Honor, just briefly, that's not correct.

The Court awarded attorneys' fees to DMA, Mr. Moore, and Longbranch, and then subsequently entered an order determining those attorneys' fees and awarding them specifically against Mr. Wright in connection with his breaches of contract, the declaratory claims, and --

**THE COURT:** Yeah.

**MR. KRIST:** -- the breach of fiduciary duty claims

which were premised on the contract.

**THE COURT:** Yeah.

**MR. KRIST:** Number two, Your Honor, the reason that we amended our motion to add these service issues is because we did think that it was fairly uncontroversial. You're correct that this Court has latitude to authorize --

**THE COURT:** Well, --

**MR. KRIST:** -- substitute service under Texas law.

**THE COURT:** -- yeah. And so I'm not going to rule on the substituted service today. But let me just tell a little story.

Back when I had the El Paso docket in the late eighties, one of the bankruptcy attorneys had a judgment against a guy that lived in a gated subdivision in El Paso area.

And they sent out the Marshals to serve a writ of execution on a judgment. And the people at the gate would say, oh, no, well he's not there, and so they were basically rebuffed.

And so they went back out in response to another order and actually went to the house, and the man's wife answered the door. And they said, you mind if we search the house. And she said, no.

Well, they found him in a closet and so they arrested him. And it was late on a Friday so he got to spend the

weekend in jail until Monday morning when his lawyer could ask for basically a writ of habeas corpus to get him out.

So the only reason I'm telling you that is we're not going to tolerate people playing games. So if the writ of execution needs to be served, it will be served. And we'll do whatever it takes.

And if it takes taking Mr. Wright in by force and in chains, we can do that. And, you know, we're happy to do that if he needs a ride down to the courthouse.

And we'll have a hearing. We'll give him a hearing on it. But we're not going to have people playing games with us on serving writs of execution, okay?

And I don't know if he has any assets or not. He may not. He may be judgment-proof, and if he is, he is. But we're not going to have people evading service of process when they -- we know where they live and they're just playing games with us.

So if he wants to spend a little time in the pokey, you know, so be it. So that's just --

**MR. SPEAKER:** (Inaudible)

**THE COURT:** -- a warning for the future.

**MR. SPEAKER:** Yes. And, Your Honor, I will admonish my client on that. But he is not playing games. The -- he has moved into a new home. And, you know, they haven't even reached out to us and asked us for that new --

**THE COURT:** On Spyglass?

**MR. GERMANY:** -- address. But it's public record.

**THE COURT:** On Spyglass or somewhere else?

**MR. SPEAKER:** No.

**MR. SPEAKER:** To be --

**MR. SPEAKER:** It's a different home, Your Honor.

**MR. SPEAKER:** To be clear, as a product of this lawsuit, he's lost everything. And so I think the representation that he has two homes on McQueeney is false. He had --

**THE COURT:** Well, you know, I don't know.

**MR. SPEAKER:** -- to sell his (inaudible) --

**THE COURT:** I just remember his address being on --

**MR. SPEAKER:** Yeah.

**THE COURT:** -- Spyglass, and that's at Lake Queeney.

**MR. SPEAKER:** (Inaudible)

**THE COURT:** That's all I know.

**MR. SPEAKER:** Yeah. He had to sell his home --

**THE COURT:** That's all I know.

**MR. SPEAKER:** -- and he had to sell his ranch. He sold everything and now he lives in a smaller house in the same neighborhood.

**THE COURT:** Okay.

**MR. SPEAKER:** And, Your Honor, --

**THE COURT:** (Inaudible) is a homestead and it's

exempt, etcetera. I understand.

**MR. GERMANY:** And, Your Honor, one other aspect about the final judgment I think that's being misrepresented to the Court, the final judgment in paragraph four is the only one that awards attorneys' fees, other than the ones that were in correspondence with the note for (inaudible) --

**THE COURT:** Well there's a supplemental order on attorneys' fees.

**MR. KRIST:** That's correct, Your Honor.

**MR. GERMANY:** (Inaudible) supplemental order, Your Honor, under 7054, which is, you know, a non-jurisdictional aspect of it. And they raised that issue for the first time on the Monday briefing or amended motion.

And, Your Honor, in that one they don't conform with what the final judgment says and just the order on attorneys' fees because the order is quite clear, Your Honor.

And we're going to file a motion with the Court to correct this, but it's under -- paragraph four is the only new attorneys' fees awarded, and that's for Krisjenn on the dec. action. That's it.

So it's the declaratory judgment action. And they are -- the Court awards attorneys' fees to DMA against Krisjenn.

**MR. KRIST:** Your Honor, --

**MR. SPEAKER:** (Inaudible)

**THE COURT:** (Inaudible) it says against Wright. On the third paragraph on page two of that order, that order is document number 353 in this adversary proceeding.

And if you look at the second full paragraph, it says $750,000 against Wright, Krisjenn Ranch, LLC, and the other two Krisjenn entities.

**MR. KRIST:** That's correct, Your Honor.

**THE COURT:** So take a look at that after we get off. You know, take a look at that. The -- so we're not going to decide that today because it hasn't been raised enough in advance.

But, okay, so what else? Anything else, Mr. Krist?

**MR. KRIST:** Your Honor, you have further questions about the constructive trust arguments, I don't believe so.

**THE COURT:** Okay. Mr. Germany or Mr. Muller.

**MR. GERMANY:** Nothing further, Your Honor.

**THE COURT:** Okay.

**MR. MULLER:** Not from me, Your Honor.

**THE COURT:** All right. I think we need the property transferred to DMA. So there is a constructive trust on it.

I'm not sure that Mr. Wright is doing everything that's in the best interests of DMA, Moore, Longbranch, and Borders because DMA owns a 20 percent profits interest that the district court has told us runs with the land.

I'm not sure that Mr. Wright is protecting that. He

might be. But he's been ordered to transfer the property back to Krisjenn.

And we've heard this morning from the attorneys that they were unable to do that for whatever reason. I find it a little hard to believe that somebody else came in and grabbed the Krisjenn Ranch, LLC name and that it's not available. But, I mean, that could be true.

But in any event, it needs to come to DMA. So I'm going to direct Mr. Wright, Express H2O, Krisjenn Ranch, LLC, all the entities to take steps to transfer the right-of-way to DMA.

And then DMA takes it subject to the obligation to pay Mr. Wright the first $4.7 million in the event of sale or other monetization.

And after that obviously the 20 percent of DMA and Longbranch or Mr. Borders, whichever is appropriate, will continue as a charge against the land, a covenant running with the land.

So, Mr. Krist, will you prepare an order to that effect?

**MR. KRIST:** Yes, we will, Your Honor.

**THE COURT:** Okay. And let Mr. Germany and Mr. Muller see it before you submit it. And if there's any disagreement about the form of the order, they can email Deanna Castleberry.

And, you know, if you want to prepare your own form,

you can send it to Ms. Castleberry and I'll look at all of them. But I hope that it won't be controversial, the form of the order. Okay. So --

**MR. KRIST:** Understood, Your Honor.

**THE COURT:** -- order to come from Mr. Krist. The motion's granted.

**MR. SPEAKER:** Thank you, Your Honor.

**MR. KRIST:** Thank you, Your Honor.

**MR. GERMANY:** Thank you, Your Honor.

**THE COURT:** All right, gentlemen, --

**MR. GERMANY:** Are we excused?

**THE COURT:** Yes, sir. Feel free to drop off. We'll be in recess.

**(This proceeding was adjourned at 10:53 a.m.)**

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**February 7, 2025**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***